# EXHIBIT 5

1          CAUSE NO. DC-13-13771

2

3   GREG HARDIN the husband          IN THE DISTRICT COURT
    of LORI HARDIN and next
4   friend of BRADY HARDIN and
    ASHTON HARDIN, their children,
5   and ROBERT LEWIS and CAPI LEWIS,
    the parents of LORI HARDIN,
6
              Plaintiffs,          DALLAS COUNTY
7        vs.

8

9   LINCOLN PROPERTY COMPANY,

10            Defendant.           A-14th JUDICIAL
                                   DISTRICT
11

12

13

14

15

16  VIDEOTAPED
    DEPOSITION OF:   THOR A. WESTBY
17
    DATE:       July 17, 2014
18
    PLACE:      Radisson Hotel
19              201 Fifth Street North
                Fargo, North Dakota
20
    TIME:       9:02 a.m.
21
    REPORTED BY:  Paula D. Weber
22

23

24

25
                                        1

---

1              APPEARANCES

2   FOR THE PLAINTIFFS HARDIN and LEWIS:

3   Asafi Law Firm
    Attorneys at Law
4   PO Box 460082
    Houston, Texas 77056
5   By:  J. A. "Jay" Asafi
         Asafi@AsafiLawFirm.com
6

7   FOR THE DEFENDANT LINCOLN PROPERTY COMPANY:

8   Beirne Maynard & Parsons, L.L.P.
    Attorneys at Law
9   1700 Pacific Avenue - Suite 4400
    Dallas, Texas 75201
10  By:  Sawnie A. McEntire
         smcentire@bmpllp.com
11
         and
12
         D. Todd Parrish
13       tparrish@bmpllp.com
         (appearing by telephone - partial testimony)
14

15  FOR THE DEFENDANTS LINCOLN PROPERTY COMPANY and CAMP
    PENDLETON & QUANTICO HOUSING, LLC:
16
    Lewis Brisbois Bisgaard & Smith, PLLP
17  Attorneys at Law
    333 Bush Street - Suite 1100
18  San Francisco, California 94104
    By:  Ralph A. Zappala
19       Ralph.Zappala@lewisbrisbois.com

20

21

22

23

24

25
                                        2

---

1          APPEARANCES - CONTINUED

2   FOR THE WITNESS THOR WESTBY:

3   Levin, Papantonio, Thomas,
    Mitchell, Rafferty & Proctor, P.A.
4   Attorneys at Law
    PO Box 12308
5   316 South Baylen Street - Suite 600
    Pensacola, Florida 32502
6   By:  Christopher G. Paulos
         cpaulos@levinlaw.com

7

8   FOR THE PLAINTIFFS WESTBY:

9   Cotchett, Pitre & McCarthy, LLP
    Attorneys at Law
10  San Francisco Airport Office Center
    840 Malcolm Road
11  Burlingame, California 94010
    By:  Ara R. Jabagchourian
12       ajabagchourian@cpmlegal.com

13

14  FOR THE DEFENDANT ABC FIRE EXTINGUISHER CO. INC:

15  Burnham Brown
    Attorneys at Law
16  1901 Harrison Street - 14th Floor
    PO Box 119
16  Oakland, California 94604
17  By:  Lynn V. Rivera
         lrivera@burnhambrown.com
18       (appearing by telephone)

19

20  FOR JARSCO UTILITIES, INC.

21  Borton Petrini, LLP
    Attorneys at Law
21  95 South Market Street - Suite 400
22  San Jose, California 95113
    By:  Lynne L. Bentley
23       lbentley@bortonpetrini.com

24

25  Also present:  Jeff Anders - Videographer
                                        3

---

1              CONTENTS

2   THOR A. WESTBY                        PAGE

3       Examination by Mr. McEntire ..........    7
        Examination by Mr. Asafi .............   98
4       Examination by Mr. McEntire ..........  113

5

6

7   DEPOSITION        DESCRIPTION              PAGE
    EXHIBIT NO.
8   1          Deposition Notice ..........    5

9   2          Diagram of Coleville .......    5
               Housing Complex
10
    3          Floor Plan .................    5
11
    4          Diagram Building Type D2 ...    5
12
    5          Photo - Staff Nco Quarters..    5
13
    6          Photo - Gas Valve ..........   90
14

15

16

17

18

19

20

21

22

23

24

25
                                        4

## Page 5

```
 1              P R O C E E D I N G S
 2        (Whereupon, the deposition of THOR A. WESTBY
 3   commenced at 9:02 a.m. as follows:)
 4        (T. WESTBY EXHIBIT NO. 1-5 MARKED)
 5                    THOR A. WESTBY
 6        HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
     THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
 7     TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
 8              THE VIDEOGRAPHER:  We are now on the
 9   record.  This is the video recording of the
10   deposition of Thor Westby taken by the defendant's
11   attorney in the matter of Greg Hardin vs. Lincoln
12   Property Company in District Court of Dallas County,
13   Texas, A-14th Judicial District, Cause No.
14   DC-13-13771.
15              We are located at the Radisson Hotel in
16   Fargo, North Dakota.  Today's date is July 17th,
17   2014.  The time is 9:02 a.m.  The court reporter is
18   Paula Weber.  My name is Jeffrey D. Anders.  I'm the
19   videographer representing DepoTexas.
20              Will counsel for the respective parties
21   please identify yourselves starting with the
22   plaintiff's attorney.
23              MR. ASAFI:  Jay Asafi for Greg Hardin
24   and the parents of the decedent, Lori Hardin, and his
25   two children, Ashton and Brady.
```

## Page 6

```
 1              MR. McENTIRE:  Sawnie McEntire on
 2   behalf of the defendant Lincoln Property Company.
 3              MR. ZAPPALA:  Ralph Zappala also on
 4   behalf of the Lincoln Property Company and Quantico
 5   Pendleton Properties, LLC.
 6              MR. PAULOS:  Chris Paulos on behalf of
 7   the witness, Thor Westby.
 8              MS. BENTLEY:  Lynne Bentley on behalf
 9   of Jarsco Utilities, Incorporated.
10              MR. JABAGCHOURIAN:  Ara Jabgchourian on
11   behalf of the Westby family.
12              MR. McENTIRE:  And the people on the
13   telephone, could you identify yourself, please.
14              MR. PARRISH:  Certainly.  This is Todd
15   Parrish on behalf of Lincoln Property Company in the
16   Hardin litigation.
17              MS. RIVERA:  Lynn Rivera with Burnham
18   Brown on behalf of ABC Fire Extinguishers.
19              MR. McENTIRE:  Anyone else?  Okay.
20              THE VIDEOGRAPHER:  Okay.  Thank you.
21   And, Mr. Westby, you may remain seated and the court
22   reporter will swear you in.
23              Please swear the witness.
24
25
```

## Page 7

```
 1                    THOR A. WESTBY
 2        HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
     THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
 3     TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:
 4              MR. McENTIRE:  Very briefly for the
 5   purposes of the record, for purposes of this
 6   deposition we've agreed to limit the examination to
 7   three and a half hours.  I will take approximately
 8   two hours initially, Mr. Asafi will take between an
 9   hour and an hour and 15 minutes, and then I may have
10   10 or 15 minutes of follow-up.
11              It's my understanding that the only
12   attorneys who will be asking questions or otherwise
13   participating verbally in this deposition will be
14   myself on behalf of the defendant in the Hardin
15   litigation, Mr. Asafi on behalf of the plaintiffs,
16   and of course you, Chris, on behalf of the witness.
17   Is that --
18              MR. PAULOS:  That's correct.
19              MR. McENTIRE:  The deposition will be
20   taken under the Texas rules, which means that all
21   objections except as to form, responsiveness, and
22   leading are preserved.  Okay.
23                      EXAMINATION
24   BY MR. McENTIRE:
25        Q.   Mr. Westby, would you state your name
```

## Page 8

```
 1   for the record, please.  ·
 2        A.   Thor Andrew Westby.
 3        Q.   Mr. Westby, have you ever had your
 4   deposition taken before?
 5        A.   No.
 6        Q.   All right.  Before you came here you
 7   had an opportunity to meet with your counsel?
 8        A.   Yes.
 9        Q.   Okay.  And you're represented by two
10   lawyers here today.  Is that correct?
11        A.   Yes.
12        Q.   Okay.  During the course of the
13   deposition if you'd like to adjourn for any reason
14   and talk to your lawyers, let me know and I'll
15   certainly extend you that courtesy.
16        A.   Yes.
17        Q.   It's very important that when we leave
18   here today you feel comfortable that you understood
19   my questions.  Okay?
20        A.   Yes.
21        Q.   So I would ask you if at any time you
22   do not understand one of my questions, do your best
23   to stop me and tell me so and I'll try to rephrase.
24        A.   Okay.
25        Q.   That way when we leave here today all
```

1  the answers -- we need to assume that you understood
2  the questions and you gave the answers to the best of
3  your ability. Is that fair?
4        A.    Yes.
5        Q.    Okay. One last request. I speak very
6  fast for a couple reasons. One, I'm from Texas; the
7  other, I'm under a time limit. The court reporter is
8  going to have trouble if we interrupt each other, so
9  I'd ask you to let me finish my question and then you
10 answer, and I'll do my best not to interrupt you.
11       A.    Okay.
12       Q.    Fair enough. Okay. How old a man are
13 you?
14       A.    Thirty-eight.
15       Q.    What is your current address?
16       A.    600 Pacific Avenue, Campbell,
17 Minnesota.
18       Q.    Okay. Are you still in the military?
19       A.    Yes.
20       Q.    Okay. And what is your rank?
21       A.    E6.
22       Q.    And what does that mean?
23       A.    I don't understand.
24       Q.    What are your responsiblities?
25       A.    Leading Marines and sailors.

1        Q.    Okay. In what capacity? In combat?
2  Do you have a particular area of specialty?
3        A.    Medicine.
4        Q.    Medicine. Do you have a medical
5  background?
6        A.    Yes.
7        Q.    Okay. Very briefly, what is your
8  medical background?
9        A.    As far as schooling?
10       Q.    Yes, sir.
11       A.    Medical schooling, Corpsman A School in
12 San Diego and then high altitude medicine.
13       Q.    Okay. Are you a doctor?
14       A.    No.
15       Q.    Are you a physician's assistant?
16       A.    No.
17       Q.    Do you know how to provide emergency
18 medical services?
19       A.    Yes.
20       Q.    Okay. And did you have this same type
21 or similar medical training before the incident
22 that's involved in this case?
23       A.    Yes.
24       Q.    Let's have a couple of defined terms.
25 Incident, when I refer to the incident I'm referring

1  to the explosion, the fire that occurred on
2  February 3rd, 2012.
3        A.    Yes.
4        Q.    At the Coleville military housing
5  complex.
6        A.    Yes.
7        Q.    Okay. You understand that that's why
8  you're here today is to give testimony based upon
9  your knowledge of what happened that day and events
10 leading up to that day.
11       A.    Yes.
12       Q.    Okay. All right. So prior to the date
13 of the event you had medical training and medical
14 expertise.
15       A.    Yes.
16       Q.    You're married to Celeste Westby?
17       A.    Yes.
18       Q.    Is she the only wife you've ever had?
19       A.    Yes.
20       Q.    Okay. How many children do you have
21 with Ms. Westby?
22       A.    One.
23       Q.    Okay. And that child's name is what?
24       A.    Talon.
25       Q.    Talon. And how old is Talon today?

1        A.    Today he is 13.
2        Q.    Thirteen. So at the time he would have
3  been roughly ten years old.
4        A.    Roughly.
5        Q.    Okay. Do you have any other children?
6        A.    A stepdaughter.
7        Q.    What is the stepdaughter's name?
8        A.    Jacqueline.
9        Q.    Okay. Do you just have the one
10 stepdaughter?
11       A.    Yes.
12       Q.    And that would be your wife's daughter
13 by a prior marriage?
14       A.    Yes.
15       Q.    How many prior marriages has your wife
16 had?
17       A.    Just one.
18       Q.    Okay. Did that end in a divorce?
19       A.    Yes.
20       Q.    Okay. And where does Jacqueline live
21 today?
22       A.    Sacramento, California.
23       Q.    Okay. What is her last name?
24       A.    Jones-Side.
25       Q.    How do you spell Side?

1      A.    S-i-d-e.

2      Q.    S-i-d-e.  Jones-Side.  Okay.  When is

3 the last time you saw Jacqueline?

4      A.    The day we left Sacramento for here.

5      Q.    Okay.  And how long ago was that?

6      A.    Roughly a year and a half.

7      Q.    Is she married?

8      A.    No.

9      Q.    Do you know her address?

10     A.    No.

11     Q.    Do you keep in contact?

12     A.    Yes.

13     Q.    By telephone?

14     A.    By telephone.

15     Q.    Have you been promoted since the date

16 of the event?

17     A.    No.

18     Q.    Do you hold the same rank?

19     A.    Yes.

20     Q.    How tall are you?

21     A.    6-foot-2.

22     Q.    And how much do you weigh?

23     A.    Approximately 195 pounds.

24     Q.    Did you have the same weight at the

25 time of the incident, roughly?

---

1      A.    I was a little lighter.  185, 195.

2      Q.    185 to 195?

3      A.    Yeah.

4      Q.    Are you on any medication today?

5      A.    No.

6      Q.    Were you on any medication at the time

7 of the incident?

8      A.    No.

9      Q.    Okay.  Have you ever been on any type

10 of medication for any type of systemic health

11 condition?

12     A.    Can you clarify?

13     Q.    Any type -- any prescribed medication

14 because of a health problem or health condition other

15 than, you know, flu, taking a couple aspirin.

16     A.    To the best of my knowledge, no.

17     Q.    Okay.  All right.  Do you have any

18 significant allergies?

19     A.    No.

20     Q.    Is there anything from your perspective

21 that impacts or impedes your ability to smell?

22     A.    No.

23     Q.    Okay.  Was there anything that impacted

24 or impeded your ability to smell back on the date of

25 the incident?

---

1      A.    No.

2      Q.    Your wife, Celeste, prior to the

3 incident was she on any medication to your knowledge?

4      A.    To my knowledge, no.

5      Q.    Okay.  Did she have any systemic health

6 condition, ongoing health problems or condition prior

7 to the date of the incident?

8      A.    To my knowledge, no.

9      Q.    To your knowledge was there anything

10 that impacted her physically, impeded her ability to

11 smell on the date of the incident?

12     A.    No.

13     Q.    The event -- first of all, let me hand

14 you what has been marked as Deposition Exhibit No. 1.

15 I don't know if you've seen this before.  You can

16 look at it.  This is simply a deposition notice.

17 Have you seen this before?

18     A.    No.

19     Q.    Okay.  This is a -- simply a lawyer

20 type paper, lawyer-generated paper that schedules

21 this deposition, all right?  You have to say yes or

22 no.

23     A.    Yes.

24     Q.    Okay.  And the significance is you

25 understand you're giving your deposition in a case in

---

1 which you are not a plaintiff.

2      A.    Yes.

3      Q.    You have a separate lawsuit that is

4 currently pending in California.  Do you understand

5 that?

6      A.    Yes.

7      Q.    You understand that you have sued my

8 client, Lincoln Property Company, in that lawsuit.

9      A.    Yes.

10     Q.    Okay.  So I guess in that sense we're

11 kind of adverse to each other.  Doesn't mean I don't

12 have to be nice to you but we're adverse.  You

13 understand that.

14     A.    Yes.

15     Q.    Okay.  All right.  So do you know Greg

16 Hardin?

17     A.    Yes.

18     Q.    Have you talked to Greg Hardin since

19 this incident?

20     A.    No.

21     Q.    Has Greg Hardin reached out to you and

22 talked to you since this incident?

23     A.    I have not spoken with him.

24     Q.    Okay.  Have you spoken to any member of

25 the Hardin family since this incident?

1      A.   No.

2      Q.   Is there any reason why you haven't

3 reached out to him to talk to him?

4      A.   No.

5      Q.   Do you know whether Celeste has talked

6 to Greg Hardin at all?

7      A.   To the best of my knowledge, no.

8      Q.   Okay.  You lived -- I'm going to hand

9 you what has been marked as Exhibit No. 2.  I'll give

10 a copy to both Mr. Asafi and counsel.  This is simply

11 a diagram of the Coleville military facilities.  Does

12 it look generally familiar?

13      A.   Yes.

14      Q.   Have you ever seen something similar to

15 this before?

16      A.   Similar.

17      Q.   Okay.  You lived on Champagne Avenue,

18 correct?

19      A.   Yes.

20      Q.   Okay.  And I have here 702 --

21      A.   Yes.

22      Q.   -- as the address.  I'm going to hand

23 that to you, and I'm going to give you a highlighter,

24 and I'm going to ask you to highlight where you lived

25 on Exhibit No. 2.

                                                    17

---

1           THE VIDEOGRAPHER:  Excuse me.

2 Mr. McEntire, can I just have you move your

3 microphone up a little higher?  Thank you.  It's just

4 rubbing on the jacket is all.

5      Q.   (Mr. McEntire continuing)  Okay.  You

6 lived in unit 702-A as reflected on Exhibit 2.  Is

7 that correct?

8      A.   Yes.

9      Q.   702-A Champagne.  And that was

10 immediately adjacent to the Hardins'.

11      A.   Yes.

12      Q.   And the Hardins lived in unit 702-B.

13      A.   Yes.

14      Q.   Okay.  Did you ever have dinner at the

15 Hardins' house?

16      A.   No.

17      Q.   How long had you lived at 702-A?

18      A.   Approximately two and half years.

19      Q.   Okay.  And I believe the Hardins moved

20 into 702-B sometime in the summer, midsummer of 2011.

21 Does that sound generally --

22      A.   About right.

23      Q.   And so during the roughly eight or

24 nine, seven or eight months that they had lived

25 there, you never had dinner with them?

                                                    18

---

1      A.   Not dinner, no.

2      Q.   Okay.  Did you ever have them over to

3 your house?

4      A.   They had come over a couple of times

5 just outside, front yard.

6      Q.   Did you ever ask them to come into your

7 house for social purposes?

8      A.   They -- I cannot remember having them

9 come in.

10      Q.   Okay.  All right, sir.  Would you also

11 highlight the community center for me on Exhibit

12 No. 2.

13      A.   (Witness complies).

14      Q.   The community center had athletic

15 facilities.  And what else was there?

16      A.   There was a gym, pool table, basketball

17 courts.

18      Q.   All right.  How long had you lived --

19 you lived at 702-A Champagne for roughly two and a

20 half years before the incident.

21      A.   Yes.

22      Q.   Okay.  Did you all change any of the

23 appliances?  Let me identify what I mean by

24 appliances.  During the two and a half years that you

25 lived there, did you have the same stove or was it a

                                                    19

---

1 new stove?  To the best of your knowledge.

2      A.   To the best of my knowledge, same

3 stove.

4      Q.   Same thing with the hot water heater,

5 did you ever replace the hot water heater during the

6 two and a half years that you were there?

7      A.   I did not replace anything, no.

8      Q.   Okay.  So to your recollection you

9 didn't change out any appliances.

10      A.   I did not change out any appliances.

11      Q.   Are you aware of any appliances being

12 changed out by anyone connected with the facility at

13 your home, specifically your home?

14      A.   I'm not aware of it.

15      Q.   Okay.  Who actually lived in 702-A at

16 the time of the incident?  Who was residing there?

17      A.   Myself, my wife, and my son.

18      Q.   Okay.  Where was Jacqueline?  Was she

19 living at the house?

20      A.   No.

21      Q.   Has she ever lived at the house?

22      A.   Yes.

23      Q.   When did she move out?

24      A.   Christmas of the year prior.

25      Q.   Okay.  How old was she at that time?

                                                    20

1    A.    Approximately 16.

2    Q.    Okay.  Where did she move to?

3    A.    Oxnard.

4    Q.    With her biological father?

5    A.    Biological father.

6    Q.    Was there friction or any kind of

7  problems between Jacqueline and your wife, Celeste?

8    A.    Yes.

9    Q.    Okay.  Were they serious issues?

10   A.    No.  Typical teenager stuff.

11   Q.    Okay.  Who made the decision that

12  Jacqueline should leave: Jacqueline or your wife?

13   A.    It was mutual.

14   Q.    Mutual decision.  Was Jacqueline at

15  home -- was Jacqueline at 702-A Champagne on the day

16  of the incident?

17   A.    No.

18   Q.    Was your son, Talon, at the house when

19  the incident actually occurred?

20   A.    No.

21   Q.    Okay.  He was at a friend's house.  Is

22  that correct?

23   A.    Yes.

24   Q.    Okay.  So the only two individuals in

25  your unit at the time of the incident were yourself

1  and your wife.

2    A.    Yes.

3    Q.    How long have you been in the Marines?

4    A.    I'm not in the Marines.

5    Q.    And I apologize.  What branch of the

6  service are you in?

7    A.    The US Navy.

8    Q.    Okay.  I apologize.  How long have you

9  been in the Navy?

10   A.    Current date, 19 years in a couple of

11  days.

12   Q.    Okay.  And how old are you?  Did you

13  say you were 38?

14   A.    Thirty-eight.

15   Q.    So you went in directly out of high

16  school?

17   A.    Within months after high school, yes.

18   Q.    Okay.  And when did you start making

19  your -- developing your specialty area in the area of

20  medicine?

21   A.    Directly after boot camp.

22   Q.    Okay.  And when you say that's your

23  specialty, do you -- are you to provide combat type

24  medicine?  Is that a combat medicine practice or is

25  it something else?

1    A.    Combat type medicine.

2    Q.    Okay.  Have you been involved in

3  combat?

4    A.    Yes.

5    Q.    Okay.  What other locations,

6  particularly in combat areas, have you been

7  stationed?

8    A.    Iraq.

9    Q.    Okay.  Recently?

10   A.    2007 to 2009 I believe.

11   Q.    2007 to 2009.  Are you familiar with

12  the smell of propane?

13   A.    Yes.

14   Q.    What does propane smell to you?  What

15  does it -- describe the smell.

16   A.    Rotten eggs.

17   Q.    Okay.  Kind of a sour, acidic rotten

18  egg smell like sulfur?

19   A.    Rotten eggs.

20   Q.    Rotten eggs.  Bad smell.  Would you

21  agree?

22   A.    I agree.

23   Q.    It's a noticeable smell.

24   A.    Yes.

25   Q.    If you smell it, it's kind of open and

1  obvious when your senses hit it.

2    A.    Yes.

3    Q.    And I guess you've been around propane

4  off and on during the course of your service?

5    A.    Yes.

6    Q.    Describe for me -- set aside the issue

7  of the fuel at your home.  What other times or

8  occasions have you been exposed to propane, used it?

9    A.    Barbecue grill.

10   Q.    Fair enough.

11   A.    That's about it.

12   Q.    Okay.  Did you have a barbecue grill at

13  702 Champagne?

14   A.    Yes.

15   Q.    Was it a propane-fueled barbecue grill?

16   A.    Yes.

17   Q.    Where did you keep it?

18   A.    On the back porch.

19   Q.    Okay.  I'm going to get to that --

20  well, might as well do it right now.  I'm going to

21  hand you what has been marked as Exhibit 3, which is

22  a diagram of the type of unit that you lived in

23  I believe.  If you could verify that for me.  Have

24  you ever seen a document that looks like this before?

25   A.    No.

Q. Okay. It represents a duplex. Do you
see? Two garages adjoined. Is that correct?

A. Yes.

Q. And that is -- is that similar to the
configuration that you had at 702-A and 702-B
Champagne?

A. Seems to be, yes.

Q. Okay. In fact I'm going to hand you
what has been marked as Exhibit 5, which is simply a
photograph of an exemplar duplex. Do you see that?

A. Yes.

Q. In this instance you would have lived
on the left-hand side of the duplex and the Hardin
family would have lived on the right.

A. Yes.

Q. Okay. And so Exhibit 3 is like an
engineering or a diagram of what Exhibit 5 is.
Agreed?

A. Agreed.

Q. Okay. Show me where you kept your
barbecue grill and highlight it. That's 702-B, isn't
it?

A. This is A, right?

Q. That would be 702-A because you're
looking at the garage. See the garage?

A. I see.

Q. Let me make sure. I don't want to mess
you up because everybody wants to have a -- here's
your front door entry.

A. It would be on the back side of
this one closet there.

Q. Okay. Was it outside on the patio
where you -- in fact let's do this. That's kind of a
faint yellow. Would you draw a circle where you kept
your barbecue grill on Exhibit 3.

A. (Witness complies).

Q. Who did the barbecuing in your family?
You?

A. Me.

Q. Okay. When was the last time that you
filled your barbecue tank, fuel tank?

A. I do not recall.

Q. Okay. Was it outside on the day of the
incident?

A. I do not recall.

Q. Okay. If it wasn't outside -- because
it was in the winter, it was February. You recall
that.

A. Yes.

Q. Not typical barbecuing weather when

it's 28 degrees outside. Do you agree with that?

MR. PAULOS: Object to form.

Q. (Mr. McEntire continuing) Would you
agree with that?

A. Yes.

Q. Okay. You don't typically barbecue
when it's 28 degrees outside, do you?

A. Depends on the day, but it's possible.

Q. It's possible. Were you barbecuing on
that day?

A. No.

Q. If you didn't have it out on the patio,
where would it be? In the garage?

A. The barbecue grill?

Q. Yes, sir.

A. The barbecue grill would be on the
patio.

Q. It would have been -- was it on the
patio on the date of the incident?

A. I do not recall.

Q. Okay. If it wasn't on the patio, where
would it have been? Where would you have stored it?

A. I wouldn't have stored it anywhere
else. It would have been on the patio.

Q. Okay. Fair enough. That's basically

what I was after. Let me hand you what has been
marked as Exhibit No. 4. I'm kind of breaking this
down into component parts. Exhibit No. 4 is a
drawing of what your house or your residence looked
like. Does that look generally familiar?

A. Generally, yes.

Q. Okay. You have the garage on the
right-hand side, you have the entryway, you have your
family room. You see the utility room, kitchen, and
master bedroom?

A. Yes, sir.

Q. Okay. I want to talk about this
exhibit for a little bit. Other than the stove, the
hot water heater, and the furnace, did you have any
other appliances -- and your barbecue grill, did you
have any other appliances or -- well, appliances that
were propane fueled in your house?

A. To the best of my knowledge, no.

Q. Okay. You had a washer and a dryer in
your house.

A. I did.

Q. That was electric?

A. It was electric to the best of my
knowledge.

Q. Did you buy that yourself?

1    A.  Yes, we did.

2    Q.  Okay.  Where did you buy it?

3    A.  Best Buy.

4    Q.  When did you buy it?

5    A.  The December prior, so December of

6 2010.  Is that the year prior?

7    Q.  So it would be a year and two months

8 before.

9    A.  Yes.

10    Q.  Okay.  Who connected it?

11    A.  Best Buy.

12    Q.  Best Buy came out.

13    A.  Yes.

14    Q.  And they're the ones who connected it.

15    A.  Yes.

16    Q.  And that was both the washer and the

17 dryer.

18    A.  Yes.

19    Q.  Did you ever manipulate or move the

20 washer and dryer at any time after it was installed?

21    A.  No.

22    Q.  Who actually -- was there a gas dryer

23 there before?

24    A.  No.

25    Q.  What was there before?

1    Q.  Best Buy removed that too.  So if

2 anybody was manipulating or adjusting any of the

3 connections behind the washer and dryer, did you do

4 that?

5    A.  No.

6         MR. PAULOS:  Object to form.

7    Q.  (Mr. McEntire continuing)  Who would

8 have done that?  Best Buy?

9    A.  Best Buy.

10    Q.  Did you ever move the washer and dryer

11 once it had been installed --

12    A.  No.

13    Q.  -- by Best Buy?  Let me finish my

14 question.  After it had been installed by Best Buy.

15    A.  No.

16    Q.  Where was the Best Buy location that

17 you bought this washer and dryer?

18    A.  Carson City, Nevada.

19    Q.  Okay.  And you say your in-laws bought

20 it?

21    A.  Yes.

22    Q.  Do you have any idea what the model

23 number would have been?

24    A.  No.

25    Q.  Do you remember the manufacturer make?

1    A.  Electric.

2    Q.  It was always electric.

3    A.  Always an electric.

4    Q.  Was the electric dryer removed because

5 it broke down or what happened?

6    A.  Because they were old.

7    Q.  Fair enough.  So you went out to

8 Best Buy and bought a new one.

9    A.  Actually my in-laws bought us new ones.

10    Q.  Fair enough.  And Best Buy connected

11 it.

12    A.  Yes.

13    Q.  And were you the ones -- did you --

14 okay.  There was enough -- back up.  Make sure the

15 record's clear.  Did you remove the washer and dryer?

16    A.  No.

17    Q.  When you -- how long -- did you just

18 have an empty space there?  You went and bought a new

19 washer and dryer.

20    A.  Yes.

21    Q.  There wasn't a washer/dryer already

22 there.

23    A.  There was.

24    Q.  There was.  Who removed that?

25    A.  Best Buy.

1    A.  LG.

2    Q.  LD?

3    A.  LG.

4    Q.  LG.  Okay.  All right.  So the washer

5 and dryer is electric, but the stove, the hot water

6 heater, and the furnace you understood were propane

7 fueled.

8    A.  Yes.

9    Q.  Starting at any time before the date of

10 the incident on February 3rd, 2012, did you ever have

11 any problems with your stove?

12    A.  Not to my knowledge.

13    Q.  Did you ever smell propane coming from

14 your -- other than when you were lighting -- lighting

15 the stovetop burners, did you ever smell any propane

16 in or around the stove?

17    A.  Not to my knowledge.

18    Q.  Same question with regard to the hot

19 water heater.  Did you ever smell propane around the

20 hot water heater?

21    A.  No.

22    Q.  Same thing with regard to the -- and

23 you know what propane smells like so if you had

24 smelled it it would have been apparent to you,

25 correct?

1    A.   Yes.

2    Q.   Did you smell any propane around the

3 furnace?

4    A.   No.

5    Q.   Who did the cooking typically in your

6 house?

7    A.   It was mutual.

8    Q.   Okay.  There were some meals that you

9 cooked, some meals that your wife cooked?

10    A.   We like to share like cooking together.

11    Q.   Fair enough.  So you like to cook.

12    A.   Yes.

13    Q.   So you were familiar with the stove and

14 you were familiar with how to use it.

15    A.   Yes.

16    Q.   Okay.  And you'd used it frequently.

17         MR. PAULOS:  Object to form.

18    A.   Yes.

19    Q.   (Mr. McEntire continuing)  All right.

20 How did the stove operate?  Did you turn the gas on

21 and you'd light a match and light the flame?  How did

22 it work if you recall?

23    A.   Turned the stove on all the way and it

24 would click, electric igniter, and then you turn it

25 to the setting you want it at.

33

1    Q.   You all like it a little cooler then.

2    A.   (Nods head).

3    Q.   Okay.  So you wouldn't put it up at 72

4 or 73 or anything like that?

5    A.   No.

6    Q.   68 would be the tops?

7    A.   On any given day, yes.

8    Q.   Okay.  On any given day.  Any reason to

9 believe that that was not the thermostat setting on

10 the day of the incident?

11    A.   No.

12    Q.   Okay.  Was your house reasonably

13 comfortable with heat --

14    A.   Yes.

15    Q.   -- even though it was cold outside?

16    A.   Yes.

17    Q.   We're up in the mountains, right?

18    A.   Yes.

19    Q.   Okay.  So it can get pretty chilly up

20 there.

21    A.   Yes.

22    Q.   And it had been very cold during

23 periods of time before the incident, correct?

24    A.   Yes.

25    Q.   And you don't recall any problem with

35

1    Q.   Okay.  So there was no external fire

2 source you needed.  It was an electric ignition.

3    A.   Yes.

4    Q.   Okay.  Prior to the date of the

5 incident, and I'm asking you to kind of go back a

6 couple years now, generally speaking would you have

7 used the stove within the day or two days or three

8 days before the incident --

9         MR. PAULOS:  Object to form.

10    Q.   -- as a general proposition?

11    A.   Yes.

12    Q.   (Mr. McEntire continuing)  Okay.  And

13 during that two- or three-day period before the

14 incident you didn't smell any propane?

15    A.   No.

16    Q.   Okay.  It was cold outside on the date

17 of the incident.  Do you recall that it was roughly

18 below freezing?

19    A.   Had been.

20    Q.   Okay.  And presumably you had your

21 furnace on.

22    A.   Yes.

23    Q.   Where did you typically keep your

24 thermostat?

25    A.   65 to 68.

34

1 the heating, do you?

2    A.   No.

3    Q.   Do you recall any inability to generate

4 a comfortable heating level in the house?

5    A.   No.

6    Q.   Up through and including the date of

7 the incident, any problems at all that you can

8 remember?

9    A.   Not that I can recall.

10    Q.   Okay.  Do you ever recall the smell of

11 propane around the furnace?

12    A.   No.

13    Q.   Did your wife ever remark to you that

14 she thought she smelled propane?

15    A.   Not to my knowledge.

16    Q.   Based upon your memory, did your wife

17 ever tell you that she had smelled propane in or

18 around the hot water heater or the furnace?

19    A.   No.

20    Q.   Same question with regards -- she ever

21 tell you that she had smelled propane around the

22 stove?

23    A.   No.

24    Q.   Did you have any problems keeping the

25 pilot -- there's a flame, a pilot, inside the hot

36

1 water heater. Did you ever have any problems keeping
2 the pilot lit on the hot water heater?
3    A. No.
4    Q. Did you ever have any problems keeping
5 the pilot lit on the furnace?
6    A. No.
7    Q. Did you ever have any problems keeping
8 the pilot lit in the -- on the stove?
9    A. I didn't know there was a pilot on the
10 stove.
11    Q. Okay. But no issues there though --
12    A. No.
13    Q. -- to your knowledge. All right.
14 Bottom line is up through the date of the incident
15 you had no problems with your appliances in doing
16 what they were supposed to do, correct?
17    A. No.
18       MR. PAULOS: Object to form.
19    Q. (Mr. McEntire continuing) The stove
20 cooked properly. Agreed?
21    A. Yes.
22    Q. Never smelled any propane.
23    A. Yes.
24    Q. My understanding is correct.
25    A. I had not.

1    Q. You did not smell it.
2    A. No.
3    Q. Same question with regard to the
4 furnace. From all indications the furnace operated
5 correctly?
6    A. Yes.
7    Q. Kept your house warm.
8    A. Yes.
9    Q. Based upon your comfort desires.
10    A. Yes.
11    Q. No problems with the pilot light,
12 correct?
13    A. That's correct.
14    Q. And you didn't smell any propane in or
15 about the furnace.
16    A. No.
17    Q. Same question with regard to the hot
18 water heater. You presumably take showers every day
19 when you're at home, right?
20    A. Yes.
21    Q. You don't take cold showers.
22 Presumably you take hot showers.
23    A. Yes.
24    Q. So -- and your kids take baths every
25 day.

1    A. Yes.
2    Q. I'm sorry. Talon, he takes his bath or
3 shower every day.
4    A. Yes.
5    Q. He never complained to you that he
6 couldn't get hot water, did he?
7    A. No.
8    Q. Okay. And so no problems at all with
9 any of the appliances at any time up through and
10 including the time of the incident to your knowledge.
11    A. To my knowledge, no.
12    Q. Okay. I'd like to talk a little bit
13 about Exhibit No. 4 again. Would you take the
14 highlighter and highlight and draw a circle around
15 the utility room.
16    A. (Witness complies).
17    Q. And why don't you take my pen so make
18 sure it comes out extra clear.
19    A. (Witness complies).
20    Q. All right. What's in the utility room?
21    A. A washer/dryer, a hot water heater, and
22 a furnace. Central air.
23    Q. Now what kind of cars -- do you all
24 park your cars in the garage or out on the driveway?
25    A. Out on the driveway.

1    Q. Okay. What did you use the garage for?
2 Just storage?
3    A. Storage.
4    Q. Okay. So you never parked your car in
5 there.
6    A. Once in a blue moon, yes.
7    Q. Okay. Fair enough. But at any time
8 relevant to this incident, the week, two weeks
9 before, did you ever park your --
10    A. No.
11    Q. What kind of car do you have just out
12 of curiosity?
13    A. It was a -- it was a Chrysler Aspen.
14    Q. Okay. Is that an SUV?
15    A. SUV.
16    Q. All right. And is that what you drove
17 or is that one car for both of you?
18    A. We had other cars, but we typically
19 drove just that one.
20    Q. Okay. And the other cars were just on
21 the street?
22    A. Yeah.
23    Q. Okay. There's a door leading from the
24 garage to the utility room. Do you see that?
25    A. Yes.

1    Q.   Was the garage air conditioned with
2  heating and air conditioning?
3    A.   No.
4    Q.   So in order to keep your house warm
5  you would have shut -- always kept that door to the
6  garage shut.
7    A.   Yes.
8    Q.   Would that door to the garage have been
9  shut on the date of the incident?
10   A.   To the best of my knowledge.
11   Q.   Can you identify any reason why it
12 would have been open?
13   A.   No.
14   Q.   I understand sometimes that you'd go
15 out there into the garage and smoke cigarettes.
16   A.   Occasionally.
17   Q.   Do you still smoke?
18   A.   Yes.
19   Q.   Okay.  You didn't smoke in the house.
20 Is that correct?
21   A.   No.
22   Q.   So if you did smoke, you either went
23 outside or you went into the garage.
24   A.   Yes.
25   Q.   Did you have an ashtray in the garage?

1    A.   Yes.
2    Q.   Okay.  There's some indication that you
3  actually smoked a cigarette at some point in time
4  shortly before this -- the explosion.  Do you recall
5  that?
6    A.   I do not recall it, but, yes, --
7    Q.   Okay.
8    A.   -- it's very possible.
9    Q.   Very possible.  And would you have
10 smoked the cigarette in the garage?
11   A.   Most likely.
12   Q.   Okay.  And presumably, since it was
13 cold outside, you would have come back in and shut
14 the door.
15   A.   Yes.
16   Q.   Another reason to shut the door is you
17 didn't want cigarette smoke in the house.
18   A.   Yes.
19   Q.   Okay.  Because neither one of you, you
20 or your wife, wanted cigarette smoke in the house.
21   A.   No.
22   Q.   Okay.  So would be fair to say that the
23 door to the garage was shut?
24   A.   Yes.
25   Q.   Okay.  There's another door from the

1  utility room into the main living area, correct?
2    A.   Yes.
3    Q.   Did you typically keep that door shut
4  too?
5    A.   No.
6    Q.   That door was typically open.
7    A.   Typically.
8    Q.   Okay.  That's because people would be
9  going back and forth through there?
10   A.   To the laundry room, yes.
11   Q.   Okay.  So to summarize where we are
12 now, the door to the garage from the utility room
13 would be typically shut but the door from the utility
14 room to the living quarters, right here into the
15 hallway directly to the left of the utility room --
16 in fact would you draw a circle around that?  In fact
17 draw a circle around the garage utility room door and
18 put a number 1 there.
19   A.   (Witness complies).
20   Q.   Okay.  Put a circle around the door to
21 the -- put a number 2.  Put a circle around the
22 bedroom door, master bedroom door, circle 3.
23   A.   (Witness complies).
24   Q.   Okay.  If I understand you correctly,
25 on the date of the incident at the time of the

1  incident it would be your best understanding that
2  door number 1 would be closed.
3    A.   Yes.
4    Q.   Door number 2 would have been open.
5    A.   Very possible.
6    Q.   Is it likely based upon your
7  recollection?
8    A.   Very likely.
9    Q.   Based upon your family's practices.
10   A.   Yes.
11   Q.   Door number 3 -- I understand your wife
12 was feeling ill that day.
13   A.   Yes.
14   Q.   And she had gone to bed earlier in the
15 day, correct?
16   A.   Yes.
17   Q.   Okay.  Would it have been most likely
18 that door number 3 would have been shut because she
19 wanted quiet?
20   A.   No.  It would have been propped open
21 just 2 inches so I could hear her call me.
22   Q.   Okay.  Do you recall that actually
23 happening?
24   A.   No, but that's our common practice.
25   Q.   Okay.  So you rarely closed the bedroom

1  door, the number 3, completely.  You would have left
2  it somewhat ajar.
3       A.   Somewhat ajar.
4       Q.   What about the other doors in the
5  house, would they have been open or shut as your
6  typical practice to the other bedrooms?
7       A.   Open.
8       Q.   Always open?
9       A.   Uh-huh.
10      Q.   Okay.  There were some intake vents in
11 the utility room.  Do you recall that?
12      A.   No.
13      Q.   Okay.  You don't know whether there
14 were any vents in the utility room?
15      A.   I don't.
16      Q.   Okay.
17      A.   I don't recall there being anything
18 else in there.
19      Q.   Okay.  When was the last time you had
20 been up in the attic?  This particular 702-A has an
21 attic, does it not?
22      A.   I would not likely go in the attic.
23      Q.   Did you ever go in the attic?
24      A.   I can't say that I would have.  There's
25 no reason for me to be up there.
                          45

1       Q.   Do you have any recollection of going
2  into the attic?
3       A.   I do not have any recollection of going
4  into the attic.
5       Q.   Did you store anything in the attic?
6       A.   To the best of my knowledge, no.
7       Q.   Where is the attic access?  Where is
8  it?  Is it a stairs or is it just a little portal?
9       A.   It's a portal, and it's in the utility
10 room.
11      Q.   Have to get a ladder and crawl up in
12 the attic space.
13      A.   Yes.
14      Q.   Okay.  Were there any workers who
15 worked in the attic space within the two to three
16 weeks before the incident?
17      A.   There were workers.  I don't recall the
18 date though.
19      Q.   Do you understand what they were doing
20 up in the attic?
21      A.   No.  I wasn't home.
22      Q.   Okay.  This is what your wife advised
23 you?
24      A.   My wife had told me.
25      Q.   So you understand there were workers at
                          46

1  your house, but you did not personally see them.
2       A.   I did not see them.
3       Q.   And you didn't personally engage or
4  talk to them.
5       A.   No, I did not.
6       Q.   And you don't know precisely what they
7  were doing.
8       A.   No, I do not.
9       Q.   Did you have any problems with your
10 fire sprinklers?
11      A.   To the best of my knowledge, no.
12      Q.   Okay.  Did you ever have any problems
13 with your carbon monoxide detectors?
14      A.   To the best of my knowledge, no.
15      Q.   Okay.  When you turned the lights on in
16 the utility room, where is the light switch, do you
17 remember?  This is I know pretty detailed stuff, but
18 if you can remember, let me know.  Do you?
19      A.   It would just be a guess.  On the
20 right-hand wall.
21      Q.   Near the garage?
22           MR. PAULOS:  Make sure you're not
23 guessing to questions that he asks you.
24      A.   Yeah, I don't know.
25      Q.   (Mr. McEntire continuing)  Okay.  Yeah,
                          47

1  and this is something I could independently determine
2  and verify.  I'm simply asking for purposes of my
3  next series of questions whether you did recall.  You
4  don't recall?
5       A.   I don't know.
6       Q.   Do you recall that when you turned on
7  the switch a fan would go on?
8       A.   No, I do not recall.
9       Q.   Okay.  One way or the other?
10      A.   One way or the other.
11      Q.   Fair enough.  Do you and your wife ever
12 go camping?
13      A.   Me and my wife have never been camping.
14      Q.   Okay.  So you don't have any camping
15 gear that might use propane like propane cylinders or
16 little stoves or portable stoves or anything like
17 that?
18      A.   (Shakes head).
19      Q.   No?
20      A.   Not to my knowledge.
21      Q.   Okay.  I'd like to talk a little bit
22 about what you stored in the garage.  Did you store
23 any type of flammable liquids of any type?
24      A.   There may have been, yes.
25      Q.   What would that have been?
                          48

1    A.   Gasoline for the lawn mower.  Maybe
2  some small propane cylinders for my camp equipment
3  for going up on the hill with the Marines.
4    Q.   That's what -- I was trying to get to
5  that --
6    A.   That's it.
7    Q.   -- but you helped me here.  Thank you.
8  Okay.  So some small propane cylinders and gasoline.
9  Anything else?
10   A.   Not to my knowledge.
11   Q.   Had you recently repainted your house
12 and had turpentine or flammable liquids like that?
13   A.   No.
14   Q.   Okay.  Tell me about the propane
15 cylinders that you'd use in your camping.
16   A.   Little isobutane cylinders about that
17 big.
18   Q.   Okay.  Were they propane or butane, do
19 you know?
20   A.   I think they're isobutane.
21   Q.   Okay.  And how were these used?
22   A.   In military operations.
23   Q.   How many did you have?
24   A.   One, maybe two.
25   Q.   Okay.  And this is when you would do

1  some type of remote camping as part of your -- part
2  of your military duties.
3    A.   Yes.
4    Q.   Did you have any ammo in the house?
5    A.   Yes.
6    Q.   Okay.  Where did you keep the ammo?
7    A.   Master bedroom.
8    Q.   What kind of ammo?
9    A.   Small handgun ammo.
10   Q.   Okay.  What kind of handgun did you
11 have?
12   A.   9-millimeter --
13   Q.   Sure.
14   A.   -- and .22.
15   Q.   The 9-millimeter is military issue?
16   A.   No.
17   Q.   That was your personal gun?
18   A.   Personal.
19   Q.   And the .22 pistol?
20   A.   .22 pistol.
21   Q.   Okay.
22   A.   There was some rifles, but I don't
23 think I had any ammo for those.
24   Q.   Okay.  So you had 9-millimeter
25 ammunition.  One box?  Two boxes?  How much?

1    A.   One box.
2    Q.   And how about the .22?
3    A.   Maybe a box.
4    Q.   Any other?
5    A.   Not to my recollection.
6    Q.   Any fireworks or anything else
7  combustible in the house?
8    A.   Not to my knowledge.
9        MR. ZAPPALA:  Can we go off the record
10 for one second?
11       MR. McENTIRE:  Is that all right?
12       MR. PAULOS:  Yeah, that's fine.
13       (Off the record)
14       THE VIDEOGRAPHER:  We are now back on
15 the record.
16       MR. McENTIRE:  Back on the record?  All
17 right.
18   Q.   (Mr. McEntire continuing)  Mr. Westby,
19 we're back on the record.  Do you understand that?
20   A.   Yes.
21   Q.   All right.  Prior to today had you ever
22 met Mr. Jay Asafi before?
23   A.   No.
24   Q.   Okay.  Had you ever talked to him
25 before?

1    A.   No.
2    Q.   Did you talk to him before this
3  deposition at all?
4    A.   No.
5    Q.   Okay.  And you understand Mr. Asafi
6  represents the Hardin family.
7    A.   Yes.
8    Q.   And just for the record, you've never
9  met me before either.
10   A.   No.
11   Q.   Okay.  All right.  The date of the
12 incident, what time did you get home?
13   A.   Approximately 11, 11:30.
14   Q.   Okay.  And I think the record indicates
15 that the explosion occurred sometime between 8:30 and
16 9 o'clock that evening.
17   A.   Okay.
18   Q.   Does that seem generally correct?
19   A.   Generally.
20   Q.   Okay.  So we're talking you'd been home
21 for eight and a half or nine hours.
22   A.   Yes.
23   Q.   Okay.  Tell me what you did during the
24 course of the day and what were you doing?
25   A.   I do not recall specifics.  Fed my wife

1 some food. Was working on my uniforms. I don't
2 recall all the specifics.
3     Q. Had you been on duty that morning?
4     A. Yes.
5     Q. And over the previous night?
6     A. Over the previous night?
7     Q. Yeah. Had you been like on call like
8 in a --
9     A. No.
10     Q. Okay. So what time had you gone on
11 duty that day?
12     A. I would guess approximately 6:30,
13 7 o'clock.
14     Q. And you got off duty at approximately
15 11:30.
16     A. Yes.
17     Q. And you had the rest of the day off.
18     A. Yes.
19     Q. Did you pick your son up from school?
20     A. It's very possible.
21     Q. Okay. Who else -- your wife was ill?
22     A. My wife was ill.
23     Q. Do you know what was wrong with her?
24     A. She had a head cold of some sort.
25     Q. A head cold.

1     A. Yes.
2     Q. Okay. And you picked your son up from
3 school.
4     A. To the best of my knowledge.
5     Q. You didn't have a head cold, did you?
6     A. No.
7     Q. You were feeling pretty good?
8     A. I was okay.
9     Q. Okay. And your son left to go play at
10 a friend's house.
11     A. Yes.
12     Q. Okay. And the friend's house -- what
13 was the friend's name?
14     A. Ricky.
15     Q. Ricky what?
16     A. Valenzuela.
17     Q. And they live in the facility, --
18     A. Yes.
19     Q. -- the complex? And you would have
20 spent the rest of the day generally at your house.
21     A. Yes.
22     Q. And would you have done chores in and
23 around the house?
24     A. Yes.
25     Q. Maybe gone into the garage, smoked a

1 cigarette?
2     A. Maybe.
3     Q. Worked on your uniform?
4     A. Yes.
5     Q. Polished the metals?
6     A. Shoes.
7     Q. Shoes. Okay. Watch TV?
8     A. Possibly.
9     Q. Do you have any other hobbies that you
10 would have undertaken at the house?
11     A. No.
12     Q. Okay. And then you said take care of
13 your wife.
14     A. Yes.
15     Q. Okay. And maybe cooked her some food.
16     A. Yes.
17     Q. Who cooked the meals that morning for
18 your son?
19     A. My son eats breakfast at school.
20     Q. Okay. Who cooked lunch for him that
21 day?
22     A. I don't know if he would have --
23 I don't recall cooking him lunch.
24     Q. Okay. All right. But you would have
25 been moving in and around the house pretty much all

1 day.
2     A. Yes.
3     Q. And you would have been in and around
4 most of the room throughout the day.
5     A. Yes.
6     Q. And that kind of activity would have
7 kept up up until roughly the time of the incident.
8     A. Yes.
9     Q. And you would have been perhaps in and
10 out of the garage a couple times during the course of
11 the day.
12     A. Yes.
13     Q. You'd have been going through the
14 utility room when you accessed the garage.
15     A. Yes.
16     Q. And at no time did you ever smell any
17 propane.
18     A. No.
19     Q. And you knew if you had smelled some
20 propane you would have taken some action, correct?
21     A. Yes.
22     Q. And you would have either called the
23 facility and alerted them to a problem, correct?
24     A. Uh-huh.
25     Q. Is that correct?

1    A.   Yes.

2    Q.   Because you know that's something

3 you need to take of immediately.

4    A.   Yes.

5    Q.   Okay.  So if you had smelled any rotten

6 egg smell, you would taken immediate steps.

7    A.   Yes.

8    Q.   And you didn't smell -- would you have

9 been walking around the house at 7:30, 8 o'clock?

10    A.   Very possible.

11    Q.   There's some indication in some of the

12 statements -- have you ever actually given a

13 statement that you've signed?

14    A.   No.

15    Q.   Have you ever given any statements on a

16 tape recording?

17    A.   No.

18    Q.   Okay.  But you have talked to various

19 investigators.

20    A.   Yes.

21    Q.   And I'm going to go through a few of

22 those during the course of the deposition, but

23 there's some indication that you may have gone out to

24 smoke a cigarette as recently as 8 o'clock, 8:15

25 before the event.  Do you recall that?

57

1    Q.   Did you have ceiling fans in the house?

2    A.   I believe we did, yes.

3    Q.   Which rooms?

4    A.   Living room, master bedroom, and

5 I don't recall if there was any in the bedrooms.

6    Q.   So you did have a ceiling fan in the

7 master bedroom and in the living room.

8    A.   Yes.

9    Q.   Did you have the ceiling fans on that

10 day?

11    A.   I do not recall.

12    Q.   Did you sometimes use the ceiling fans

13 for purposes of circulating warm air?

14    A.   It's very possible,yes.

15    Q.   Is that something that you would know

16 to do?

17    A.   I wouldn't not do it.  I mean it just

18 depends.  Typically we would leave a light on or

19 light and the ceiling fan.  Flip the switch, it comes

20 on.

21    Q.   Okay.  So when you -- when you flip the

22 switch on in your living room the fan comes on.

23    A.   For the most part.

24    Q.   Okay.  Unless you make a conscious

25 effort to turn it off.

59

1    A.   I don't recall it, but, yes, it's very

2 possible.

3    Q.   That's not something that you would

4 dispute.

5    A.   No.

6    Q.   And if that's the case, likely you

7 would have gone into the garage because it was really

8 cold outside.

9    A.   Yes.

10    Q.   And you would have opened and shut the

11 door when you went into the garage.

12    A.   Yes.

13    Q.   And you didn't smell any propane.

14    A.   No, not to my knowledge.

15    Q.   Okay.  Okay.  Would all the windows

16 have been closed on the date of the incident?

17    A.   For the most -- or my best guess, yes.

18    Q.   Did you ever keep any windows open in

19 the actual living quarters?

20    A.   No.

21    Q.   Again, it was cold outside.

22    A.   Yes.

23    Q.   So it doesn't -- it seems logical to me

24 that the windows would have been shut.

25    A.   Logical.

58

1    A.   Turn it off, yes.

2    Q.   And you don't recall that on the date

3 of the incident, do you?

4    A.   No.

5    Q.   And presumably -- it gets dark -- is it

6 dark at 8:15, 8:30 at Coleville during that time of

7 year?

8    A.   I don't remember, but it seems to be

9 okay, yeah.  Seems to be probably dark.

10    Q.   So you probably would have had some

11 lights on.

12    A.   Good possibility, yes.

13    Q.   And so if you had been in the living

14 room, you probably would have had a living room light

15 on as well.

16    A.   Yes.

17    Q.   When did your wife get ill?

18    A.   That evening.  The evening before --

19 the evening prior to the accident --

20    Q.   Okaky.

21    A.   -- she started to feel sick.

22    Q.   Okay.  Did she have a job at the time?

23    A.   No.

24    Q.   Was she a housewife, stay at·home,

25 homemaker?

60

1      A.   Yes.

2      Q.   Okay.  Are you aware that subsequent to
3  the incident various investigators found the
4  stovetop -- one of the stovetop burners in the on
5  position?

6      A.   No.

7      Q.   No one's ever advised you of that?

8      A.   No.

9      Q.   So the first time you've ever heard of
10 that is sitting here right now?

11     A.   To the best of my knowledge, yes.
12 I didn't know.

13     Q.   Okay.  Can you explain to us tonight --
14 or today why one of the stove burners would have been
15 in the on position?

16          MR. PAULOS:  Object to form.

17     A.   No, I cannot.

18     Q.   (Mr. McEntire continuing)  If that is
19 the case.

20     A.   No.

21     Q.   When the incident happened, where was
22 your wife?

23     A.   I do not know.

24     Q.   You stated in various statements to
25 investigators that she was in bed.  Do you recall

                                                    61

1  that?

2      A.   To the best of my knowledge she was
3  in bed.

4      Q.   Okay.  Can you explain to the ladies --
5  and show us in the bed.  Would you mark where the bed
6  would have been?

7      A.   (Witness complies).

8      Q.   Would you draw a circle around it and
9  write the word "bed" in it?

10     A.   (Witness complies).

11     Q.   Okay.  And so the best of your
12 knowledge at the time that the explosion occurred she
13 would have been in the bed.

14     A.   Yes.

15     Q.   And could you draw a circle around the
16 kitchen area.

17     A.   (Witness complies).

18     Q.   Okay.  Does the kitchen open up on to
19 your living area?

20     A.   Yes.

21     Q.   Okay.  And would you draw a circle
22 around the stove and write the word "stove"?

23     A.   I think that's where it was.

24     Q.   You're making all these marks on
25 Exhibit 4.  Is that correct?

                                                    62

1      A.   Yes.

2      Q.   Can you tell us why in the aftermath of
3  the incident, if you know -- let me back up.

4          Do you know where investigators found
5  your wife after the accident, after the event?

6      A.   No.

7      Q.   Have you talked to anybody and they've
8  told you where she was actually physically found?

9      A.   No.

10     Q.   If in fact she was found in the area of
11 the kitchen, can you explain to us why she was in the
12 kitchen area after the explosion?

13          MR. PAULOS:  Object to form.

14          MR. ASAFI:  Objection.  Form.

15     A.   No.

16     Q.   (Mr. McEntire continuing)  Have you ever
17 talked to your wife where she -- have you ever talked
18 to your wife about this incident?

19     A.   No.

20     Q.   You've never talked to your wife about
21 the incident itself.

22     A.   We've talked about the basic stuff
23 like, Hey, but -- afterward stuff, her recovery, but
24 that's it.

25     Q.   You never talked about what you think

                                                    63

1  might have happened or where she was or where you
2  were or anything like that?

3      A.   We don't remember.

4      Q.   Okay.  You don't remember today?

5      A.   To this date I do not remember.

6      Q.   Well, why is it that -- you recall
7  giving statements to various investigators shortly
8  after the incident, don't you?

9      A.   Giving statements, yes, I do.

10     Q.   And do you recall telling various
11 investigators that -- that you had been on the couch?

12     A.   No, I do not recall.

13     Q.   Polishing metals?

14     A.   I do not recall.

15          MR. PAULOS:  Object to form.

16     Q.   (Mr. McEntire continuing)  Do you deny
17 that that's what you told investigators?

18     A.   No.

19     Q.   Do you also know that you told
20 investigators that you were in bed?

21     A.   I do not know.

22     Q.   Why would there be a difference in
23 where you were -- let me back up.

24          Can you explain to us why your
25 statements to investigators would have changed from

                                                    64

1 being on the couch in one instance and being in bed
2 with your wife on the other?
3   A.   No, I cannot.
4        MR. PAULOS: Object to form.
5   Q.   (Mr. McEntire continuing)  Do you recall
6 telling investigators that your wife and you had
7 actually cooked dinner together?
8   A.   No.
9   Q.   Do you deny that you told investigators
10 that?
11   A.   No, I do not.
12   Q.   Okay.  Do you deny that you told
13 investigators that you were -- had been in the living
14 room watching TV and you had then started to polish
15 or clean the aquarium in anticipation of your son's
16 birthday the next day?
17   A.   No.
18   Q.   Where was the aquarium?
19   A.   In the living room.
20   Q.   Okay.  Do you deny you told
21 investigators that?
22   A.   No.
23   Q.   Can you explain to us why there would
24 be any inconsistencies in what you told
25 investigators?

1        MR. PAULOS: Object to form.
2        MR. ASAFI: Objection.  Form.
3   A.   No, I cannot.
4   Q.   (Mr. McEntire continuing)  Have you
5 reviewed any of the -- any of the interview notes of
6 the investigators before you came here today?
7   A.   No.
8   Q.   When you came home from service that
9 day, when you went off duty, did you change your
10 clothes?
11   A.   Very possible.
12   Q.   Is it my understanding that when you
13 come home and you don't think you're going to have to
14 go back on duty you typically get into pajamas?
15   A.   Yes.
16   Q.   And -- to get comfortable.
17   A.   Yes.
18   Q.   And you wear -- sometimes you go
19 barefooted.
20   A.   Yes.
21   Q.   Okay.  Do you know the chaplain of the
22 base?
23   A.   I do not know him.  I know of him.
24   Q.   Okay.  You've met him before.
25   A.   Met him, yes.

1   Q.   Okay.  Did you all attend any of his
2 services, you and your wife?
3   A.   No.
4   Q.   Do you know the chaplain's wife, --
5   A.   No.
6   Q.   -- Elaine?
7   A.   No.
8   Q.   You know the chaplain by Chaplain
9 Taylor, correct?
10   A.   Yes.
11   Q.   Okay.  And you'd seen him on or about
12 the complex on several occasions.
13   A.   Yes.
14   Q.   Okay.  So you'd know what he looked
15 like.
16   A.   Yes.
17   Q.   Okay.  Was he always nice to you and
18 personable?
19   A.   Personable.
20   Q.   Okay.  Do you recall seeing him that
21 day at the community center?
22   A.   No.
23   Q.   Do you recall leaving your home and
24 going to the community center?
25   A.   No.

1   Q.   Okay.  Do you deny that you did?
2   A.   No.
3   Q.   Okay.  So you may have gone to the
4 community center and you just don't recall at this
5 time.
6   A.   Yes.
7   Q.   And I'll represent to you that Chaplain
8 Taylor has testified that you were wearing pajama
9 bottoms when he saw you at the community center --
10   A.   Okay.
11   Q.   -- at approximately 5 o'clock that
12 afternoon.
13   A.   Yes.
14   Q.   Do you deny that?
15   A.   No.
16   Q.   He stated that you were looking for
17 your son.
18   A.   Okay.
19   Q.   Why were you looking for your son, if
20 that was the case?
21   A.   I do not know.
22   Q.   You knew your son was going to be
23 spending the night out that night, did you not?
24   A.   To the best of my knowledge, yes.
25   Q.   Why would you be looking for him if he

1   was going to be spending the night out?

2       A.  I do not know.

3       Q.  Your son at the time was ten years old.

4       A.  Yes.

5       Q.  And you knew that day that he was going

6   to be spending the night at Ricky's house.

7       A.  Yes.

8       Q.  Did he bicycle or walk over there?

9       A.  I do not know.

10      Q.  How did he get over there?

11      A.  I do not know.

12      Q.  But, frankly, when he left the house

13  you didn't expect him to return because you thought

14  he would be spending the night out.

15          MR. PAULOS:  Object to form.

16      A.  I do not know.

17      Q.  (Mr. McEntire continuing)  Well, I'm

18  asking you what you -- what you recall.  You knew he

19  was going to be spending the night out, correct?

20      A.  Uh-huh.

21      Q.  And you knew that sometime during the

22  midday, correct?

23      A.  Yes.

24      Q.  Okay.  So why would you be looking for

25  your son at the community center at 5 o'clock?

---

1      A.  I do not know.

2      Q.  Can you provide us any explanation at

3  all?

4      A.  No.

5      Q.  Why would you have been at the

6  community center in pajama bottoms?

7      A.  I frequently wear pajama bottoms.

8      Q.  Do you typically go out in public in

9  just your pajama bottoms?

10      A.  Yeah, absolutely.

11      Q.  Can you explain to us why you went to

12  the community center in pajama bottoms without any

13  type of jacket?

14      A.  No.

15      Q.  It was 28 degrees outside on the day

16  of the incident.  Can you explain why you would have

17  gone outside in just a T-shirt?

18      A.  No.

19      Q.  There is some indication, Mr. Westby,

20  that you were also barefooted.

21      A.  Okay.

22      Q.  Do you typically -- I know you walk

23  around the house barefooted, correct?

24      A.  Correct.

25      Q.  Why were you at the community center,

---

1  if you were, barefooted on the date of the incident?

2      A.  I do not know.

3          MR. PAULOS:  Object to form.

4      Q.  (Mr. McEntire continuing)  Do you deny

5  that you were at the community center barefooted in

6  pajama bottoms?

7      A.  No.

8      Q.  You stated to one of the investigators

9  that you quit drinking on June 11 of 2011.  Do you

10  recall that?

11         MR. PAULOS:  Object to form.

12      A.  Yes.

13      Q.  (Mr. McEntire continuing)  What is it

14  about the date June 11 that rings such significance

15  to you, why it was kind of a -- was it a stop date

16  that you quit drinking?

17      A.  Yes.

18      Q.  Did you do that on your own accord or

19  was that in consultation with someone helping you?

20      A.  It was consultation.

21      Q.  Okay.  Did you think that you were --

22  either had a drinking problem or an incipient

23  drinking problem?

24      A.  Yes.

25          MR. PAULOS:  Object to form.

---

1      Q.  (Mr. McEntire continuing)  And so you

2  went and sought help.

3      A.  Yes.

4      Q.  Okay.  And June 11, was that a cold

5  turkey day?

6      A.  Yes.

7      Q.  Okay.  And on that cold turkey day you

8  basically told yourself no more.

9      A.  Yes.

10      Q.  And what had you been drinking before

11  that day?

12      A.  What?

13      Q.  Alcohol.  What kind of alcohol?

14      A.  Beer, alcohol.

15      Q.  Vodka?

16      A.  Very possible.

17      Q.  Okay.  So it was not just beer.  It was

18  also hard liquor.

19      A.  Yes.

20      Q.  Okay.  And you felt that you had a

21  drinking problem.

22      A.  Yes.

23      Q.  All right.  And who were you seeing?

24  Were you seeing a camp counselor at the time?

25      A.  Military.

```
1       Q.   Military counselor?
2       A.   Yes.
3       Q.   Was it a physician or a psychiatrist,
4  psychologist?
5       A.   It was -- I don't know what they were.
6       Q.   Okay.  Personnel and professionals made
7  available to you.
8       A.   Yes.
9       Q.   Did you seek any religious assistance
10  from the pastor, from the chaplain or anyone else?
11      A.   No.
12      Q.   Okay.  Were you a church-goer at the
13  time?
14      A.   No.
15      Q.   Okay.  All right.  Do you know Steven
16  Head?
17      A.   Yes.
18      Q.   He was also in the military at the
19  time.
20      A.   Yes.
21      Q.   In the Navy?
22      A.   Yes.
23      Q.   Okay.  You sometimes had been drinking
24  with him, had you not?
25      A.   Yes.
                                              73
```

```
1       Q.   Okay.  If Steven Head said that he had
2  been drinking with you recently just before the
3  incident, would he be not telling the truth?
4            MR. PAULOS:  Object to form.
5       A.   I don't know.  I don't recall.
6       Q.   (Mr. McEntire continuing)  Did you fall
7  off the wagon?
8            MR. ASAFI:  Objection to form.
9            MR. PAULOS:  Object to form.
10      A.   To the best of my knowledge, no.
11      Q.   (Mr. McEntire continuing)  Well, you
12  would know.  You're probably the only person who
13  would know whether you fell off the wagon.  Between
14  June 11 and the date of the incident did you fall off
15  the wagon?
16           MR. PAULOS:  Object to form.
17           MR. ASAFI:  Object to form.
18      A.   I would like to think that I didn't,
19  but I do not recall.  I would like to think that --
20  I would know if I drink.
21      Q.   (Mr. McEntire continuing)  Yeah.
22      A.   I do not recall.
23      Q.   Okay.  And you don't recall whether you
24  were drinking again?
25      A.   No.
                                              74
```

```
1       Q.   Okay.  If the chaplain's testified
2  under oath that he smelled alcohol about you on the
3  date of the incident, are you in a position to deny
4  that?
5            MR. ASAFI:  Objection.  Form.
6            MR. PAULOS:  Object to form.
7       A.   No, I'm not.
8       Q.   (Mr. McEntire continuing)  Okay.  So on
9  the date of the incident you do not deny that you had
10  been drinking.
11           MR. PAULOS:  Object to form.
12      A.   I do not recall.
13      Q.   (Mr. McEntire continuing)  Okay.  You
14  don't recall one way or the other?
15      A.   No, sir, I do not.
16      Q.   Okay.  So sitting here today under oath
17  you can't say, "Yes, I was drinking" and you can't
18  say, "No, I wasn't drinking," one way or the other.
19  Is that correct?
20           MR. PAULOS:  Object to form.
21           MR. ASAFI:  Object to form.
22      A.   No, sir, I cannot.
23      Q.   (Mr. McEntire continuing)  Okay.  Did
24  you buy vodka that morning?
25      A.   I do not know, sir.
                                              75
```

```
1       Q.   What kind of stresses -- and I'm asking
2  you just man to man in this deposition.  What kind of
3  stresses were you experiencing at the time that may
4  have led you to drink?
5            MR. PAULOS:  Object to form.
6            MR. ASAFI:  Objection.
7       A.   I do not know.
8       Q.   (Mr. McEntire continuing)  Were there
9  any problems with Jacqueline, the daughter-in-law --
10  the stepdaughter rather?
11      A.   At that time, no.
12      Q.   Any other stresses that you can
13  identify?
14      A.   No.
15      Q.   Tell me what you recall eating that
16  day.  We talked about your heighth and your weight.
17  Tell me what you recall eating on the date of the
18  incident.
19      A.   I do not recall.
20      Q.   Okay.  There's some indication,
21  statements that you gave to investigators that you
22  weren't very hungry in the afternoon and you ate some
23  chips while you were sitting on the couch.
24      A.   Okay.
25      Q.   Does that sound consistent generally?
                                              76
```

1     A.   It's a very good possibility.

2     Q.   Okay.  Do you recall anything else that

3 you ate that day?

4     A.   I do not recall.

5     Q.   All right.  So if that's what you told

6 the investigators, that would be the best we've got

7 at this point.

8          MR. PAULOS:  Object to form.

9     A.   Okay.

10    Q.   (Mr. McEntire continuing)  I'm asking

11 you.  You're the person who would know.

12    A.   I do not recall.

13    Q.   Do you recall making any meal for

14 yourself at dinner?

15    A.   No.

16    Q.   Do you recall making a meal for

17 yourself at lunch?

18    A.   No.

19    Q.   Do you recall what you had for

20 breakfast if you had breakfast?

21    A.   No.

22    Q.   Are you typically a heavy eater or a

23 light eater?  You look like you're in pretty good

24 shape.  My guess is -- you were actually a little

25 lighter then, right?  Do you eat a whole lot or

---

1 just --

2     A.   Average.

3     Q.   Average?  Can you specifically identify

4 that you ate any heavy meals that day?

5     A.   I cannot.

6     Q.   Okay.  Did you get your blood alcohol

7 tested after this incident?  Do you know whether

8 anybody tested your alcohol?

9          MR. PAULOS:  Object to form.

10    A.   I do not know.

11    Q.   (Mr. McEntire continuing)  Following the

12 incident there's been people who've -- do you recall

13 Steven Head coming to your assistance after the

14 incident?

15    A.   No.

16    Q.   Do you recall anybody coming to you and

17 talking to you after the incident?  Immediately

18 after.

19          MR. PAULOS:  Object to form.

20    A.   (Shakes head).

21    Q.   (Mr. McEntire continuing)  There's been

22 some indication that you had the odor and smell of

23 alcohol about you.  Do you -- can you tell us whether

24 that in fact was the case?

25          MR. PAULOS:  Object to form.

---

1     A.   I don't know.

2     Q.   (Mr. McEntire continuing)  Can you deny

3 one way or the other whether you had alcohol on your

4 breath?

5     A.   No.

6     Q.   You recall that you made your wife some

7 soup that evening?

8     A.   Yes.

9     Q.   What kind of soup?

10    A.   Egg drop soup.

11    Q.   Did that come out of the freezer?

12    A.   Yes.

13    Q.   Out of the garage.

14    A.   Yes.

15    Q.   Freezer was in the garage, correct?  In

16 fact I think it's actually -- would you put a circle

17 around it?

18    A.   (Witness complies).

19    Q.   So we know that you would have been in

20 the garage at least once to get the soup out of the

21 freezer.

22    A.   Yes.

23    Q.   And you would have made that soup

24 sometime in the afternoon or early evening.

25    A.   Yes.

---

1     Q.   And some indication that you used the

2 microwave?

3     A.   Yes, sir.

4     Q.   You recall using the microwave and you

5 recall the egg drop soup, correct?

6     A.   I don't recall using the microwave.

7 I recall using -- warming up egg drop soup for my

8 wife.

9     Q.   Could have been the stove or it could

10 have been the microwave.

11    A.   No.  It would have been the microwave

12 because it would have been in a frozen container.

13    Q.   Okay.  So you recall that it was egg

14 drop soup.

15    A.   Yes.

16    Q.   And you recall that it was in a frozen

17 container.

18    A.   Yes.

19    Q.   And you recall putting it in the

20 microwave oven.

21    A.   Yes.

22    Q.   But you can't tell us whether or not

23 you were drinking that day.

24          MR. PAULOS:  Object to form.

25          MR. ASAFI:  Objection.  Form.

1    A.  It's the only soup that was in the
2  freezer.
3    Q.  (Mr. McEntire continuing)  I see.  Did
4  you have any liquor in the house?
5    A.  It's very possible.
6    Q.  Was your wife drinking?
7    A.  Not to my knowledge.
8    Q.  Had your wife been drinking before?
9  Had she -- did she have a drinking issue at some
10 point in time before?
11         MR. PAULOS:  Object to form.
12    A.  She drank.
13    Q.  (Mr. McEntire continuing)  What did she
14 drink?  Hard alcohol?
15    A.  Wine coolers, hard alcohol.
16    Q.  Was she drinking at the time of the
17 incident?
18    A.  No.  Not to my knowledge.
19    Q.  Was your wife taking any kind of
20 medication for her head cold?
21    A.  Not to my knowledge.
22    Q.  Did you typically walk outside
23 barefooted during the cold weather season?
24    A.  Yes.
25    Q.  You did?

1    A.  Yes.
2    Q.  And you would have walked all the way
3  from your house to the community center barefooted
4  when it's 28 degrees outside?
5    A.  I don't believe so.
6    Q.  That seems a little atypical?
7    A.  I don't recall.
8    Q.  You don't recall one way or the other,
9  correct?
10    A.  No.
11    Q.  That was not something you typically
12 would do.  Would you agree with that?
13    A.  Not something typically, no.
14    Q.  If it's really cold outside one would
15 typically put shoes on of some type.
16         MR. PAULOS:  Object to form.
17    A.  Some type.
18    Q.  (Mr. McEntire continuing)  I'm asking
19 for your -- you know, what your practice was.  Right?
20    A.  Yeah.
21    Q.  Other than talking with your son and
22 taking -- about him spending the night out and your
23 wife, did you talk or meet with anybody else
24 that day that you can specifically recall?  We've
25 talked about the chaplain.  We've talked about Steven

1  Head.  Let me back up.
2         Do you recall going to Steven Head's
3  house --
4    A.  No.
5    Q.  -- on the day of the incident?
6    A.  I do not recall.
7    Q.  Do you deny that happened?
8    A.  No.
9    Q.  Do you deny that Steven Head also
10 smelled alcohol on you?
11    A.  No.
12    Q.  So you can't recall one way or the
13 other whether you went to the community center,
14 correct?
15    A.  No.
16    Q.  Can't recall one way or the other
17 whether you had been drinking, correct?
18    A.  No.
19    Q.  Is my statement correct?
20    A.  Yes.
21    Q.  You can't recall one way or the other
22 whether you saw Steven Head that afternoon, correct?
23    A.  That's correct.
24    Q.  Other than your wife and your son, can
25 you identify anybody else specifically that you

1  recall talking to that day?
2    A.  No.
3    Q.  Do you recall also talking to Elaine
4  Taylor at the community center?
5    A.  No.
6    Q.  Some of the evidence that was found in
7  your house, in your residence after the incident was
8  a cigar box or some type of holding box full of
9  incense.
10    A.  Okay.
11    Q.  Did you all burn incense at your house?
12    A.  It wasn't -- it's not an uncommon
13 practice for us, no.
14    Q.  Okay.  Were you burning incense on the
15 date of the incident?
16    A.  No.  Not to my knowledge.
17    Q.  Because your wife would have been in
18 bed and she was typically the incense burner?
19    A.  Yes.
20    Q.  Where were you located at the time of
21 the actual explosion?
22    A.  I do not know.
23    Q.  So you could have been on the couch?
24    A.  It's possible.
25    Q.  You could have been in bed.

```
 1      A.  It's possible.
 2      Q.  Is there anything that has happened
 3 since April of 2012 -- the event happened in
 4 February of 2012, correct?
 5      A.  Uh-huh.
 6      Q.  Right?
 7      A.  Yes.
 8      Q.  And you would agree with me as a
 9 general proposition that your memory would have been
10 better immediately after the event than it is today.
11          MR. PAULOS:  Object to form.
12      Q.  (Mr. McEntire continuing)  As a general
13 proposition.
14      A.  Generally.
15      Q.  As we get further and further away from
16 an event we tend to lose some data points, correct?
17      A.  Yes.
18          MR. PAULOS:  Object to form.
19      Q.  (Mr. McEntire continuing)  So can you
20 explain to us why you would have told investigators
21 in February of 2012 that you had been on the couch?
22      A.  Because to the best of my knowledge at
23 that point in time that's where I was.
24      Q.  And you think at the best point in
25 time -- at that point in time you also recall going
                                             85
```

```
 1 out right around 8, 8:15 smoking a cigarette in the
 2 garage as well.
 3          MR. PAULOS:  Object to form.
 4      Q.  (Mr. McEntire continuing)  If that's
 5 what the --
 6      A.  It's possible.
 7      Q.  And you have no reason to dispute that
 8 at this time.
 9      A.  No.
10      Q.  Were you asleep when the explosion
11 occurred?
12      A.  To the best of my knowledge.
13      Q.  Do you think you had passed out when
14 the explosion occurred?
15          MR. PAULOS:  Object to form.
16          MR. ASAFI:  Objection.  Form.
17      A.  No.
18      Q.  (Mr. McEntire continuing)  You know what
19 I mean by passed out.
20      A.  Yes.
21      Q.  Because of alcohol, drifting off,
22 right?
23      A.  Yes.
24      Q.  Okay.  You had passed out before, had
25 you not?
                                             86
```

```
 1          MR. PAULOS:  Object to form.
 2      A.  I had.
 3      Q.  (Mr. McEntire continuing)  The military
 4 police had found you before passed out in your
 5 garage, correct?
 6      A.  Yes.
 7      Q.  With a cigarette smoldering in an
 8 ashtray next to a gasoline can.  Do you recall that?
 9          MR. PAULOS:  Object to form.
10      A.  That's what they say.
11      Q.  (Mr. McEntire continuing)  Was that one
12 of the issues that made you stop drinking is that you
13 were concerned about your behavior?
14      A.  Yes.
15      Q.  And that you would drink too much and
16 you would pass out?
17      A.  Yes.
18      Q.  Did it happen on more than one
19 occasion?
20          MR. PAULOS:  Object to form.
21      A.  It's been known to happen.
22      Q.  (Mr. McEntire continuing)  What do you
23 recall happened in the context of the explosion
24 itself?  What is the first thing that you do
25 remember?
                                             87
```

```
 1          MR. PAULOS:  Object to form.
 2      Q.  (Mr. McEntire continuing)  A noise?
 3 A flame?  A burst?
 4      A.  The first thing I remember is the
 5 colonel holding onto me.  That's it.
 6      Q.  So you remember -- the last thing you
 7 remember is sitting on the couch presumably.
 8      A.  It's feasible.
 9      Q.  And the next thing you remember is the
10 colonel.
11      A.  Yes.
12      Q.  Nothing in between.
13      A.  No.
14      Q.  Do you recall whether the TV set was on
15 when you were sitting on the couch?
16      A.  I do not recall.
17      Q.  So you recall nothing about the
18 intensity of the explosion, the loudness of the
19 explosion, where the explosion seemed to come from,
20 how it may have moved you one way or the other or
21 anything like that.
22      A.  No.
23      Q.  You recall nothing about flames in or
24 around the house?
25      A.  No.
                                             88
```

1  Q.  You don't recall anything that would
2 help us orient the locus or the center point of the
3 explosion.
4           MR. PAULOS:  Object to form.
5      A.  No.
6      Q.  (Mr. McEntire continuing)  Have you been
7 back to 702 Champagne since the incident?
8      A.  Yes.
9      Q.  Looking for personal belongings?
10      A.  Pick up personal belongings.
11      Q.  Okay.  Has your wife been back to your
12 knowledge?
13      A.  Yes.
14      Q.  Okay.  To help you look for personal
15 belongings?
16      A.  Yes.
17      Q.  Was it -- how soon after the incident
18 was that?
19      A.  I don't remember the date, but it was
20 months afterwards.
21      Q.  Months?
22      A.  (Nods head).
23      Q.  And your son was not at home.
24      A.  No.
25      Q.  And the only two people in the house at

1 the time were you and your wife.
2      A.  Yes.
3           MR. McENTIRE:  Okay.  Let's take a
4 little break.  How much time have I used?
5           THE VIDEOGRAPHER:  We are now going off
6 the record.
7           (Recess from 10:18 to 10:24)
8           (T. WESTBY EXHIBIT NO. 6 MARKED)
9           THE VIDEOGRAPHER:  We are now back on
10 the record.
11           MR. McENTIRE:  Back on?
12      Q.  (Mr. McEntire continuing)  Okay.
13 Mr. Westby, I've handed you Exhibit No. 6.  It's a
14 photograph of a gas valve, which I understand was
15 taken in the utility room following the incident.
16 Do you see it?
17      A.  Yes.
18      Q.  Do you see that it appears to be in
19 the -- the actual turn knob appears to be in the on
20 or nearly on position?
21           MR. ASAFI:  Objection.  Form.
22      A.  I don't know what on or off would look
23 like.
24      Q.  (Mr. McEntire continuing)  Well, you
25 know -- you've had experience with faucets and things

1 that typically when it's perpendicular to the pipe
2 it's off and when it's parallel to the pipe it's in
3 an on position.
4      A.  Okay.
5      Q.  Does that sound at all familiar to you?
6      A.  Sounds --
7      Q.  Can you explain to us why this valve
8 would have been, at least apparently, in an on
9 position?
10           MR. PAULOS:  Object to form.
11      A.  No, I cannot.
12      Q.  (Mr. McEntire continuing)  Okay.  And,
13 again, you had no involvement in moving the dryer at
14 any time --
15      A.  No.
16      Q.  -- or installing the dryer at any time.
17      A.  No.
18      Q.  Okay.  There was some flex line that
19 was behind the stove.  Do you know what I mean by
20 flex, flex tubing?
21      A.  Uh-huh.
22      Q.  Where the propane comes through.  Do
23 you know what I'm talking about?
24      A.  Yes.
25      Q.  Okay.  You've seen that before.

1      A.  Yes.
2      Q.  At any time before the incident, within
3 a few days or weeks before the incident, do you
4 recall ever moving the stove for any reason?
5      A.  No.
6      Q.  Getting behind the stove because
7 something dropped behind there or anything like that?
8      A.  No.
9      Q.  Was the stove ever moved to your
10 knowledge?
11      A.  To my knowledge, no.
12      Q.  Okay.  I'd like to talk about your
13 wife's involvement -- or not involvement but her
14 activities that day.  When you went to go on duty
15 that morning at 6:30 in the morning she was at home.
16      A.  Uh-huh.
17      Q.  She stayed at home to your knowledge
18 the entire day.
19      A.  Yes.
20      Q.  Does she typically stay at home or did
21 she have any outside activities?
22      A.  Typically stayed at home.
23      Q.  Okay.  And how did your son get to
24 school that morning?
25      A.  Rode the bus.

| | | |
|---|---|---|
| 1 | Q. | Rode the bus? |
| 2 | A. | (Nods head). |
| 3 | Q. | And would he typically ride the bus |
| 4 | back? | |
| 5 | A. | No. |
| 6 | Q. | You would go pick him up. |
| 7 | A. | Somebody would go pick him up. |
| 8 | Q. | Either your wife or you. |
| 9 | A. | Yes. |
| 10 | Q. | And if your wife was sick, you would |
| 11 | have picked him up that day. | |
| 12 | A. | Yes. |
| 13 | Q. | Okay. Can you identify any time that |
| 14 | your wife left the house at any time that day? | |
| 15 | A. | No. |
| 16 | Q. | Other than being in the bedroom, did |
| 17 | you ever see your wife outside the bedroom that day? | |
| 18 | A. | No, not to my knowledge. |
| 19 | Q. | Okay. At any time in the afternoon |
| 20 | when you were at home you never saw her moving about | |
| 21 | the house. | |
| 22 | A. | Not to my knowledge. |
| 23 | Q. | At any time prior to the incident, the |
| 24 | actual explosion, do you recall her ever being | |
| 25 | outside the bedroom that day? | |

93

| | | |
|---|---|---|
| 1 | A. | Not to my knowledge. |
| 2 | Q. | We talked about typically when you |
| 3 | turned on the light you would probably turn on the | |
| 4 | light in the living room and the fan would go on. Is | |
| 5 | that correct? | |
| 6 | A. | Typically. |
| 7 | Q. | If you were going in and out of the |
| 8 | utility room into the garage to get the soup or to | |
| 9 | smoke a cigarette, you would typically turn the light | |
| 10 | on in the utility room, correct? | |
| 11 | A. | Typically. |
| 12 | Q. | Okay. And you don't know one way or |
| 13 | the other whether when you do that the fan is | |
| 14 | triggered. | |
| 15 | A. | No. |
| 16 | | MR. PAULOS: Object to form. |
| 17 | Q. | (Mr. McEntire continuing) All right. |
| 18 | Or a vent. You don't know one way or the other. | |
| 19 | A. | No. |
| 20 | Q. | Would you typically leave lights on at |
| 21 | night? When you'd turn a light on, did you typically | |
| 22 | leave them on until you went to bed? | |
| 23 | A. | No. |
| 24 | Q. | Okay. Tell me what your practice was |
| 25 | there. | |

94

| | | |
|---|---|---|
| 1 | A. | I would try to turn them off. |
| 2 | Q. | When would you turn them off? |
| 3 | A. | After leaving a room. |
| 4 | Q. | Okay. All right. So can you tell us |
| 5 | unequivocally that you would have turned the light | |
| 6 | off in the utility room when you went back and forth? | |
| 7 | A. | No. |
| 8 | | MR. PAULOS: Object to form. |
| 9 | Q. | (Mr. McEntire continuing) Can you tell |
| 10 | us whether it was more likely than not one way or the | |
| 11 | other? | |
| 12 | A. | No. |
| 13 | Q. | Okay. So if you'd be going in and out |
| 14 | the garage you might have had the utility room light | |
| 15 | on. | |
| 16 | A. | It's possible. |
| 17 | Q. | Okay. You would have probably had the |
| 18 | light on in the kitchen? | |
| 19 | A. | It's possible. |
| 20 | Q. | Okay. Can you remember, would the |
| 21 | lights in the other bedrooms have been on or off? | |
| 22 | A. | They would have been off. |
| 23 | Q. | Okay. So the lights that probably |
| 24 | would have been on would have been a light in the | |
| 25 | living room, perhaps the utility room, and perhaps | |

95

| | | |
|---|---|---|
| 1 | the kitchen. | |
| 2 | A. | Perhaps. |
| 3 | Q. | Okay. How about the lights in the |
| 4 | master bedroom, were they on? | |
| 5 | A. | I don't recall. |
| 6 | Q. | Okay. Is that light switch also |
| 7 | similar to the one in the living room, that when you | |
| 8 | turn it on the fan goes on? | |
| 9 | A. | Yes. |
| 10 | Q. | Okay. Do you have any background or |
| 11 | experience in -- we talked about your medical | |
| 12 | background and training. How many years of medical | |
| 13 | training had you had before this incident? | |
| 14 | A. | On and off? |
| 15 | Q. | Yes, sir. |
| 16 | A. | Eight years. |
| 17 | Q. | Eight years? And you'd actually been |
| 18 | employed in a combat situation before this incident. | |
| 19 | A. | Yes. |
| 20 | Q. | Okay. And did you live in tents when |
| 21 | you were in Iraq or -- | |
| 22 | A. | No. |
| 23 | Q. | In barracks? |
| 24 | A. | No. Abandoned schoolhouse. |
| 25 | Q. | Abandoned schoolhouse. Did you also |

96

**Page 97**

1  use propane heaters over there?

2      A.  Not to my knowledge.

3      Q.  Okay.  And did you have any training in

4  ordnance, explosives or anything like that?

5      A.  No.

6      Q.  No training at all.

7      A.  No.

8      Q.  Have you been involved in that at all?

9      A.  No.

10     Q.  All right.  You knew Caroline Parker

11  there at the office there on the complex?  Does that

12  name ring a bell?

13     A.  No.

14     Q.  How about Melody?  Do you know Melody?

15     A.  Melody rings a bell.

16     Q.  Okay.  Would you recognize her if she

17  walked into the room?

18     A.  It's very possible.

19     Q.  Okay.  Were they always polite and

20  courteous to you?

21     A.  Yes.

22     Q.  Always responsive to your requests, --

23     A.  Yes.

24     Q.  -- the people who were managing the

25  facility out there?

**Page 98**

1      A.  Yes.

2      Q.  Okay.  Always seemed to -- if you asked

3  them, expressed a concern they were always responsive

4  to try to solve the problem?

5      MR. PAULOS:  Object to form.

6      Q.  (Mr. McEntire continuing)  To your

7  recollection.

8      A.  Yes.

9      Q.  And you never advised them that you had

10  any problems with any of your appliances, did you?

11     A.  Not to my knowledge.

12     MR. McENTIRE:  I'm going to reserve the

13  rest of my questions.  I think I've got -- how much

14  time have I used?

15     THE VIDEOGRAPHER:  About an hour and

16  20 minutes.

17     MR. McENTIRE:  Hour and 20 minutes.

18  And then you're going to go whatever you're going to

19  do, and then I'll pick -- you'll take about an hour

20  and a half you said, up to it.

21     MR. ASAFI:  Should be.  Maybe less.

22     MR. McENTIRE:  Okay.

23          EXAMINATION

24  BY MR. ASAFI:

25     Q.  Mr. Westby, you okay to proceed?

**Page 99**

1      A.  Yes, sir.

2      Q.  Okay.  I introduced myself earlier.

3  My name is Jay Asafi, and I represent Mr. Hardin and

4  the family.

5     First and foremost, I want to thank you

6  for your service to our country.

7     A.  Thank you.

8     Q.  I want to thank you for what you've

9  done, what you continue to do.

10     My questions are pretty much clear-cut.

11  It's going to basically be on some of the stuff that

12  you can recall.  Did you smell propane in your unit

13  at any time?

14     A.  Not to my knowledge.

15     Q.  Okay.  And when I say your unit, we can

16  agree for the record that it's 702-A Champagne at the

17  Coleville housing complex.

18     A.  Yes, sir.

19     Q.  Okay.  So I'm going to be referencing

20  702-A Champagne, which is your unit at the Coleville

21  housing complex, and I'll be calling it your unit.

22  Is that okay for the record?

23     A.  That's perfect.

24     Q.  Okay.  Did you ever smell propane in

25  your unit at any time?

**Page 100**

1      A.  Not to my knowledge.

2      Q.  Okay.  Did you smell propane at the

3  time of the incident on February 3rd, 2012?

4      A.  Not to my knowledge.

5      Q.  Did you ever have any problems with

6  propane leaks in your unit at any time?

7      A.  Not to my knowledge.

8      Q.  What about on the day of the accident?

9      A.  Well, I mean not to my knowledge other

10  than the house blowing up.

11     Q.  Okay.  Did you ever report a propane

12  gas leak in your unit?

13     A.  No, not to my knowledge.

14     Q.  Did you have any warnings from anybody

15  at any time on what to do or what not to do when

16  there is a propane leak?

17     MR. McENTIRE:  Objection.  Form,

18  leading.

19     A.  No.

20     Q.  (Mr. Asafi continuing)  Okay.  Did you

21  have any warnings from anybody at any time on what to

22  smell for when there is a propane leak?

23     MR. McENTIRE:  Objection.  Form,

24  leading.

25     A.  No.

1      Q.   (Mr. Asafi continuing)  Was there any
2  warning devices on how to detect propane leaks?
3           MR. McENTIRE:  Objection.  Form,
4  leading.
5      A.   No.
6      Q.   (Mr. Asafi continuing)  Okay.  Were
7  there any propane detection devices anywhere in your
8  unit?
9      A.   No.
10          MR. McENTIRE:  Objection.  Form,
11  leading.
12     Q.   (Mr. Asafi continuing)  Now we know
13  there was a fire detector and a carbon monoxide
14  detector.  Is that correct?
15     A.   To the best of my knowledge, yes.
16     Q.   Was there a propane detector?
17     A.   No.
18     Q.   Was there a propane leak detector?
19     A.   No.
20     Q.   Was there any warning device with
21  regard to propane?
22          MR. McENTIRE:  Objection.  Form,
23  leading.
24     A.   Not to my knowledge.
25     Q.   (Mr. Asafi continuing)  Okay.  Is that a
                                                101

1  before the accident.  What's a typical day?  Do you
2  usually go out to dinner with your wife?  Do you
3  usually eat sandwiches?  What do you usually eat?
4      A.   Typical day, get up, go to work.
5  Usually grab something up at work for breakfast late,
6  like 9, 10 o'clock, and whenever I get home we would
7  eat.  But it just depends.  Warm up something from
8  the freezer outside or -- it's completely up in the
9  air.  No scheduled eating plan.
10     Q.   And I understand that -- you know, in
11  some households people use the microwave like
12  95 percent of the time.
13     A.   Yes.
14     Q.   Would that be your household?
15          MR. McENTIRE:  Objection.  Form,
16  leading.
17     A.   Probably 60 percent of the time.
18     Q.   (Mr. Asafi continuing)  Okay.  Now you
19  and your wife, you guys don't cook with the stove
20  that much I'm assuming.  Is that correct?
21          MR. McENTIRE:  Objection.  Form,
22  leading.
23     A.   No.
24     Q.   (Mr. Asafi continuing)  Okay.  Talon, at
25  the time he was ten years old.  What does he
                                                103

1  no?
2      A.   No.
3      Q.   Okay.  Any warning systems for propane?
4           MR. McENTIRE:  Same objections.
5      A.   No.
6      Q.   (Mr. Asafi continuing)  Okay.  Did
7  anybody at any time instruct you on what to do in the
8  event you smell propane in your unit?
9      A.   No.
10     Q.   Okay.  Was there any kind of an
11  evacuation plan?
12     A.   No.
13     Q.   Okay.  And was there any step-by-step
14  evacuation plan in the event of a gas leak or a
15  propane leak?
16          MR. McENTIRE:  Objection.  Form,
17  leading.
18     Q.   (Mr. Asafi continuing)  Okay.  Let's
19  talk about the stove.  Did you use the stove on the
20  day of the incident?
21     A.   Not to my knowledge, no.
22     Q.   When was the last time you ever used
23  the stove?
24     A.   I do not know.
25     Q.   Let's go back to February 2nd, the day
                                                102

1  typically eat?
2      A.   Whatever we're eating.
3      Q.   Okay.  Do you eat a lot of sandwiches?
4      A.   Yes.
5      Q.   Okay.  Do you microwave a lot of
6  microwave dinners?
7      A.   Not microwave dinners.  Leftovers.
8      Q.   Okay.  And how do you make these
9  leftovers?
10     A.   Microwave them in the microwave.
11     Q.   Okay.  So, again, you go back to the
12  microwave.  And you said on the day of the incident
13  you did not use the stove.
14     A.   I did not --
15          MR. McENTIRE:  Objection.  Form,
16  leading.
17     A.   -- to the best of my knowledge.
18     Q.   (Mr. Asafi continuing)  Okay.  And can
19  you recall, when was the last time you ever used the
20  stove?
21     A.   I do not know.
22     Q.   Okay.  And if you're not using the
23  stove, what do you eat?  Give me a list.
24     A.   Leftover stuff that was cooked from
25  like maybe the previous week.
                                                104

1    Q.   Okay.  What else?

2    A.   Sandwiches.

3    Q.   What else?

4    A.   Lots of sandwiches.

5    Q.   How's breakfast in the morning?  What

6  do you eat for breakfast?

7    A.   I typically don't.  My son eats

8  breakfast at school.  My wife typically does not eat

9  breakfast.

10   Q.   Okay.  So we can rule out breakfast.

11  Breakfast is out.  How about lunch?

12   A.   Sandwiches.

13   Q.   Everybody?

14   A.   A lot of sandwiches.  Yeah, for

15  everybody.

16   Q.   Okay.  How about dinner?

17   A.   Again, stuff that was cooked like the

18  prior week.  We cook -- my wife and I tend to cook

19  large dishes and freeze half of them so half of

20  whatever is left goes in the freezer.  We take it out

21  and eat it.

22   Q.   Okay.  And when does that week start --

23  Let's say Monday through Sunday, when do you guys

24  start cooking?

25   A.   Big meals typically on the weekends.

1    Q.   On the weekends.  Okay.  And you guys

2  would freeze it --

3    A.   Uh-huh.

4    Q.   -- and then heat it up in the

5  microwave, correct?  Did you ever heat it up on the

6  stove?

7    A.   Very rarely.  Some stuff has to be done

8  in the oven I guess.

9    Q.   But a majority of the time it's in the

10  microwave.

11   A.   Yes.

12   Q.   Okay.  You know, there has been talk

13  and you've heard from some of the reports, you've

14  heard from opposing counsel that after the accident

15  the stove knob was in the on position.

16   A.   Yes.

17   Q.   Okay.  Can you give me scenarios, you

18  yourself, of why that stove was in the on position?

19        MR. McENTIRE:  Objection.  Form.

20   A.   Could be any -- anything could have

21  happened.

22   Q.   (Mr. Asafi continuing)  Okay.  Give me

23  some examples.

24        MR. McENTIRE:  Same objections.

25   A.   There was, what, a hundred people in

1  our house afterwards?  So anything could happen.

2    Q.   (Mr. Asafi continuing)  Let's talk about

3  that.  When you say a hundred people, were there a

4  number of people that were coming into the search and

5  rescue effort or there was just a hundred

6  investigators after the incident?  What do you mean?

7    A.   All of the above.  There was rescuers.

8  There was people coming in investigating.  I don't

9  even know, I wasn't there, but I mean just a guess.

10   Q.   Okay.  And let's talk about on the day

11  of the explosion.  Were there a number of people

12  coming to your house on the day of the explosion?

13  And when I say the day of the explosion I'm talking

14  about on February the 3rd, 2012.

15   A.   No.

16   Q.   Okay.  Did some people come in in the

17  assistance of you and your wife?

18   A.   Yes.

19   Q.   Okay.  And let's talk about that.

20  Were there a number of people that came to your

21  assistance?

22   A.   To the best of my knowledge.

23   Q.   Yes?

24   A.   Yes.

25   Q.   Okay.  And that's why you mentioned a

1  hundred or so people, correct, that came to that

2  unit?

3    A.   (Nods head).

4    Q.   Okay.  Yes?

5    A.   Yes.

6    Q.   Okay.  And you understand that since

7  we're on the record here the court reporter's taking

8  down yes and no answers.

9    A.   Yes.

10   Q.   And the nodding and the uh-huhs,

11  they're not going to understand that.

12   A.   Okay.

13   Q.   But thank you very much.  You're doing

14  very good so far.

15        I'll give you some examples and tell me

16  if you agree with me.  Could the explosion have put

17  the knob in the on position?

18        MR. McENTIRE:  Objection.  Form,

19  leading.

20   A.   It's possible.

21   Q.   (Mr. Asafi continuing)  Okay.  The

22  hundred or so people in there could have been playing

23  with the knobs.  Is that correct?

24        MR. McENTIRE:  Objection.  Form,

25  leading.

1     A.   It's possible.

2     Q.  (Mr. Asafi continuing) Okay. During

3  the search and rescue and during the chaos of

4  everything, could people have been moving things

5  around and put the knob in the on position?

6         MR. McENTIRE: Objection. Form,

7  leading.

8     A.   Possible.

9     Q.  (Mr. Asafi continuing) People walking

10  by after the incident.

11     A.   It's possible.

12        MR. McENTIRE: Same objections.

13     Q.  (Mr. Asafi continuing) Did anybody at

14  any time warn you of the dangers of propane gas?

15        MR. McENTIRE: Objection. Form,

16  leading.

17     A.   No.

18     Q.  (Mr. Asafi continuing) Did anybody at

19  any time warn you of what to do in the event of a

20  gas leak?

21     A.   No.

22     Q.  Did anybody at any time warn you or

23  educate you on how to detect a propane leak in your

24  unit?

25     A.   No.

---

1        MR. McENTIRE: Objection. Form,

2  leading.

3     Q.  (Mr. Asafi continuing) Did anybody at

4  any time warn you of not using propane warning

5  detection devices?

6     A.   No.

7        MR. McENTIRE: Objection. Leading.

8     Q.  (Mr. Asafi continuing) Did anybody at

9  any time recommend to you that you should install a

10  propane warning detection device in your unit?

11        MR. McENTIRE: Objection. Leading.

12     A.   No.

13     Q.  (Mr. Asafi continuing) Did anybody at

14  any time warn you of what to smell for regarding a

15  propane leak?

16        MR. McENTIRE: Objection. Leading.

17     A.   No.

18     Q.  (Mr. Asafi continuing) Did you smell

19  propane gas in your unit on the day of the explosion?

20     A.   No, not to my knowledge.

21     Q.  How about -- there was a fire in your

22  unit. Is that correct?

23     A.   As far as I know of.

24     Q.  Okay. Firefighters were called out?

25     A.   Yes.

---

1     Q.  Okay. You know they use a

2  high-pressured water hose. Is that correct?

3     A.   That's typically I guess.

4     Q.  Could the high-pressured water hose

5  have turned on that stove in the on position?

6        MR. McENTIRE: Objection. Form,

7  leading.

8     A.   It's possible.

9     Q.  (Mr. Asafi continuing) Could the

10  concussion of the blast have put that stove in the on

11  position?

12        MR. McENTIRE: Objection. Form,

13  leading.

14     A.   It's possible.

15     Q.  (Mr. Asafi continuing) Okay. Were you

16  warned of how propane smells by anybody at any time?

17        MR. McENTIRE: Objection. Leading.

18     A.   No.

19     Q.  (Mr. Asafi continuing) Did you do

20  anything to cause a propane leak in your unit?

21        MR. McENTIRE: Objection. Leading.

22     A.   No.

23     Q.  (Mr. Asafi continuing) Did you tamper

24  with any of the propane tanks out in the field?

25        MR. McENTIRE: Objection. Leading.

---

1     A.   No.

2     Q.  (Mr. Asafi continuing) Okay. Did you

3  leave maybe the furnace on or anything with regard to

4  a gas -- whether it's the water heater -- did you do

5  anything with regard to those three appliances that

6  opposing counsel mentioned?

7        MR. McENTIRE: Objection. Form,

8  leading.

9     A.   No.

10     Q.  (Mr. Asafi continuing) How do you know

11  that it smells like rotten eggs? Propane.

12     A.   That's just what it smells like when

13  you start the stove.

14     Q.  Okay. And that's from your own

15  personal knowledge.

16     A.   Yes.

17     Q.  Okay. Opposing counsel mentioned

18  something about incense. And, do you know, had there

19  been times where maybe your wife might have some

20  incense on at the time and you can still smell that

21  rotten egg smell when you turn the stove on?

22     A.   Yes.

23     Q.  Okay. So that has no bearing on you

24  not being able to smell the rotten egg smell,

25  correct?

1    A.   No.

2    Q.   Okay.  Would you describe it as a very
3  strong odor?

4    A.   Which?  The --

5    Q.   The propane.

6    A.   Yes.

7    Q.   Okay.  And I might have asked this
8  question again.  Some of the questions I've already
9  asked twice and maybe even three times, so I
10  apologize.  Were you warned by anybody at any time of
11  how propane smells and what to look for regarding the
12  smelling of propane gas?

13           MR. McENTIRE:  Objection.  Form,
14  leading.

15    A.   No.

16           MR. ASAFI:  All right.  At this time
17  I'll pass the witness.  If I have any further
18  questions I still have some time left.  How many
19  minutes have I went through?

20           THE VIDEOGRAPHER:  Oh, 15.

21           MR. ASAFI:  15?

22               EXAMINATION

23  BY MR. McENTIRE:

24    Q.   All right.  Feel like a ping-pong ball
25  yet?  Okay.  It's my time, okay?  I have a few more

                                          113

1  questions.

2           In response to Mr. Asafi's questions
3  you said you probably used the microwave 60 percent
4  of the time and the stove 40 percent of the time.

5    A.   Yes.

6    Q.   Is that fair to say?

7    A.   Fair to say.

8    Q.   So 40 percent of the time that you all
9  would be cooking you may be smelling propane.

10    A.   It's possible.

11    Q.   That's a lot of time over the last
12  couple of years before this incident, isn't it?

13    A.   It's possible.

14    Q.   Yeah.  Well, that's -- based upon your
15  own testimony, that's likely, correct?

16    A.   Yes.

17    Q.   So you were very familiar with that
18  rotten egg smell.

19    A.   Yes.

20    Q.   What is the last thing that you
21  remember before the explosion?

22    A.   My counterpart at work coming to pick
23  up a go-cart.

24    Q.   Okay.  That would have been what time?

25    A.   Don't know.  3:30, 4.

                                          114

1    Q.   Okay.  And the last thing you -- the
2  first thing you remember after the explosion is when
3  the colonel was helping you.

4    A.   When the colonel grabbed ahold of me,
5  yeah.

6    Q.   And then he -- did he move you to the
7  side?

8    A.   He moved me to the side I believe.
9  I don't remember.

10    Q.   You didn't directly participate in any
11  type of rescue operations for your wife, did you?

12    A.   No.

13    Q.   You were on the edge.

14    A.   Yes.

15    Q.   You really don't know what the
16  investigators did in the immediate aftermath of the
17  explosion, do you?

18    A.   No.

19    Q.   You don't know what the emergency
20  rescue or first responders did in the immediate
21  aftermath of the incident, do you?

22    A.   No.

23    Q.   You don't know what kind of hoses they
24  were using, where they put the water, what they
25  touched or did not touch, do you?

                                          115

1    A.   No.

2           MR. PAULOS:  Object to form.

3    Q.   (Mr. McEntire continuing)  You don't
4  know what kind of -- where they were spraying the
5  water, do you?

6           MR. ASAFI:  Objection.  Form.

7    A.   No.

8    Q.   (Mr. McEntire continuing)  You don't
9  know what kind of pressure was on the water, do you?

10    A.   No.

11    Q.   You don't know what they touched inside
12  the building, what was left of it, do you?

13    A.   No.

14    Q.   So you really have no explanation of
15  why -- if the stovetop was in -- the burner was in
16  the on position, you have no explanation at all, do
17  you?

18    A.   No.

19           MR. PAULOS:  Object to form.

20    Q.   (Mr. McEntire continuing)  You've stated
21  that you recall that you cooked for your wife in the
22  microwave.

23    A.   Yes.

24    Q.   You would have cooked your soup
25  sometime in the evening around 6, 6:30 or 7 o'clock.

                                          116

1 Does that sound right?

2     A.   I don't know what time I did cook it.

3     Q.   Okay.  Would it have been before or

4 after your friend came to pick up the go-cart?

5 Probably afterwards?

6     A.   Probably.

7     Q.   So you remember -- I'd asked you a

8 moment ago what was the last thing you remembered.

9 You said -- before the event.  You said it was when

10 your friend came over to pick up the go-cart.  But

11 that's not really accurate because you remember, you

12 say, cooking soup for your wife.

13     A.   Yes.

14     Q.   And you recall getting the soup -- the

15 egg noodle soup out of the refrigerator.

16     A.   Yes.

17     Q.   And it was in a freezer carton and

18 that's why you microwaved it.

19     A.   Yes.

20     Q.   Okay.  And you remember all these

21 details specifically, don't you?

22            MR. PAULOS:  Object to form.

23     A.   No, they're vague.

24     Q.   (Mr. McEntire continuing)  They're

25 vague.  So you can't sit here and tell me and deny

1 that you actually used the stove on the evening of

2 the accident, can you?

3            MR. PAULOS:  Object to form.

4            MR. ASAFI:  Objection.  Form.

5     A.   I can't deny it.

6     Q.   (Mr. McEntire continuing)  Can't deny

7 it.  You know that one of the reasons why they make

8 the propane smell like rotten eggs -- that's your

9 description, right? --

10     A.   Yes.

11     Q.   -- is so that -- because propane is

12 invisible, the gas is invisible, right?

13     A.   (Nods head).

14     Q.   And so the purpose of -- you understand

15 the purpose of putting the chemical in there to make

16 it smell like rotten eggs is so that people notice

17 it.

18            MR. PAULOS:  Object to form.

19     Q.   (Mr. McEntire continuing)  Right?

20     A.   Okay.

21     Q.   I mean that sounds reasonable to you?

22     A.   Sounds reasonable.

23     Q.   Is that your general understanding of

24 why they make it smell that way?

25     A.   Sounds reasonable, yeah.

1     Q.   Okay.  So, again, that smell was very

2 familiar to you.

3     A.   It was familiar.  I knew the smell.

4     Q.   Okay.  There's no reason to believe

5 that your wife wasn't familiar with the smell either.

6     A.   No.

7     Q.   You would think she would be.

8     A.   Yes.

9     Q.   Because she also regularly used the

10 stove, at least 40 percent of the time, with you,

11 correct?

12     A.   Okay.

13     Q.   Is that fair?

14     A.   Fair to say.

15     Q.   So the actual rotten smell in propane

16 is actually a method of letting the user know that

17 propane is in the space, correct?

18     A.   Okay.

19            MR. PAULOS:  Object to form.

20     Q.   (Mr. McEntire continuing)  Do you agree

21 with that?

22     A.   I agree.

23            MR. McENTIRE:  I'll reserve the rest of

24 my questions.

25            MR. ASAFI:  I have nothing further.

1 Thank you very much.  I'm sorry.  I'll reserve the

2 rest of my questions for time of trial.

3            MR. McENTIRE:  I meant to say the same

4 thing.

5            THE VIDEOGRAPHER:  This concludes the

6 deposition.  We're now going off the record.

7            (Off the record)

8            MR. McENTIRE:  I'll go on the record.

9 Mr. Westby, you have a right to read

10 and sign your deposition.  And I'm not your lawyer,

11 but I think it's available, right, if you want to

12 exercise it?  I encourage you do so.

13            MR. PAULOS:  Yeah, we will exercise our

14 right.

15            (Whereupon, the deposition of THOR A.

16 WESTBY concluded at 10:49 a.m.)

17

18

19

20

21

22

23

24

25

```
 1   STATE OF NORTH DAKOTA          Greg Hardin et al
                                            v
 2   COUNTY OF CASS                 Lincoln Property Company

 3              CERTIFICATE OF DEPONENT

 4       I hereby certify that I have read and
     examined the aforegoing transcript, and the same is a
 5   true and correct record of the testimony given by me,
     with corrections, if any, as noted on the attached
 6   sheet or sheets.

 7       DATE:

 8                       THOR A. WESTBY - WITNESS

 9              CERTIFICATE OF REPORTER

10       Be it known that I reported the deposition of
     THOR A. WESTBY on July 17, 2014, at Radisson Hotel,
11   201 Fifth Street North, Fargo, North Dakota;
         That I was then and there a Notary Public in and
12   for the County of Cass and State of North Dakota, and
     that by virtue thereof I was duly authorized to
13   administer an oath;
         That the witness before testifying was by me
14   first duly sworn to testify the whole truth and
     nothing but the truth relative to said cause;
15       That the testimony of said witness was recorded
     in Stenograph by myself and transcribed into
16   typewritten testimony given by the witness;
         That I am not related to any of the parties
17   thereto, nor interested in the outcome of this
     action;
18       That the said deposition, having been
     transcribed, was subsequently made available to said
19   deponent by me, Paula D. Weber, for purposes of
     reading and signing;
20       Witness my hand this 28th day of July, 2014.

21

22                       Paula D. Weber
                         Notary Public
23                       Cass County, North Dakota

24   My commission expires June 10, 2016.

25
                                                    121

              NORMAN E. MARK - COURT REPORTER SERVICE
     300 NP AVENUE  - SUITE 201, FARGO, ND 58107 (701) 235-7571
```