# EXHIBIT 6

## Page 1

```
 1              CAUSE NO. DC-13-13771

 2

 3   GREG HARDIN the husband            IN THE DISTRICT COURT
     of LORI HARDIN and next
 4   friend of BRADY HARDIN and
     ASHTON HARDIN, their children,
 5   and ROBERT LEWIS and CAPI LEWIS,
     the parents of LORI HARDIN,
 6
                 Plaintiffs,           DALLAS COUNTY
 7       vs.

 8
     LINCOLN PROPERTY COMPANY,
 9
                 Defendant.            A-14th JUDICIAL
10                                     DISTRICT

11

12

13

14

15

16   VIDEOTAPED
     DEPOSITION OF:  CELESTE WESTBY
17
     DATE:      July 17, 2014
18
     PLACE:     Radisson Hotel
19                201 Fifth Street North
                  Fargo, North Dakota
20
     TIME:      11:49 a.m.
21
     REPORTED BY:  Paula D. Weber
22

23

24

25
```

## Page 2

```
 1              APPEARANCES

 2   FOR THE PLAINTIFFS HARDIN AND LEWIS:

 3   Asafi Law Firm
     Attorneys at Law
 4   PO Box 460082
     Houston, Texas 77056
 5   By:  J. A. "Jay" Asafi
          Asafi@AsafiLawFirm.com
 6

 7   FOR THE DEFENDANT LINCOLN PROPERTY COMPANY:

 8   Beirne Maynard & Parsons, L.L.P.
     Attorneys at Law
 9   1700 Pacific Avenue - Suite 4400
     Dallas, Texas 75201
10   By:  Sawnie A. McEntire
          smcentire@bmpllp.com
11

12   FOR THE DEFENDANTS LINCOLN PROPERTY COMPANY and
     CAMP PENDLETON & QUANTICO HOUSING, LLC:
13
     Lewis Brisbois Bisgaard & Smith, PLLP
14   Attorneys at Law
     333 Bush Street - Suite 1100
15   San Francisco, California 94104
     By:  Ralph A. Zappala
16        Ralph.Zappala@lewisbrisbois.com

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1              APPEARANCES - CONTINUED

 2   FOR THE WITNESS CELESTE WESTBY:

 3   Levin, Papantonio, Thomas,
     Mitchell, Rafferty & Proctor, P.A.
 4   Attorneys at Law
     PO Box 12308
 5   316 South Baylen Street - Suite 600
     Pensacola, Florida 32502
 6   By:  Christopher G. Paulos
          cpaulos@levinlaw.com
 7

 8   FOR THE PLAINTIFFS WESTBY:

 9   Cotchett, Pitre & McCarthy, LLP
     Attorneys at Law
10   San Francisco Airport Office Center
     840 Malcolm Road
11   Burlingame, California 94010
     By:  Ara R. Jabagchourian
12        ajabagchourian@cpmlegal.com

13

14   FOR THE DEFENDANT ABC FIRE EXTINGUISHER CO. INC:

15   Burnham Brown
     Attorneys at Law
16   1901 Harrison Street - 14th Floor
     PO Box 119
17   Oakland, California 94604
     By:  Lynn V. Rivera
18        lrivera@burnhambrown.com
          (appearing by telephone)
19

20   FOR JARSCO UTILITIES, INC.

21   Borton Petrini, LLP
     Attorneys at Law
22   95 South Market Street - Suite 400
     San Jose, California 95113
23   By:  Lynne L. Bentley
          lbentley@bortonpetrini.com

24   Also present:  Jeff Anders - Videographer

25
```

## Page 4

### CONTENTS

```
 1              CONTENTS

 2   CELESTE WESTBY                              PAGE

 3       Examination by Mr. McEntire ..........    6
         Examination by Mr. Asafi .............   81
 4       Examination by Mr. McEntire ..........   98
         Examination by Mr. Asafi .............  104
 5

 6

 7   DEPOSITION      DESCRIPTION                 PAGE
     EXHIBIT NO.
 8   1               Deposition Notice            5

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 5

1    P R O C E E D I N G S

2    (Whereupon, the deposition of CELESTE WESTBY

3    commenced at 11:49 a.m. as follows:)

4         (C. WESTBY EXHIBIT NO. 1 MARKED)

5         THE VIDEOGRAPHER:  We are now on the

6    record.

7         This is the video recording of the

8    deposition of Celeste Westby taken by the defendant's

9    attorney in the matter of Greg Hardin vs. Lincoln

10   Property Company in District Court of Dallas County,

11   Texas, A-14th Judicial District, Cause No.

12   DC-13-13771.

13        We are located at the Radisson Hotel

14   in Fargo, North Dakota.  Today's date is July 17th,

15   2014.  The time is 11:49 a.m.  The court reporter is

16   Paula Weber.  My name is Jeffrey D. Anders.  I'm the

17   videographer representing DepoTexas.

18        Will counsel for the respective parties

19   please identify yourselves starting with the

20   plaintiff's attorney.

21        MR. ASAFI:  Jay Asafi for the

22   plaintiffs, Greg Hardin and the parents of the

23   decedent, Lori Hardin, as well as the children of

24   Mr. Hardin, Ashton and Brady.

25        MR. McENTIRE:  Sawnie McEntire on

## Page 6

1    behalf of the defendant Lincoln Property Company.

2         MR. ZAPPALA:  Ralph Zappala on behalf

3    of Lincoln Property Company and Camp Pendleton &

4    Quantico Housing, LLC.

5         MS. BENTLEY:  Lynne Bentley on behalf

6    of Jarsco Utilities, Incorporated.

7         MR. PAULOS:  Chris Paulos on behalf of

8    the witness, Celeste Westby.

9         THE VIDEOGRAPHER:  Thank you.  And,

10   Mrs. Westby, you may remain seated, and the court

11   reporter will swear you in.

12        Please swear the witness.

13             CELESTE WESTBY

14   HAVING BEEN FIRST DULY SWORN TO TESTIFY THE TRUTH,
     THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE
15   TO THE CAUSE SPECIFIED, TESTIFIED AS FOLLOWS:

16             EXAMINATION

17   BY MR. McENTIRE:

18        Q.   Would you state your name for the

19   record, please.

20        A.   Celeste Westby.

21        Q.   Ms. Westby, --

22        MR. McENTIRE:  For the record, just

23   very quickly for counsels' purposes, this deposition

24   is being taken in connection with the matter pending

25   in State Court in Texas in the Hardin matter.  All

## Page 7

1    objections are reserved except as to form,

2    responsiveness, and leading.

3         And it's my understanding we have three

4    and a half hours, and Mr. Asafi and I have agreed to

5    an equitable allocation of that time.  And you've

6    been provided all the exhibits that we intend to use

7    or possibly use.

8         MR. PAULOS:  That's correct.

9         MR. McENTIRE:  Okay.  And it's my

10   understanding that no one will be asking questions or

11   otherwise verbally participating in the deposition

12   except myself, Mr. Asafi, and of course you on behalf

13   of the witness.

14        MR. PAULOS:  That's correct.

15        Q.   (Mr. McEntire continuing)  Okay.

16   Ms. Westby, I haven't asked my first question, and

17   I just noticed you're very emotional about this,

18   aren't you?

19        A.   Yes.

20        Q.   Okay.  I don't think I'm a bad guy so

21   what I'm going to tell you is if you want to stop the

22   deposition, let me know and we'll stop it, okay?

23        A.   Thank you.

24        Q.   And you can go talk to your lawyer.

25   You have two lawyers here, correct?

## Page 8

1         A.   Uh-huh.

2         Q.   Is that correct?

3         A.   Yes.

4         Q.   Okay.  Have you ever given your

5    deposition before?

6         A.   No.

7         Q.   This is not a memory test, and I'm not

8    intending to put any pressure on you.  I simply want

9    your best answers that you remember or recall under

10   the circumstances.

11        A.   Okay.

12        Q.   Okay.  If you want to take a break for

13   any reason, let me know, --

14        A.   Okay.

15        Q.   -- okay?  And if you feel any stress or

16   anything particular from an emotional perspective

17   that you really want a break, I will do that as well.

18        A.   Thank you.

19        Q.   We have a court reporter that takes

20   down everything that we say on this little machine

21   here.  It's important that you listen to my questions

22   and let me finish a question.  Try not to interrupt,

23   and I'll do my best not to interrupt you.

24        A.   Okay.

25        Q.   If for any reason you do not understand

1 one of my questions because I speak funny or I speak
2 too fast or whatever it is, let me know.
3     A.  Okay.
4     Q.  When we finish the deposition you're
5 going to get a chance, presumably, to read it and
6 sign it, but it's important to all of us, including
7 you and your lawyer, that you only answer questions
8 that you understood.
9     A.  Okay.
10     Q.  So if for any reason you do not
11 understand a question for any reason, let me know,
12 okay?
13     A.  Okay.
14     Q.  Fair enough.  Okay.  Have you -- you've
15 never given your deposition before.
16     A.  No.
17     Q.  Have you ever testified in a trial
18 before?
19     A.  No.
20     Q.  You ever filed a lawsuit before?
21     A.  No.
22     Q.  Okay.  You understand that you are a
23 plaintiff in a lawsuit currently pending in Federal
24 Court in California.
25     A.  Okay.

1 his deposition today.
2     A.  Yes.
3     Q.  Have you talked to him yet about his
4 deposition?
5     A.  No.
6     Q.  Okay.
7     A.  Just that he was happy it was over.
8     Q.  Happy it was over.  Okay.  Mr. Asafi is
9 here.  Have you ever met Mr. Asafi before?
10     A.  No.
11     Q.  Do you know -- to your knowledge have
12 you ever talked to him?
13     A.  Not that I know of.
14     Q.  Okay.  Mr. Asafi represents the Hardin
15 family, okay?  And you understand the Hardins have
16 filed a lawsuit.
17     A.  Yes.
18     Q.  Okay.  But to your knowledge before
19 today you'd never met him or talked to him.
20     A.  No.
21     Q.  How long have you been married to
22 Thor Westby?
23     A.  I know I should know this.  Fifteen
24 years.  Fifteen and a half years.
25     Q.  Okay.  Had you been married before?

1     Q.  Okay.  And your lawyer is sitting
2 directly next to you.  Is that correct?
3     A.  Yes.
4     Q.  You understand you've filed a lawsuit.
5     A.  Yes.
6     Q.  Okay.  And even though this is a
7 different lawsuit in which you're giving your
8 deposition testimony, you know that I'm technically
9 adverse to you.  I represent somebody you've sued.
10     A.  Okay.
11     Q.  Is that fair enough?
12     A.  Yes.
13     Q.  Okay.  You've sued Lincoln Property
14 Company in the case in California, and there's a
15 separate case in Texas where Lincoln Property Company
16 has also been sued but not by you.
17     A.  Okay.
18     Q.  Okay.  All right.  What is your current
19 address?
20     A.  600 Pacific Avenue, Campbell,
21 Minnesota.
22     Q.  Okay.  And you're married to Thor
23 Westby?
24     A.  Yes.
25     Q.  And you understand Thor's just given

1     A.  Yes.
2     Q.  And who was your husband before Thor?
3     A.  Richard Side.
4     Q.  Richard -- I'm sorry?
5     A.  Side.  S-i-d-e.
6     Q.  And was that a divorce?
7     A.  Yes.
8     Q.  And when was that divorce?
9     A.  I think we filed separation -- well,
10 in '95, '96.
11     Q.  Where were you living at the time?
12     A.  Virginia Beach.
13     Q.  Virginia Beach, Virginia?
14     A.  Norfolk, Virginia, yes.
15     Q.  Norfolk.  So the divorce papers would
16 have been filed there?
17     A.  Yes.
18     Q.  Your married name at the time would
19 have been Celeste Side?
20     A.  Yes.
21     Q.  All right.  And how long had you been
22 married to Mr. Side?
23     A.  Somewhere between two and a half and
24 three years.  They take a year to finalize the
25 divorce.  That's why I'm having difficulty with the

## Page 13

1 dates.
2    Q.   Understood.  How old a woman are you?
3    A.   Forty.
4    Q.   You have two children?
5    A.   Yes.
6    Q.   You have Talon with Thor Westby?
7    A.   Yes.
8    Q.   And you had a daughter by the name of
9 Jacqueline?
10    A.   Yes.
11    Q.   And how old is Jacqueline today?
12    A.   She turned 20 in July.
13    Q.   Okay.  And the biological father for
14 Jacqueline would be Richard Side?
15    A.   Richard.
16    Q.   Okay.  Do you have any other children?
17    A.   No.
18    Q.   Is Jacqueline currently dependent on
19 you and Thor?
20    A.   No.
21    Q.   Okay.  Where does Jacqueline live?
22    A.   Sacramento.  Or Carmichael, California.
23    Q.   Do you know her address?
24    A.   Not off the top of my head, no.
25    Q.   Okay.  And what is her last name?

13

## Page 14

1    A.   Jones-Side.  J-o-n-e-s  S-i-d-e.
2    Q.   Where does the Jones come?  Was that
3 your maiden name?
4    A.   Yes.
5    Q.   So it was -- she took your maiden name
6 and then hyphenated it with Side.
7    A.   Yes.
8    Q.   Is that how you were known?  Were you
9 known as Celeste Jones-Side as well?
10    A.   No.  Just Side.
11    Q.   Just Side.  Okay.  When is the last
12 time you saw your daughter, Jacqueline?
13    A.   May of last year when we moved out
14 here.
15    Q.   May of 2013?  Do you talk to her
16 frequently on the phone?
17    A.   Yes.
18    Q.   How often do you think?
19    A.   We normally text quite regularly.
20 I currently don't have a phone so I haven't spoken to
21 her in a while.
22    Q.   Okay.  How long do you think it's been
23 since you have talked to her?
24    A.   Probably about a month.
25    Q.   Have you given any type of witness

14

## Page 15

1 statements in connection with this matter or this --
2 this event, this incident?
3    A.   I spoke with NCIS.
4    Q.   Okay.  And someone came and took notes
5 and they talked to you for a little while.
6    A.   Yes.
7    Q.   But have you ever signed any kind of
8 statement to your knowledge?
9    A.   Not to my knowledge.
10    Q.   Have you ever been tape recorded to
11 your knowledge?
12    A.   Not to my knowledge.
13    Q.   So this is the first formal interview
14 you really ever had where everything's being
15 recorded.
16    A.   Anything that stays up here.
17    Q.   Okay.  All right.  Are you on any
18 medication today that would inhibit or somehow
19 frustrate your testimony today?
20    A.   I don't know whether it would inhibit
21 it or not, but, yes, I am on medication.
22    Q.   What type of medication?
23    A.   Zoloft.
24    Q.   Antidepressant?  That's an
25 antidepressant to my knowledge.

15

## Page 16

1    A.   Yes.
2    Q.   Okay.
3    .A.   And Percocet.
4    Q.   Percocet.  Percocet's for pain?
5    A.   Uh-huh.
6    Q.   Okay.  How long have you been on the
7 Zoloft?
8    A.   About two months after being released
9 from the hospital.
10    Q.   After this incident.
11    A.   Yes.
12    Q.   Were you on Zoloft or any type of
13 antidepressants before the incident?
14    A.   Years ago, yes, during my divorce.
15    Q.   Okay.  And what medication were you on
16 then?
17    A.   Zoloft.
18    Q.   Okay.  Have you been on any type of
19 anti-anxiety medication?
20    A.   You'd have to be more specific.
21    Q.   Okay.  Before this incident -- let's
22 back up and define the term incident.
23    A.   Okay.
24    Q.   You understand there was an explosion
25 and a fire.  It occurred on February 3rd, 2012, at

16

1 the Coleville facility, right?

2     A.    Right.

3     Q.    And you were involved in that explosion

4 and fire.

5     A.    Yes.

6     Q.    When I refer to incident, that's what

7 I'm referring to.

8     A.    Okay.

9     Q.    You understand that.

10     A.    Yes. I was -- go ahead.

11     Q.    Prior to the date of that incident, had

12 you been on any type of Zoloft medication other than

13 in connection with your divorce?

14     A.    No, not since after the divorce.

15     Q.    Okay. Were you on any other types of

16 medication prior to the incident other than the

17 Zoloft that you identified?

18     A.    Not to my knowledge.

19     Q.    Do you smoke cigarettes?

20     A.    Yes.

21     Q.    Still smoke cigarettes?

22     A.    Yes.

23     Q.    Okay. Were you smoking cigarettes at

24 the time of the incident?

25     A.    I don't know if I was at the exact time

17

---

1 of the incident.

2     Q.    Of course not. That's not what

3 I meant. And I apologize.

4     A.    Yes, I was a smoker at the time.

5     Q.    And that's a really good point. My

6 question was not a very good question. It wasn't

7 very specific. I understand why you reacted the way

8 you did. So I'll ask you to continue to do that if

9 you think my question's a poor one, okay? Just let

10 me know. Is that fair?

11     A.    I just don't want to get confused.

12     Q.    Understood. So were you a cigarette

13 smoker on -- on and before the date of the incident?

14     A.    Yes.

15     Q.    Okay. How much were you smoking?

16     A.    Maybe a half a pack if I had to guess.

17     Q.    Okay. And your residence was at

18 702 Champagne, A.

19     A.    Okay.

20     Q.    702-A Champagne, correct?

21     A.    Okay.

22     Q.    Does that sound right to you?

23     A.    We can go with that, yes.

24     Q.    Okay. We talked to your husband

25 earlier today, and he said that you all typically

18

---

1 would not smoke in the house. If you smoked you

2 would either smoke outside or in the garage.

3     A.    Yes.

4     Q.    Is that fair?

5     A.    Yes.

6     Q.    So as a general practice even on the

7 date of the incident or before, if you smoked

8 cigarettes it would be either outside or in the

9 garage.

10     A.    Away from the children, yes.

11     Q.    You say children. Did you have two

12 children living there at the time?

13     A.    No, only one. Just my son.

14     Q.    Talon.

15     A.    Uh-huh.

16     Q.    Okay. And how long had it been since

17 Jacqueline had moved out of the house?

18     A.    This is where I get foggy so I don't --

19 I don't want to answer incorrectly.

20     Q.    Give me your best recollection.

21     A.    December the year before the accident.

22     Q.    Okay. So --

23     A.    Christmastime.

24     Q.    The accident happened in February of

25 2012, so you're thinking December of 2011?

19

---

1     A.    Yeah.

2     Q.    Just a few months before?

3     A.    Yeah. I guess it was, wasn't it? That

4 doesn't seem right to me.

5     Q.    Was it just a few months before?

6     A.    No, I want to say it was a year.

7     Q.    Okay. So it would have been --

8     A.    December of 2010.

9     Q.    -- December of 2010. Where was

10 Jacqueline? She moved out of the house?

11     A.    Yes.

12     Q.    Where did she move to?

13     A.    With her biological father.

14     Q.    And where was that?

15     A.    Oxnard.

16     Q.    Is that close to the base?

17     A.    To our base?

18     Q.    Yes.

19     A.    No.

20     Q.    Okay. Did you see Jacqueline during

21 the intervening period?

22     A.    No.

23     Q.    So during that one year after she moved

24 out you did not see her.

25     A.    No.

20

1    Q.   She never came by the house?

2    A.   She was ten hours away and she didn't

3  have a license.

4    Q.   Okay.  Why did she move out?

5    A.   Irreconcilable differences.

6    Q.   Between yourself and her?

7    A.   Yes.  And she wanted to get to know her

8  father.  She had never really spent time with him.

9    Q.   The differences were between yourself

10  and your daughter, not between her and your husband,

11  Thor, or both?

12    A.   I would say difficult teenager.

13    Q.   All right.  Have -- you personally, are

14  you a drinker?

15    A.   Sometimes.

16    Q.   Okay.  Do you still drink today?

17    A.   No.

18    Q.   Okay.  Have you ever sought any type of

19  professional counseling --

20    A.   No.

21    Q.   -- in connection with drinking?  Were

22  you seeing any psychiatrists or psychologists before

23  the incident?

24    A.   No.

25    Q.   Let me hand you what has been

---

1  previously marked as Exhibit 2.  And this was to

2  your husband's deposition, but we're going to use the

3  same exhibit for this deposition.  All right?

4    A.   Uh-huh.

5    Q.   Exhibit 2 is a very simple diagram of

6  the Coleville military housing complex.

7    A.   Uh-huh.

8    Q.   And I asked him to highlight where

9  you and your husband and Talon lived in 702-A

10  Champagne, correct?

11    A.   Uh-huh.

12    Q.   You have to say yes or no.

13    A.   Oh, I'm sorry.  Yes.

14    Q.   The court reporter can't pick up --

15    A.   I know.  I'm sorry.

16    Q.   Not a problem.

17    A.   I apologize.

18    Q.   Okay.  And so does that generally

19  refresh your memory as to where you lived?

20    A.   Yes.

21    Q.   Okay.  I also asked him to highlight

22  the community center.  Do you see the community

23  center?

24    A.   Yes.

25    Q.   Okay.  Do you know where the Heads

---

1  lived?

2    A.   No.

3    Q.   There's been some indication that your

4  husband was close to Steven Head.  But you don't know

5  where the Heads would have lived.

6    A.   I have no recollection of -- I couldn't

7  put his name with his face.

8    Q.   Okay.  How about the chaplain, did you

9  know the chaplain?

10    A.   No.

11    Q.   Chaplain Taylor who is the base

12  chaplain?

13    A.   No.

14    Q.   Do you even know what he would look

15  like?

16    A.   No.

17    Q.   So you don't recall ever meeting him

18  either.

19    A.   No.

20    Q.   Okay.  Did you ever go to the community

21  center?

22    A.   I did prior years with the old

23  chaplain.  Our sons were friends.

24    Q.   Okay.  But the new chaplain had been

25  there almost two years, but you don't ever recall

---

1  meeting him.

2    A.   No.

3    Q.   You lived at the -- before the incident

4  you had lived at the complex for almost three years.

5  Is that right?

6    A.   Yes.

7    Q.   Okay.  And so if your husband was

8  friends with Steve Head, you don't know that to be a

9  fact one way or the other.

10    A.   I -- his name is familiar to me.

11    Q.   But you don't recall --

12    A.   I couldn't put his name with his face.

13  I know I've probably met him if I had to guess, but

14  I would rather not guess.

15    Q.   Okay.  Sure.  And you don't recall what

16  the chaplain would have looked like and you don't

17  recall meeting him.

18    A.   No.

19    Q.   And you likewise don't recall meeting

20  the chaplain's wife at all.

21    A.   No.

22    Q.   Okay.  And you used to go to the

23  community center when the old chaplain was there.

24    A.   Yes.

25    Q.   But you don't really recall going to

1 the community center after he left.

2     A. I did the summer Bible -- vacation

3 Bible school with the old chaplain's wife.

4 I volunteered with the kids.

5     Q. And that would have been probably two

6 years before the incident.

7     A. Yes.

8     Q. And since they departed, do you recall

9 ever going to the community center?

10     A. Yes.

11     Q. Was it frequent or infrequent?

12     A. Infrequent.

13     Q. Okay.

14     A. My children both did sports with the

15 schools.

16     Q. Okay. Did you have a job at the time

17 of the incident?

18     A. No.

19     Q. Were you a stay-at-home mom?

20     A. Yes.

21     Q. Okay. Did you have any hobbies outside

22 of the home?

23     A. Driving to sports.

24     Q. Okay. Other than -- fair enough. That

25 would be Talon's sports teams.

1     A. And Jacqueline.

2     Q. Okay. And Jacqueline had been gone for

3 about a year.

4     A. Yes.

5     Q. So other than driving to Talon's sports

6 for -- since December of 2010 up through the date of

7 the incident, other than driving him to his sporting

8 activities did you have any other ongoing

9 out-of-the-house activities?

10     A. No. Grocery shopping.

11     Q. Fair enough. Okay. Did you know Lori

12 Hardin?

13     A. Yes.

14     Q. Okay. Did you ever have the Hardins

15 over for dinner?

16     A. No.

17     Q. You lived next door to them for

18 probably nine or ten months.

19     A. Yes.

20     Q. Okay. Did Lori Hardin ever come into

21 your house?

22     A. Yes.

23     Q. On how many occasions?

24     A. We dog sat for them so I couldn't give

25 you an exact number.

1     Q. I'm sorry?

2     A. I couldn't give you an exact number.

3     Q. Okay. What did you say before that?

4     A. We dog sat for them.

5     Q. Dog sat for them. That's a good point.

6 They had a pet, didn't they?

7     A. I think they had two.

8     Q. Two little dogs?

9     A. One large.

10     Q. One large and one small. Did you have

11 any pets?

12     A. Yes.

13     Q. What did you have?

14     A. A golden retriever and a Cairn terrier.

15     Q. A terrier is a little small dog?

16     A. Uh-huh.

17     Q. Okay. And the retriever a little bit

18 bigger dog, right? And so when they would ever leave

19 you would sometimes dog sit for them.

20     A. Yes.

21     Q. Okay. Are you okay?

22     A. Yeah.

23     Q. Is there something I said that made you

24 cry? Because if it is, I won't ask those type of

25 questions. I just need to understand. Are you okay?

1     A. Yes.

2     Q. Okay. You know I don't mean to make

3 you cry.

4     A. I know.

5     Q. Okay. Do you need to take a break?

6     A. Could I?

7     Q. Yes.

8     THE VIDEOGRAPHER: We are now going off

9 the record.

10     (Recess from 12:06 to 12:16)

11     THE VIDEOGRAPHER: We are now back on

12 the record.

13     Q. (Mr. McEntire continuing) Go ahead.

14     A. The Zoloft, I was put on it

15 approximately ten years ago for about a year and a

16 half to two years.

17     Q. Okay. That was before your divorce?

18     A. It was after my divorce. We were --

19 received orders to live in the same town as my

20 ex-husband.

21     Q. Okay. And you went on the Zoloft --

22     A. Yes.

23     Q. -- at that time. Okay. And how long

24 were you on the Zoloft?

25     A. I'm sorry, I have to do the math in my

1 head. Maybe two years.

2     Q.  Two years?

3     A.  Yeah.

4     Q.  Okay.

5     A.  That's an approximate.

6     Q.  Okay.  And where were you living at the

7 time?

8     A.  Fallon -- or San Diego.  Sorry.

9     Q.  San Diego?

10     A.  We were in Fallon, Nevada, when

11 I started and then San Diego for a little while.

12     Q.  Okay.  All right.  Going back to your

13 home at 702 Champagne, let me hand you what is

14 another picture which is -- or Exhibit No. 3, which

15 is a diagram of your house.  You understood that your

16 house was part of a duplex unit that you shared with

17 the Hardin family.

18     A.  Yes.

19     Q.  And do you see the two units there are

20 combined, how they connect at the garage?

21     A.  Yes.

22     Q.  Does that seem generally familiar to

23 you?

24     A.  Yes.

25     Q.  Okay.  In fact I'm going to hand you

1 what has been marked as Exhibit 5.  This is an

2 exterior shot of an example of the type of house that

3 you were living in at the time.  Is that correct?

4     A.  Yes.

5     Q.  You would have lived on the left-hand

6 side of the duplex unit, and the Hardin family would

7 have lived on the right.

8     A.  Yes.

9     Q.  Okay.  The garage would have been

10 approached from the street and you would have a

11 driveway into your garage.

12     A.  Yes.

13     Q.  Your husband has testified that the

14 garage was not separately air conditioned or heated.

15 Is that correct?

16     A.  To the best of my knowledge.

17     Q.  Okay.  It gets cold where you were,

18 right?

19     A.  Yes.

20     Q.  In fact I think the evidence in this

21 case will show that it was below freezing on the date

22 of the incident, in the high 20s, 27, 28 degrees,

23 okay?

24     A.  Okay.

25     Q.  Do you have any recollection of that

1 one way or the other?

2     A.  No.

3     Q.  Okay.  But you do know that it

4 frequently got below freezing.

5     A.  Yes.

6     Q.  Okay.  And so if you were going to

7 smoke a cigarette, you would either go outside or in

8 the garage where it might be a little warmer.

9     A.  Yes.

10     Q.  Okay.  So if you were going to smoke a

11 cigarette when it was below freezing weather, it

12 would be more likely than not you'd probably smoke it

13 in the garage.

14     A.  I couldn't agree with that because

15 I have two dogs --

16     Q.  Okay.

17     A.  -- and they'd go outside to use the

18 bathroom.

19     Q.  Sure.  When you'd take your dogs out

20 you may smoke a cigarette as well.

21     A.  Yes.

22     Q.  Okay.  If you were not taking your dogs

23 out you might go into the garage.

24     A.  I might.

25     Q.  I'll hand you what has been

1 marked as Exhibit No. 4, which is a diagram of

2 your -- of your house.  Do you see it?

3     A.  Uh-huh.

4     Q.  And all the handwriting and the yellow

5 marking is marking put on there by your husband

6 earlier today, okay?

7     A.  Okay.

8     Q.  And he circled the bedroom.  Do you see

9 where it says "bed"?

10     A.  Uh-huh.  Yes.

11     Q.  And you see the utility room next to

12 the garage, right next to door number 1 --

13     A.  Yes.

14     Q.  -- and door number 2.  Do you see that?

15     A.  Yes.

16     Q.  Your husband said that whenever he

17 would smoke a cigarette in the garage, particularly

18 during the winter months, he would go into the garage

19 and shut the door because he didn't want the

20 cigarette smoke in the house.

21     A.  Yes.

22     Q.  Did you do the same thing?

23     A.  Yes.

24     Q.  And that when he finished smoking a

25 cigarette, particularly in the cold winter months,

1 he would shut the door because he didn't want all the
2 warm air to go into the garage, keep the house warm.
3 Does that sound right?
4     A.   It sounds like a considerate thing to
5 do.
6     Q.   Was that more or less consistent with
7 the behaviors you would expect of him?
8     A.   Yes.
9     Q.   And is that also a practice that you
10 probably would have followed?
11     A.   Yes.
12     Q.   So going in and out of the garage
13 during the day or the nighttime during February of
14 2012, typically you would shut the door when coming
15 back in or leaving.
16     A.   Yes.
17     Q.   The bedroom door, did you typically
18 keep that open or shut?
19     A.   It would depend on whether or not I was
20 in there by myself.  If I was taking a nap.
21     Q.   Okay.
22     A.   I'm going off of what I do now at this
23 time.
24     Q.   Sure.  Well, back then there's some
25 indication that on the date of the incident you were

1 not feeling well.
2     A.   Okay.
3     Q.   Do you recall that?
4     A.   No.
5     Q.   Okay.  And that you were a little under
6 the weather.  So if that was the case and you had
7 gone to bed, would the door have been shut or open?
8     A.   Thor would have most likely closed the
9 door.
10     Q.   Okay.  So in all likelihood then that
11 door would have been closed.
12     A.   Possibly.
13     Q.   Okay.  With regard to -- you have a
14 ceiling fan in the bedroom?
15     A.   I don't know.
16     Q.   Okay.  You don't remember?
17     A.   No.
18     Q.   There's a ceiling fan in the living
19 room.  Do you remember that?
20     A.   No.
21     Q.   Okay.  You don't recall that when you
22 turn on the light switch the ceiling fan goes on or
23 off?
24     A.   No.  I don't recall there being ceiling
25 fans.

1     Q.   Fair enough.  Do you recall that you
2 had three appliances in the house?  The stove.
3     A.   Yes.
4     Q.   The hot water heater.
5     A.   Yes.
6     Q.   And a furnace.
7     A.   Would that be the heater thing?
8     Q.   Yes, ma'am.
9     A.   Yes.
10     Q.   Okay.  The hot water heater and the
11 furnace were located in the utility room.
12     A.   Yes.
13     Q.   And he's marked the utility room.  Do
14 you see where -- I think it actually refers to
15 utility room.  Do you see it there?
16     A.   Yes.
17     Q.   Okay.  So your memory would be that
18 the furnace and the hot water heater would be in
19 that area.
20     A.   Yes.
21     Q.   Do you remember what walls they were
22 on?
23     A.   The left.
24     Q.   Okay.  Did you ever have any occasion
25 to adjust the furnace or do anything to the furnace?

1     A.   No.
2     Q.   Typically the furnace is operated by a
3 thermostat, right?
4     A.   Yes.
5     Q.   Do you know where the thermostat was?
6     A.   In the hallway.
7     Q.   Typically at what temperature would you
8 keep it during the winter months when it was really
9 cold outside?
10     A.   I want to guess between 60 and 65.
11     Q.   Okay.  Do you kind of like the colder
12 temperature?
13     A.   Yeah.  We're not heat people.
14     Q.   Okay.  So he indicated 65 to 68.
15     A.   Okay.
16     Q.   Is that in the realm of your experience
17 as well?
18     A.   I guess.
19     Q.   Okay.  Does that seem inconsistent with
20 where you would have kept it?
21     A.   No.
22     Q.   Okay.  And prior to the date of the
23 incident, which is February 3, 2012, did you have any
24 problems keeping your house warm?
25     A.   No, not to my knowledge.

1      Q.   Do you recall anything -- any serious
2  problem about:  Our furnace is not working, --
3      A.   No.
4      Q.   -- anything like that?
5      A.   The last thing I remember is our fence
6  blowing away in a storm.
7      Q.   Okay.  And when was that?
8      A.   I don't know when it was.  I just
9  remember it blowing away.
10      Q.   In a big thunderstorm or a windstorm?
11      A.   I think it was a windstorm.
12      Q.   It was sometime well before --
13      A.   I don't recall if it was raining.
14      Q.   It was well before the incident though.
15      A.   Yes.  I guess.
16      Q.   Okay.  Fair enough.  I want to talk
17  about the appliances now, --
18      A.   Okay.
19      Q.   -- okay?  You don't recall any problems
20  ever associated with the furnace not working or not
21  properly heating the house, do you?
22      A.   No.
23      Q.   Do you recall any problems in getting
24  hot water in the house?
25      A.   No.

                                                    37

1  furnace, keeping the pilot light lit on the furnace?
2      A.   I didn't know there was a pilot light
3  on the furnace.
4      Q.   So I take it then by your answer that
5  you were not aware of any problems.
6      A.   No, I was not.
7      Q.   As far as you knew, the furnace and the
8  hot water heater were performing just like they were
9  supposed to.
10      A.   Yes.
11      Q.   Did you ever smell any propane on the
12  date of the incident?
13      A.   I don't know.
14      Q.   Okay.
15      A.   I don't recall.
16      Q.   Okay.  Was there any physical -- did
17  you have any physical problem that you're aware of
18  that would have prevented you from smelling propane?
19          MR. PAULOS:  Object to form.
20      A.   Not to my knowledge.
21          MR. PAULOS:  You can answer.
22      Q.   (Mr. McEntire continuing)  I'm asking --
23  I'm asking based upon what you know.
24      A.   Not to my knowledge.  I don't know.
25      Q.   Well, you're a 40-year-old woman,

                                                    39

1      Q.   I'm assuming, like a lot of people, you
2  either bathe or -- every day or every other day or
3  thereabouts, take showers or a bath, right?
4      A.   Uh-huh.
5      Q.   Presumably you don't take cold showers,
6  right?
7      A.   I would assume I didn't.
8      Q.   Okay.  There you go.  So using the hot
9  water, that would have been a typical standard
10  practice, right?
11      A.   Uh-huh.
12      Q.   Okay.  You have to say yes or no.
13      A.   Yes.  I'm sorry.
14      Q.   Do you recall any problems at all with
15  getting hot water in the house?
16      A.   No.
17      Q.   Okay.  So as far as you knew, you had
18  no problems with the hot water heater.
19      A.   Not to my knowledge.
20      Q.   Do you recall any problems prior to the
21  date of the incident or on the date of the incident
22  with regard to the pilot light on the hot water
23  heater?
24      A.   Not to my knowledge.
25      Q.   Any problems associated with the

                                                    38

1  right?
2      A.   Yes.
3      Q.   Okay.  Has anybody ever told you that
4  you have some type of deficiency in your ability to
5  smell?
6      A.   No.
7      Q.   Has anybody ever told you you had a
8  deficiency in terms of your ability to smell things
9  like gas or natural gas?
10      A.   I wouldn't know what the difference
11  would be.
12      Q.   Fair enough.  But you've smelled
13  propane before, have you not?
14      A.   No.
15      Q.   Never smelled propane.
16      A.   No.  Not to my knowledge.
17      Q.   So if your husband has testified that
18  he smelled propane every time he would light the
19  oven, are you saying he's not right?
20      A.   I would have assumed it was gas.
21      Q.   Propane is gas.  Fair enough.
22      A.   I've lived in homes with gas.  It's
23  never been my responsibility to do the maintenance.
24      Q.   Fair enough.  You've smelled gas
25  before.

                                                    40

```
 1      A.   Yes.
 2      Q.   And when you turned the stove on at
 3 your house here at 702 Champagne, you'd smelled gas
 4 before.
 5      A.   Yes.
 6      Q.   Okay.
 7      A.   But just when it starts up.
 8      Q.   Sure.  And it kind of smells like
 9 rotten eggs, doesn't it?
10      A.   I guess.  I haven't been around gas
11 since the accident so I don't really remember.
12      Q.   Okay.  Well, for -- so if your husband
13 has testified that he was familiar with the odor of
14 propane or gas, you wouldn't deny that, would you?
15      A.   Oh, no.
16      Q.   Okay.  And you may have remembered that
17 you could smell gas, but you have not been around gas
18 since then so you don't have any specific
19 recollection.
20      A.   No.
21      Q.   You may have had an appreciation of
22 what propane smelled like at the time, rotten eggs or
23 otherwise, but you just don't recall at this time.
24           MR. PAULOS:  Object to form.
25           You can answer.
```

                                                    41

```
 1      Q.   (Mr. McEntire continuing)  Is that fair?
 2           MR. PAULOS:  Just give me time.  I'll
 3 object but you can go ahead and answer.
 4      A.   Can you repeat that?
 5      Q.   (Mr. McEntire continuing)  Sure.  You're
 6 not saying you have an unequivocal impression that
 7 you didn't know what gas smelled like, are you?
 8      A.   No.
 9           MR. PAULOS:  Object to form.
10      Q.   (Mr. McEntire continuing)  Okay.
11 All right.  So what you're saying right now is you
12 just don't recall one way or the other.
13      A.   I don't recall what I would associate
14 the odor with.
15      Q.   Okay.  Fair enough.  But you do recall
16 smelling gas whenever you would light the stove.
17      A.   I couldn't say every time I've lit the
18 stove, but I had smelled it before.
19      Q.   Okay.  Well, did you smell rotten eggs
20 in the house on the date of the incident?
21      A.   I don't remember anything the day of
22 the incident --
23      Q.   Okay.
24      A.   -- so I couldn't answer that.
25      Q.   So you can't answer that question.
```

                                                    42

```
 1      A.   No.
 2      Q.   So if your husband said he didn't smell
 3 any gas in the house, you're not in a position to
 4 dispute that one way or the other.
 5      A.   No, I am not.
 6      Q.   Did you smell any gas in the house the
 7 day before the incident?
 8      A.   I don't remember the day before the
 9 incident.
10      Q.   What is the last thing that you
11 remember before the incident?
12      A.   At some point picking my son up from
13 school and talking to a parent, but I don't know what
14 day.
15      Q.   It could be --
16      A.   It could have been that week.  It could
17 have been the week before.
18      Q.   You have no memory.
19      A.   No.
20      Q.   So you have no memory at all of what
21 happened on the date of the incident.
22      A.   During the day, no.
23      Q.   What is your first memory after the
24 incident?
25      A.   Hearing people calling my husband's
```

                                                    43

```
 1 name.
 2      Q.   Okay.  Do you remember the incident
 3 itself?
 4      A.   No.
 5      Q.   So the last thing you remember before
 6 the incident is picking your son up from school a day
 7 or two before.
 8      A.   At some point.  It could have been a
 9 memory from the week before.  I would -- we took
10 turns.
11      Q.   And you have no memory specifically of
12 the day.
13      A.   No.
14      Q.   You have no memory even of being ill,
15 do you?
16      A.   No.
17      Q.   And the first thing you remember then
18 after that is after the incident occurred.
19      A.   Yes.
20      Q.   So you have no memory at all about what
21 happened in connection with the actual incident
22 itself.
23      A.   No.
24      Q.   Is that correct?
25      A.   That's correct.
```

                                                    44

1    Q.   Okay.  Do you know where you were at
2 the time of the incident?
3    A.   No.
4    Q.   So you're not in a position to say what
5 you smelled or didn't smell one way or the other.
6    A.   No, I'm not.
7    Q.   Okay.  But you're not here today to
8 dispute what your husband's testified to.
9    A.   No.
10        MR. ASAFI:  Object to the form.
11   Q.   (Mr. McEntire continuing)  With regard
12 to what he did or did not smell.  Is that correct?
13   A.   That's correct.
14   Q.   Are you okay?
15   A.   I'm okay.
16        MR. PAULOS:  Take some water.
17   Q.   (Mr. McEntire continuing)  Okay.  Let me
18 know and I'll break again for you, okay?
19        Do you know who was at the house at the
20 time of the incident?
21   A.   No.
22   Q.   Was your son at home?
23   A.   No.
24   Q.   You know your husband was.
25   A.   Yes.

1    A.   It was a gift.
2    Q.   From your parents.
3    A.   Yes.
4    Q.   How long before the incident did you
5 purchase the washer/dryer?
6    A.   I think it was a year and two months.
7 It was not the most recent Christmas.  It was the
8 Christmas before.
9    Q.   Okay.  And it was an electric
10 washer/dryer.
11   A.   Yes.
12   Q.   The old washer/dryer, did you -- do you
13 remember why you got rid of them?
14   A.   They were old and the washer leaked.
15   Q.   The washer leaked?
16   A.   Yes.
17   Q.   Was that an electric dryer as well?
18   A.   Yes.
19   Q.   Okay.  Did you ever have a gas
20 appliance there for a washer and a dryer?
21   A.   No.
22   Q.   Did your husband participate at all in
23 the removal and replacement --
24   A.   No.
25   Q.   -- of the washer/dryer?  Who did that,

1    Q.   And yourself, correct?
2    A.   Correct.
3    Q.   Would there be anybody else at the
4 house?
5    A.   No.
6    Q.   There's a door between the utility room
7 and the main hallway.  Do you see that?
8    A.   Yes.
9    Q.   The door is marked as number 2 on
10 Exhibit No. 4.  Do you see that?
11   A.   Yes.
12   Q.   Your husband has testified that he
13 typically would leave that door open.  Does that
14 sound consistent with your memory?
15   A.   Yes.
16   Q.   There's a light switch in the utility
17 room that -- for illumination, for light, and when
18 you turn it on a fan goes on.  Do you recall that at
19 all --
20   A.   No.
21        MR. PAULOS:  Object to form.
22   Q.   -- one way or the other?
23   A.   I do not remember one way or the other.
24   Q.   (Mr. McEntire continuing)  Okay.  You
25 all bought a washer and a dryer?

1 do you remember?
2    A.   Best Buy.
3    Q.   Were you there when they did that work?
4    A.   Yes.
5    Q.   All right.  Did you ever have occasion
6 to move the washer and dryer after they installed it?
7    A.   No.
8    Q.   There was a company that did some work
9 in the attic.  Do you recall that?
10   A.   Yes.
11   Q.   The date of the incident was
12 February 3, 2012.  Do you recall in terms of time
13 period how long before the date of the incident they
14 were working in the attic?
15   A.   No.
16   Q.   What do you recall about them coming
17 out there?
18   A.   That they were next door for a long
19 time, and then they came over to my house and went
20 into the attic.  And I don't remember if they went
21 all the way in or not.  I remember they then
22 proceeded to go down to Lincoln to request to cut a
23 wall or something.
24   Q.   In your house?
25   A.   Yes.

Q. Okay. So you recall a company coming out. Do you remember the name of the company?

A. No. I just remember a red truck.

Q. Okay. And the attic access portal is in the utility room?

A. Yes.

Q. Kind of a little door. You get on a ladder, you push it open, and you crawl up. Kind of like a crawl space.

A. I wouldn't, but yes.

Q. Had you ever been up in the attic?

A. No.

Q. Even know what it looks like up there?

A. No. Don't even own a ladder.

Q. Don't own a ladder. And I take it then when you say you don't own a ladder, that's a collective, --

A. Yes.

Q. -- you and your husband don't own a ladder.

A. Yes.

Q. Okay. So they came out there to do some work. And do you know what the purpose of the work was?

A. No. I do know that the fire alarm in

between the two houses was the reason I noticed them because they were testing it or something. It was very loud.

Q. Okay. You're talking about the fire alarm between the two houses, the Hardins' residence and your residence?

A. Yes.

Q. Okay. And how long were they there?

A. I can't say exactly, but for some reason a couple of days keeps ringing in my head.

Q. They were coming and going for a couple of days?

A. Yes.

Q. And so during that couple of days you think they actually went up into the attic?

A. I can remember a really tall man for some reason, and I don't remember whether he went all the way up in or not. I remember something about Lincoln -- a smaller man coming from Lincoln and saying there was no need to cut something because there was plenty of room.

Q. Plenty of room.

A. Yeah.

Q. Okay. All right. And when do you think this happened? A few days before the actual

incident? A week or so?

A. I...

Q. How was it resolved? Did they just quit coming?

A. I don't remember.

Q. Was there something broken up there?

A. I don't remember.

Q. Do you know -- so you don't even know why they were up there.

A. I thought it was because the garage sprinklers. For some reason we had sprinklers there.

Q. Fair enough. Did you ever talk to the people who were managing the property? Did you know Caroline Parker or Melody?

A. The names are familiar, but I couldn't tell you which one looks like what.

Q. Sure. But you probably had communications with them before?

A. I'm sure.

Q. Did they ever refuse to cooperate and do what you asked them to do or try to fix --

A. Never.

MR. PAULOS: Object to form.

Q. (Mr. McEntire continuing) Did they always seem cooperative and responsive to your

knowledge?

A. To my knowledge.

Q. Okay. And you never complained to them about your furnace?

A. No.

MR. PAULOS: Object to form.

Q. (Mr. McEntire continuing) And you never complained to either Caroline or Melody about the hot water heater?

A. No.

Q. And you never complained to Melody or Caroline about your stove.

A. Not to my knowledge.

Q. To your knowledge did the stove always work?

A. Uh-huh. Yes.

MR. ZAPPALA: Is that a yes? I'm sorry.

A. I'm sorry.

Q. (Mr. McEntire continuing) And so when you wanted to turn on the top stove burner, it would ignite?

A. Yes.

Q. To your knowledge you'd never had any problems with the ignition on the stovetop burners?

| | |
|---|---|
| 1    A.   Not to my knowledge. | 1    A.   We would have left the house and, if we |
| 2    Q.   The stove had some flex tubing that | 2  had to, walk down to Lincoln. |
| 3  connects it to the fuel source, the gas.  It's kind | 3    Q.   So if you smelled gas, you would have |
| 4  of like this little flex piping.  You know what I'm | 4  left the house. |
| 5  talking about? | 5    A.   Yes. |
| 6    A.   No. | 6    Q.   Again, it was February 28th -- excuse |
| 7    Q.   Did you ever have occasion to move the | 7  me, February 3rd when the incident happened.  On that |
| 8  stove? | 8  date it was -- I think the evidence will show that it |
| 9    A.   No.  Not to my knowledge. | 9  was cold.  Would you have typically kept your windows |
| 10    Q.   You would know whether you ever moved | 10  shut? |
| 11  the stove.  Did you ever drop something back there | 11    A.   I would assume so.  I don't -- |
| 12  that you can remember and -- | 12    Q.   Fair enough. |
| 13    A.   No, not that I can remember. | 13    A.   I don't know. |
| 14    Q.   Okay.  So as far as you know the stove | 14    Q.   Okay.  You say you don't remember |
| 15  never was moved. | 15  anything about the date of the incident. |
| 16    A.   As far as I know. | 16    A.   No. |
| 17    Q.   And you don't have any memory of | 17    Q.   You don't know what your husband did? |
| 18  smelling any gas around the stove at any time prior | 18    A.   No. |
| 19  to the incident. | 19    Q.   You don't know where he went. |
| 20    A.   Occasionally I remember when you would | 20    A.   No. |
| 21  turn it on there would be an odor. | 21    Q.   You don't know whether he went to the |
| 22    Q.   Okay. | 22  community center or not. |
| 23    A.   But as I said before, I can't tell you | 23    A.   No. |
| 24  what that odor smelled like. | 24    Q.   You don't know what he had been doing |
| 25    Q.   And so -- but other than when you | 25  during the course of the day. |

| | |
|---|---|
| 1  turned it on and it ignited, you don't have any other | 1    A.   No. |
| 2  memory of smelling gas -- | 2    Q.   You don't know what kind of clothes he |
| 3    A.   No. | 3  was wearing. |
| 4    Q.   -- around the stove.  Either on the | 4    A.   No. |
| 5  date of the incident or anytime immediately before | 5    Q.   If he was wearing his pajamas and was |
| 6  the incident. | 6  walking around barefooted outside, you wouldn't know, |
| 7    A.   No. | 7  would you? |
| 8    Q.   And you don't have any memory of | 8    A.   No. |
| 9  smelling any gas around the furnace or around the hot | 9    Q.   You don't know who came over during the |
| 10  water heater. | 10  course of the day. |
| 11    A.   No.  No memory. | 11    A.   No. |
| 12    Q.   If you had smelled something funny, | 12    Q.   You don't know whether anybody came |
| 13  would you have alerted your husband? | 13  over to pick up a go-cart, do you? |
| 14    A.   Yes. | 14    A.   No. |
| 15    Q.   So you consider yourself to be a | 15    Q.   You don't know -- do you know where |
| 16  reasonably safe person? | 16  Talon was? |
| 17    A.   I would have either told him or called | 17    A.   I do now. |
| 18  Lincoln. | 18    Q.   Did you know -- do you have any memory |
| 19    Q.   Okay.  So if you smelled -- if you | 19  at the time of -- |
| 20  smelled what you thought was gas, some smell that | 20    A.   No. |
| 21  you're not used to, you would have advised somebody | 21    Q.   -- where he was?  Where do you |
| 22  immediately. | 22  understand he was? |
| 23    A.   Yes. | 23    A.   With Ricky.  Rick and Mary Ann. |
| 24    Q.   Because you knew something would have | 24    Q.   Was he going to spend the night? |
| 25  been wrong. | 25    A.   It's a weekend so I would assume yes |

1  because they were always together.
2          Q.   Okay.
3          A.   But I don't know that specific night
4  if that's what...
5          Q.   The following day was your son's
6  birthday, right?
7          A.   No.  His birthday's February 13th.
8          Q.   February 13th.
9          A.   Uh-huh.
10         Q.   Not February 4th.
11         A.   No.
12         Q.   Okay.  Were you going to have a party
13 at the house?
14         A.   Yes.
15         Q.   Do you remember what you ate on the
16 date of the incident?
17         A.   No.
18         Q.   Do you remember whether you cooked any
19 food on the date of the incident?
20         A.   If I what?
21         Q.   Cooked any food.
22         A.   No, I don't.
23         Q.   One way or the other.
24         A.   Not at all.
25         Q.   You don't know whether you used the
                                            57

1  stove or not.
2          A.   Not at all.
3          Q.   You don't know whether you went out and
4  smoked a cigarette in the garage.
5          A.   No.
6          Q.   And, if you did, what time.
7          A.   No.
8          Q.   Do you know where your husband was at
9  the time of the explosion?
10         A.   No.
11         Q.   Do you know whether your husband went
12 outside one way or the other into the garage to smoke
13 a cigarette?
14         A.   No.
15         Q.   Do you know whether your husband cooked
16 any food for you?
17         A.   No.
18         Q.   Do you know whether your husband went
19 to the community center?
20         A.   No.
21         Q.   And just so the record's clear, to your
22 knowledge, at least as of the date of the incident,
23 you had no problems with the stove.
24         A.   As far as I know.
25         Q.   And at least to your knowledge prior to
                                            58

1  the incident you had no problems with the furnace or
2  the hot water heater.
3          A.   Not to my knowledge, no, I don't.
4          Q.   When you turned the stove on it worked.
5          A.   To the best of my knowledge, yes.
6          Q.   You had incense in the house.
7          A.   Yes.
8          Q.   What did you use the incense for?  Was
9  that typically your deal, you liked it?
10         A.   Yes.
11         Q.   Okay.  What were you using the incense
12 for typically?
13         A.   The scent.
14         Q.   You liked the smell.
15         A.   Yes.
16         Q.   So there was nothing that obstructed
17 your ability to smell things on the time of the
18 incident.
19         A.   I don't know about the time of the
20 incident, but I enjoy the smell of candles, or used
21 to, of candles and incense.
22         Q.   Fair enough.  So you enjoyed the smell
23 of candles.  You had perfumed candles?
24         A.   Yes.
25         Q.   And you enjoyed the smell of incense.
                                            59

1          A.   Yes.
2          Q.   So there was nothing in a physical
3  sense that prevented you from appreciating those
4  smells.
5          A.   Not to my knowledge.
6          Q.   In the garage were there any types of
7  flammable liquids that you all kept in the garage?
8          A.   I don't know.
9          Q.   Gas, gasoline?  Butane cylinders?
10 Propane cylinders?
11         A.   For some reason I want to say the gas
12 can was with the lawn mower.
13         Q.   Okay.  How about -- you had an outdoor
14 barbecue.  Where did you keep the propane cylinder
15 for that?
16         A.   The barbecue blew away when the fence
17 blew away.
18         Q.   Okay.  The barbecue grill was gone
19 along with the propane?
20         A.   It was -- Lincoln had to come and help
21 me unhook the propane tank because I didn't know how.
22         Q.   You kept the propane tank but the
23 barbecue grill was gone.
24         A.   I don't recall if the propane tank was
25 still there or not.  I wasn't the one that took the
                                            60

1 stuff to the dump. For some reason I'm thinking my
2 dad came up and they used his truck to go to the
3 dump.
4        Q.   Other than them coming out here to
5 disconnect the propane tank on the barbecue grill --
6 that's what you remember, right?
7        A.   Uh-huh.
8        Q.   You have to say yes or no.
9        A.   Yes. I'm sorry.
10       Q.   Do you recall them ever coming out for
11 any other maintenance -- significant maintenance
12 issue?
13       A.   Changing filters and batteries in the
14 smoke detector.
15       Q.   Okay. And was that at your request or
16 did they just do that on a routine basis?
17       A.   Routine.
18       Q.   So they would come out and check the
19 smoke detectors to make sure they were working.
20       A.   I think the smoke detector, I called
21 them because every time you opened the shower -- the
22 bathroom door, the shower steam was setting off the
23 fire alarm.
24       Q.   So you had an alarm, and so the steam
25 from the shower would trigger the alarm?

                                                    61

1        A.   That's what I had thought it was, but
2 it turned out it needed new batteries I think.
3        Q.   Okay. And you called them and they
4 came out and fixed it. And they also did routine
5 inspections from time to time on your house too,
6 didn't they?
7        A.   Yes.
8        MR. ASAFI:   Objection.
9        Q.   (Mr. McEntire continuing) To make sure
10 everything looked -- operated safely?
11       A.   As far as I remember.
12       Q.   Okay.
13       MR. ASAFI:   Objection to form.
14       Q.   (Mr. McEntire continuing) So you have
15 no memory at all of where Thor was at the time of the
16 incident or any rooms he may have been in during the
17 course of the day.
18       A.   No, I do not.
19       Q.   Have you tried to reach out to Greg
20 Hardin at all since the incident?
21       A.   No.
22       Q.   Has, to your knowledge, Greg Hardin
23 ever tried to reach out to you since the incident?
24       A.   Not to my knowledge.
25       Q.   Have you had any communication with the

                                                    62

1 Hardin family at all?
2        A.   No.
3        MR. PAULOS:   If you need to take a
4 break, just let us know, okay?
5        Q.   (Mr. McEntire continuing) In some
6 medical records that were produced just the --
7 actually yesterday, there was a meeting that you
8 had --
9        MR. McENTIRE:   And I'll be glad to give
10 this to you. And I'm not going into the details of
11 the medical records. I just want to ask her a
12 question about one or two.
13       Q.   (Mr. McEntire continuing) Let me hand
14 this to you. It's Westby document 683. This
15 indicates that on April 11th, 2013 -- I'm looking in
16 the -- if you look at the middle of the page there's
17 kind of a line going across the page. It shows:
18 Progress Notes, April 11, 2013, Evaluation and
19 Management.
20       MR. PAULOS:   I think you handed me a
21 different document.
22       MR. McENTIRE:   Is that 683?
23       MR. PAULOS:   This has no Bates stamp on
24 it whatsoever.
25       MR. McENTIRE:   Let me see. I know what

                                                    63

1 that is. My fault. Okay. I'll give you that one.
2        MR. PAULOS:   You were looking at the
3 progress notes?
4        MR. McENTIRE:   Yeah, progress notes.
5        Q.   (Mr. McEntire continuing) It indicates
6 there -- if I could see it. I only had two copies.
7 Under the progress notes of April 11, 2013, it says:
8 Plaintiff had no memory of the events surrounding
9 this home explosion. Do you see where I'm reading,
10 the first little paragraph?
11       A.   Okay.
12       Q.   Do you see that now?
13       MR. PAULOS:   She has a difficult time
14 reading small print.
15       MR. McENTIRE:   Fair enough.
16       MR. PAULOS:   So if you could just give
17 her some time --
18       MR. McENTIRE:   Sure.
19       MR. PAULOS:   -- or read it out loud to
20 her, and I'll represent to her whether or not you're
21 reading it correctly.
22       Q.   (Mr. McEntire continuing) All right.
23 In the first paragraph under -- on page 683 under
24 Progress Notes for April 11, 2013, it says: P-t,
25 patient, has no memory of the events surrounding this

                                                    64

1 home explosion.
2          MR. McENTIRE:  Have I read that
3 correctly?
4          MR. PAULOS:  You have read that
5 correctly.
6     Q.  (Mr. McEntire continuing)  Is that
7 consistent with what you've told people in the past?
8     A.  To the best of my knowledge, yes.
9     Q.  Husband and son were involved in the
10 explosion as well.
11          MR. McENTIRE:  Have I read that
12 correctly?
13          MR. PAULOS:  You have.
14     Q.  (Mr. McEntire continuing)  Okay.  Was
15 your son at home when this explosion occurred?
16     A.  No.
17     Q.  Okay.  So was that -- that was a
18 misinterpretation then by the medical care person?
19          MR. PAULOS:  Let me -- you're asking
20 her to interpret somebody else's note on a medical
21 record?
22          MR. McENTIRE:  Well, I'm asking her --
23 this is a discussion presumably that she had.
24     Q.  (Mr. McEntire continuing)  Did you ever
25 tell anybody that your son was involved in --

65

1     A.  My son was -- ran up to the house after
2 the explosion.
3     Q.  After.  Okay.  Fair enough.
4     A.  With the -- my understanding is that
5 Ricky's dad helped pull us out of the house.  And
6 that's who he was staying the night with who was his
7 best friend.
8     Q.  Fair enough.  Okay.  But he was not at
9 the house when the actual event happened.
10     A.  Not to my knowledge.  He's not hurt in
11 any way --
12     Q.  Okay.
13     A.  -- physically.
14     Q.  All right.
15     A.  Can we take a break so I can use the
16 restroom?
17     Q.  Yeah, let me just ask two more
18 questions and we'll take a break.  Did you leave the
19 house at all on the date of the incident?
20     A.  I don't know.
21          MR. McENTIRE:  Okay.  Why don't we take
22 a break.  I only have a few more minutes of
23 questions.
24          THE VIDEOGRAPHER:  We are now going
25 off the record.

66

1          (Recess from 12:46 to 12:52)
2          THE VIDEOGRAPHER:  We are now back on
3 the record.
4     Q.  (Mr. McEntire continuing)  Okay.
5 Ms. Westby, I'm going to ask maybe ten more minutes'
6 worth of questions, and then I'm going to pass the
7 witness to let the other -- Mr. Asafi ask you some
8 questions, okay?
9          Who would you say was your best friend
10 out at the Coleville housing complex at the time of
11 the incident?
12     A.  In the housing complex?
13     Q.  Yes, ma'am.
14     A.  I spoke to Lori more than anybody else.
15     Q.  Lori Hardin?
16     A.  My best friend would have been my
17 husband --
18     Q.  Okay.  All right.
19     A.  -- and Mary Ann.
20     Q.  Who's Mary Ann?
21     A.  Ricky's mom.
22     Q.  Okay.  And what was her last name?
23     A.  It started with a V.
24     Q.  Okay.  How often did you see her?
25     A.  Anytime I picked up the boys from

67

1 school or the boys -- she picked them up.
2     Q.  Did you ever socialize with the Hardins
3 in the Hardins' home?
4     A.  No.
5     Q.  And you really never socialized with
6 the Hardins in your home either, did you?
7     A.  No.
8     Q.  So your best friend really would have
9 been Mary Ann?
10     A.  Probably, yes.
11     Q.  You would see Lori from time to time.
12 She lived right next door to you.
13     A.  Yes.
14     Q.  But your confidante or whoever you had
15 been close to would have been Mary Ann.
16     A.  Yes.
17          MR. PAULOS:  Object to form.
18     Q.  (Mr. McEntire continuing)  Okay.
19 How about the chaplain's wife, do you remember her
20 name, the one --
21     A.  No.
22     Q.  -- that you did the summer Bible group
23 with?
24     A.  Oh.  Not the current chaplain, the
25 prior?

68

Q. Yes, ma'am.

A. Jen.

Q. Jen?

A. Uh-huh.

Q. Like Jennifer?

A. Uh-huh, I suppose. I don't know.

Q. What was her last name?

A. I don't recall.

Q. And have you kept up with her?

A. I believe -- I know we were trading Christmas cards for a while, but I have not spoken to her.

Q. Do you remember her last name?

A. No.

Q. Do you know where she lives today?

A. No.

Q. But she was the wife of the chaplain before the Taylors.

A. Yes.

Q. Okay. How often would you burn the incense?

A. I couldn't really give you an estimation.

Q. Was it frequently?

A. I would say no because there was

nowhere in Coleville to purchase them.

Q. So you had -- where did you have to go to get your incense?

A. Gardnerville. No. Reno.

Q. Reno?

A. Yeah.

Q. And when was the last time --

A. Trying to think of a mall. I'm having a little difficulty there.

Q. And was it just for the aromatic -- the perfumed smell?

A. Yes.

Q. And how often would you burn your perfumed candles?

A. Anytime I cleaned really because I don't like the smell of cleaning products.

Q. Anytime you would clean you would probably -- was that -- you were a homemaker, correct?

A. Yes.

Q. And so your responsibilities would have been to do the laundry.

A. Yes.

Q. Presumably pick up Talon from school.

A. When I had the vehicle, yes.

Q. When you had the vehicle. Do the laundry. Cooking.

A. Yes.

Q. Cleaning the house.

A. Yes.

Q. Would that be fair?

A. Yeah. Sounds quite dull, but yes.

Q. No, it doesn't. But I'm just trying to understand what your responsibilities would have been, how you and your husband divided responsibilities.

A. He brought in the money, and I was there so we didn't have to worry about the kids.

Q. Okay. Fair enough. Did you do most of the cooking?

A. Yes.

Q. Okay. So in terms of -- tell me typically what you all would do. Would you cook meals for them, for your son and your husband?

A. Yes.

Q. And then he indicated from time to time you'd have leftovers and keep it out in the freezer.

A. Typically if I'm making a soup or a pasta sauce I will make an abundance amount so that we have them in the freezer.

Q. Did you enjoy cooking?

A. Yes.

Q. Okay. Was that one of your things that you liked to do?

A. Yes.

Q. And so you would be frequently cooking?

A. Yes. And baking.

MR. ASAFI: Objection. Form.

Q. (Mr. McEntire continuing) Would you cook either every day or at least every other day depending upon what kind of leftovers you would have?

A. That would be determined by whether or not Thor was home or at work.

Q. It was what?

A. Whether Thor was home or at work.

Q. Okay. And so if he was at home you'd be cooking.

A. Yes.

Q. All right. And you'd try to have hot meals for your son, Talon, as well?

A. Yes.

Q. Okay. And did you typically have a sit-down dinner?

A. Yeah, once or twice a week.

Q. What did you all typically do for

1 breakfast?

2      A.   Talon liked to eat at school.

3      Q.   Okay. And what did you do typically

4 for lunch?

5      A.   Me, nothing. Talon ate at school or

6 I sent his lunch with him.

7      Q.   And what about Thor?

8      A.   Thor would be at work.

9      Q.   And so really the big family meal would

10 be dinner.

11      A.   Yes.

12      Q.   And you would typically cook that meal

13 or if you had an abundant supply you'd use leftovers.

14      A.   Uh-huh. Yes.

15      Q.   But you were frequently in the kitchen

16 cooking hot meals.

17      A.   Yes.

18      MR. PAULOS: Object to form.

19      Q.   (Mr. McEntire continuing) Is that fair?

20      A.   Yes.

21      Q.   You were no stranger to the stove and

22 the --

23      A.   No.

24      MR. PAULOS: Object to form.

25      MR. ASAFI: Objection.

1      Q.   (Mr. McEntire continuing) Where do your

2 parents live?

3      A.   Ridgecrest, California.

4      Q.   Are they still both alive?

5      A.   I'm sorry?

6      Q.   Are they still both alive?

7      A.   Yes.

8      Q.   And what are their names?

9      A.   Jacqueline Jones and Kirk Jones.

10      Q.   Okay. And they live, I'm sorry, where?

11      A.   Ridgecrest, California.

12      Q.   Okay. Tell me what your typical day

13 would be during -- be like during the week.

14      A.   Get up, get Talon off to school or

15 sleep in and Thor would get Talon off to school.

16 Pick Talon up from school. Make something to eat,

17 clean up the house, do the laundry. Whatever needed

18 to be done.

19      Q.   Okay. And Talon, I believe, was

20 like -- how old was he at the time of the incident?

21 Ten years old?

22      A.   I think so. I'd have to count back.

23      Q.   So was he running through dirty clothes

24 pretty quickly?

25      A.   No.

1      Q.   How often did you do the laundry?

2      A.   Probably every other day.

3      Q.   Okay. So once every two days or so?

4      A.   Yeah.

5      Q.   Is that fair?

6      A.   Yes.

7      Q.   Okay. And so you'd be using the

8 utility room fairly frequently.

9      A.   Yes.

10      Q.   And the washer and the dryer in there.

11      A.   Yes.

12      Q.   So you would have -- you would go back

13 and forth through the utility room probably several

14 times during the course of the day.

15      A.   Between the main house and the utility,

16 yes.

17      Q.   Through the utility room into the

18 garage --

19      A.   Yes.

20      Q.   -- or to the utility room to do

21 washing.

22      A.   Yes.

23      Q.   And so if it was a typical day, an

24 ordinary day, you would have probably done washing

25 either the day of the incident or the day before the

1 incident or sometime in that proximity?

2      A.   I'm not sure how to answer that because

3 I don't remember that week, so...

4      Q.   I'm asking -- what I'm trying to do is

5 take a routine practice and try to reconstruct.

6      A.   It is possible.

7      Q.   Okay.

8      A.   To the best of my knowledge I could

9 have been doing laundry.

10      Q.   Consistent with your practice.

11      A.   Yes.

12      Q.   Okay. And when you did laundry, were

13 you doing several loads or would it just be typically

14 one load?

15      A.   One or two.

16      Q.   One or two loads a day or whenever you

17 did it.

18      A.   Yes.

19      Q.   What other reasons would you have to go

20 into the utility room other than passing through or

21 doing washing? Did you keep any of your supplies in

22 there?

23      A.   My cleaning supplies are above the

24 washer and dryer I think.

25      Q.   That stuff for cleaning tables and the

1 floor and --
2    A.  Yes.  Pledge.
3    Q.  Probably the broom and the mop were in
4 there too?
5    A.  Yes.
6    Q.  Okay.  So other than what you've
7 described, which is substantial, and picking up Talon
8 from school and going to his sporting events, was
9 there anything else taking you out of the house on a
10 typical day?
11    A.  Sports practices.
12    Q.  Sport practices.  Was Talon playing any
13 sports at this time of the year?
14    A.  I honestly don't remember.  He played
15 basketball so it would depend on when the basketball
16 season fell.
17    Q.  Okay.  I think I asked this before.
18 Were you receiving any type of psychiatric or
19 psychological or counseling assistance before the
20 incident?
21        MR. PAULOS:  Object to form.
22        You can answer the question.
23    A.  Ten years before.
24    Q.  (Mr. McEntire continuing)  Ten years
25 before.  That was in connection with the divorce or

77

1 separation from your husband.
2    A.  In connection to have to be back --
3 being back into where he was.
4    Q.  Moving back to San Diego.
5    A.  Moving to San Diego.  My husband got
6 stationed in the same area as him and I...
7    Q.  Okay.  And when is the last time you
8 saw a doctor before you came here today?
9    A.  It's July, right?
10    Q.  This is July.
11    A.  June.  The first or second week in
12 June.
13    Q.  First or second week in June?  Okay.
14 Was that like an ob/gyn or --
15    A.  Primary care physician.
16    Q.  Primary?  And what's his name?
17    A.  I don't know off the top of my head.
18        MR. PAULOS:  I'm going to object.
19 I thought this deposition was --
20        MR. McENTIRE:  It is.
21        MR. PAULOS:  -- reserved for
22 liability --
23        MR. McENTIRE:  It is.
24        MR. PAULOS:  -- so her visitation of
25 doctors and stuff two weeks ago or a month I think is

78

1 outside the scope of the deposition.
2    Q.  (Mr. McEntire continuing)  When was
3 the -- do you recall the last time you saw a doctor
4 before the actual incident itself?
5    A.  No.
6    Q.  Okay.  Do you know where that would
7 have -- did you have a physician in the Coleville
8 area?
9    A.  I'm going to need a minute.  I don't
10 think I seen any physician while I lived in
11 Coleville.
12    Q.  Okay.  For the three years that you
13 lived there you didn't see a doctor?
14    A.  I don't believe so.
15    Q.  Let me hand you what has been
16 previously marked as Exhibit No. 6, which is a
17 photograph of a valve behind the washer/dryer
18 I believe is my understanding.  Can you think of any
19 reason why the valve would be open, assuming it's in
20 an open condition in this photograph?
21        MR. PAULOS:  Object to form.
22        MR. ASAFI:  Objection.  Form.
23    A.  I have no idea.
24    Q.  (Mr. McEntire continuing)  Okay.  Are
25 you aware that following the incident various

79

1 investigators found the stove in your house -- one of
2 the stove burners was in the on position?
3    A.  No.
4        MR. PAULOS:  Object to form.
5    Q.  (Mr. McEntire continuing)  Were you
6 aware of that?
7    A.  No.
8    Q.  No one's mentioned that to you before
9 you came here today.
10        MR. ASAFI:  Objection.  Form.
11    Q.  (Mr. McEntire continuing)  Assuming that
12 to be the case, can you explain to us how the stove
13 burner, the front left burner, would have been found
14 in the on position?
15    A.  No.
16        MR. PAULOS:  Object to form.
17    Q.  (Mr. McEntire continuing)  You have no
18 explanation at all one way or the other.
19    A.  No.
20    Q.  You may have turned it on but you don't
21 recall.
22        MR. ASAFI:  Objection.  Form.
23        MR. PAULOS:  Object to form.
24    A.  I don't know.
25    Q.  (Mr. McEntire continuing)  You don't

80

1 recall anything.

2          A.   No.  I don't recall the day.

3          MR. McENTIRE:  All right.  I'll reserve

4 the rest of my questions subject to what questions

5 Mr. Asafi may ask.

6               EXAMINATION

7 BY MR. ASAFI:

8          Q.   Ms. Westby, I introduced myself to you

9 earlier.

10         A.   Yes.

11         Q.   I know this must be hard.  I want to

12 thank you for being here today.  Some of my

13 questions -- I'm not here to fuss at you.  I'm just

14 here to just get some facts.  You understand that.

15         A.   Yes, sir.

16         Q.   And I'm probably going to ask some of

17 the same questions that he's already asked, but, you

18 know, I'm going to apologize up front.  I might even

19 ask you the question three or four different times,

20 so I apologize up front.  Do you understand that?

21         A.   Yes.

22         Q.   Okay.  Did you smell propane in your

23 unit?  And when I say your unit, that's the 702-A

24 Champagne in the Coleville housing complex.

25         MR. McENTIRE:  Objection.  Form,

1 leading.

2          A.   When?

3          Q.   (Mr. Asafi continuing)  At any time.

4          A.   I don't know what propane smells

5 like, so...

6          Q.   Okay.  And you had said earlier when

7 you turned the stove on you had smelled that gas

8 smell.

9          A.   Yes.

10         Q.   Okay.  And that's really what I'm

11 looking for when I say smelling the propane, that gas

12 smell that you're familiar with.

13         A.   Okay.

14         Q.   Okay.  And so did you smell propane in

15 your unit at any time?

16         A.   In previous times when I've turned the

17 oven on to start the stove -- not the stove, the

18 oven, there would be an odor initially.

19         Q.   Okay.  And that's the time when you

20 would turn the stove on or turn the oven on.

21         A.   Just turn the oven on.

22         Q.   Turned the oven on.  And you would

23 smell that gas smell, correct?

24         A.   Uh-huh.

25         Q.   Yes?

1          A.   Yes.

2          Q.   Okay.

3          A.   Sorry.

4          Q.   And when I talk about unit, I'm just

5 going to say unit.  I'm referencing 702 Champagne in

6 the Coleville housing complex.  Will you agree to

7 that?

8          A.   Yes.

9          Q.   Okay.  Did you ever smell propane --

10 I'm sorry.  Did you smell propane at the time of the

11 accident on February the 3rd, 2012?

12         MR. McENTIRE:  Objection.  Leading.

13         A.   I have no recollection of smelling

14 anything.

15         Q.   (Mr. Asafi continuing)  And as I stated

16 before, some of the same questions, I'm going to be

17 boring, so whatever your answer is is your answer.

18 Did you ever have any problems with propane leaks in

19 your unit at any time?

20         A.   Not to my knowledge.

21         Q.   Again, what about on the day of the

22 incident?

23         A.   I don't remember that day.

24         Q.   Okay.  And we understand the day of the

25 incident to be February the 3rd, 2012.

1          A.   That's what I'm told.

2          Q.   Okay.  You have no memory whatsoever.

3          A.   No.

4          Q.   Okay.  Did you ever report a propane

5 gas leak in your unit?

6          A.   Not to my knowledge.

7          Q.   Okay.  Did you have any warnings from

8 anybody at any time on what to do or what not to do

9 when there is a propane leak?

10         A.   I --

11         MR. McENTIRE:  Objection.  Form,

12 leading.

13         A.   -- didn't know we had propane.  I just

14 thought gas was gas, --

15         Q.   Okay.

16         A.   -- just like you pay PG&E in

17 California.

18         Q.   (Mr. Asafi continuing)  Okay.  So no one

19 ever told you about any kinds of warnings on what to

20 look for --

21         MR. McENTIRE:  Objection.  Form,

22 leading.

23         Q.   -- at any time.

24         A.   No, not to my knowledge.

25         Q.   (Mr. Asafi continuing)  Okay.  Did you

1  have any warnings from anybody at any time on what to
2  smell for when there is a propane leak?
3      A.   Not to my knowledge.
4           MR. McENTIRE:  Objection.  Form,
5  leading.
6           You got to let me make my objections.
7           THE WITNESS:  I'm sorry.
8           MR. McENTIRE:  That's okay.
9           THE WITNESS:  I was doing the same
10 thing on the other way.
11          MR. McENTIRE:  This is all new to
12 you --
13          THE WITNESS:  Yes.
14          MR. McENTIRE:  -- so we understand.
15     Q.   (Mr. Asafi continuing)  Were there any
16 warning devices on how to detect propane leaks?
17          MR. McENTIRE:  Objection.  Form,
18 leading.
19     A.   Not to my knowledge.
20     Q.   (Mr. Asafi continuing)  Okay.  Were
21 there any propane detection devices anywhere in your
22 unit?
23          MR. McENTIRE:  Objection.  Form,
24 leading.
25     A.   Not to my knowledge.

1           MR. McENTIRE:  Objection.  Form,
2  leading.
3      A.   Not to my knowledge.
4      Q.   (Mr. Asafi continuing)  Okay.  And when
5  I say that I'm talking about did anybody go over an
6  evacuation plan in the event that you do smell
7  propane in your unit?
8      A.   No.
9           MR. McENTIRE:  Objection.  Form,
10 leading.
11     Q.   (Mr. Asafi continuing)  Okay.  Did
12 anybody at any time go and do a step-by-step process
13 in how to evacuate, when to evacuate whenever there's
14 a propane smell in your unit?
15          MR. McENTIRE:  Objection.  Form,
16 leading.
17     A.   No, not to my knowledge.
18     Q.   (Mr. Asafi continuing)  Okay.  The use
19 of the stove on the day of the incident, you don't
20 recall if you turned on the knob.  Is that correct?
21     A.   No, I do not.
22     Q.   Okay.  And do you remember, when was
23 the last time you did use the stove?
24     A.   No, I do not.
25     Q.   Okay.  We know February the 3rd was the

1      Q.   (Mr. Asafi continuing)  Do you know if
2  you had a fire detector in your unit?
3      A.   A fire detector?
4      Q.   A smoke detector.
5      A.   Yes, a smoke detector.
6      Q.   Okay.  How about a carbon monoxide
7  detector?
8      A.   I believe so.
9      Q.   Okay.
10     A.   They're usually standard with Lincoln.
11 I can't place it in my head.
12     Q.   Sure.  Do you know if there was a
13 propane detector?
14     A.   Not to my knowledge.
15     Q.   Okay.  Have you seen a propane
16 detector?
17     A.   No, not to my knowledge.
18     Q.   Were there any warning systems for
19 propane leaks?
20     A.   Not to my knowledge.
21          MR. McENTIRE:  Objection.  Form,
22 leading.
23     Q.   (Mr. Asafi continuing)  Did anybody at
24 any time instruct you on what to do in the event you
25 smelled propane in your unit?

1  day of the incident.  Let's go to February the 2nd.
2  Do you know if you cooked on that day or used the
3  stove on that day?
4      A.   No.
5      Q.   No, you did not?
6      A.   I don't remember.
7      Q.   You don't remember.  Now your husband
8  had testified earlier that he uses -- or the
9  household used a microwave like 60 percent of the
10 time, maybe the stove about 40 percent of the time.
11 Does that sound about right to you?
12     A.   A crockpot would be in there too.
13     Q.   Okay.  So you used a crockpot.
14     A.   Yes.
15     Q.   Okay.  But the cooking is generally --
16 is it mainly on the crockpot?
17          MR. McENTIRE:  Objection.  Form,
18 leading.
19     A.   Main meals were cooked on the stove and
20 then defrosted and cooked in the microwave.
21     Q.   (Mr. Asafi continuing)  And what's the
22 crockpot used for?
23     A.   Roasts, spaghetti sauce, braciole.
24     Q.   What did you use the stove for?
25     A.   Maybe to brown meat, cook eggs --

Q. Okay.

A. -- brown onions.

Q. But you didn't use the stove that much though. Is that correct?

MR. McENTIRE: Objection. Leading.

A. No, I did not.

Q. (Mr. Asafi continuing) Okay.

A. Simmering soup.

Q. I'm sorry?

A. I'm sorry. Simmering soup.

Q. Okay. If you didn't use the stove, what would you eat?

A. Leftovers.

MR. McENTIRE: Objection. Form, leading.

Q. (Mr. Asafi continuing) You would heat those up in the microwave, correct?

A. Yes.

Q. What about sandwiches?

A. Yes.

Q. Okay. What about TV dinners, microwave dinners, anything like that?

A. Maybe once every couple of months we might get a TV dinner, but typically we would cook it in the microwave.

Q. You're not the kind of housewife that -- you know, that, say, slaves on the hot stove every day though.

A. No.

Q. Okay. I mean you mainly are cleaning your house and making it nice and smelling nice, but the cooking part, you're not in the stove the majority of the day. Is that correct?

MR. McENTIRE: Objection. Leading.

A. No.

Q. (Mr. Asafi continuing) Okay.

A. No. There's only one meal, typically that's dinner, where everyone would be there.

Q. And you cook that infrequently. Is that correct?

MR. McENTIRE: Objection. Form.

Q. (Mr. Asafi continuing) As far as you make a big meal that one time and then you freeze it or store it and then you --

A. We eat leftover until nobody wants any more and then we freeze it.

Q. All right. Now there's been talk about the stove was in the on position. You're heard some testimony with regard to that from opposing counsel.

A. Yes.

Q. Could you yourself give me some scenarios of maybe how that stove was in the on position?

A. No.

MR. McENTIRE: Objection. Form.

Q. (Mr. Asafi continuing) Okay. How about if I give you some scenarios. Why don't you tell me if you agree or disagree, okay?

A. For that day?

Q. Yeah. Well, I'll just give you some scenarios and you tell me. Sounds good?

A. Okay.

Q. Okay. How about the explosion itself, could that have put the knob in the on position?

MR. McENTIRE: Objection. Form, leading.

A. I don't know.

Q. (Mr. Asafi continuing) Okay. How about people walking by, could they have maybe turned that knob in the on position?

MR. McENTIRE: Objection. Form, leading.

Q. (Mr. Asafi continuing) And it doesn't mean -- I mean --

A. For some reason I'm thinking that it

was too close to the counter to really do anything.

Q. Okay. Were there a lot of people in your unit? I think your husband testified there were about over a hundred people or so.

A. In the entire complex?

Q. Well, no, just maybe in the rescue or search effort.

A. I don't know.

Q. Okay. So any of those scenarios, people could have turned on the stove or anybody could have turned the stove on.

MR. McENTIRE: Objection. Form, leading.

A. Anything is possible.

Q. (Mr. Asafi continuing) Okay. That's a good point. Anything's possible. Okay. Let's talk about that for a minute. People walking by turning the stove on in the on position, is that possible?

MR. McENTIRE: Objection. Form, leading.

A. Anything is possible.

Q. (Mr. Asafi continuing) Well, I'm asking you a direct question. Could that be a possibility?

A. I can't think of any reason that anybody would have --

```
 1       Q.  Okay.
 2       A.  -- because Talon was with his friend.
 3       MR. PAULOS:  I think she's confused
 4  about the timing of your question.
 5       THE WITNESS:  Yes.
 6       MR. PAULOS:  I believe you're asking
 7  her about after the explosion.  I think she's
 8  thinking in general during -- at any time prior to
 9  the explosion or thereafter.  If the counter's in the
10  way I think --
11       MR. ASAFI:  Okay.
12       MR. PAULOS -- it's -- I think she's --
13       THE WITNESS:  I guess I'm confused.
14  I'm sorry.
15       MR. PAULOS:  She's confused about your
16  questions.
17       Q.  (Mr. Asafi continuing)  Good point.
18  Good point.  And I apologize.  Let's talk about --
19  let's just talk about the stove in general, okay?
20       A.  Okay.
21       Q.  We know that the stove has some knobs,
22  right?
23       A.  Correct.
24       Q.  Okay.  We know there was an explosion,
25  right?
                                             93
            NORMAN E. MARK - COURT REPORTER SERVICE
     300 NP AVENUE - SUITE 201, FARGO, ND 58107 (701) 235-7571
```

```
 1  leading.
 2       Q.  (Mr. Asafi continuing)  And that one of
 3  those movements could have been moving the stove
 4  knob.  Would you agree?
 5       MR. McENTIRE:  Objection.  Form,
 6  leading.
 7       A.  Anything is possible.
 8       Q.  (Mr. Asafi continuing)  Okay.  And the
 9  reason I'm saying that is that you don't recall you
10  turning the stove on yourself.
11       A.  No.
12       Q.  And the reports show that the knob was
13  in the on position.
14       A.  Okay.
15       Q.  And the explanations are endless.  You
16  agree?
17       A.  Yes.
18       MR. McENTIRE:  Objection.  Leading.
19       Q.  (Mr. Asafi continuing)  So you're not in
20  a position to say anything with regard to why that
21  stove was in the on position.
22       A.  No, I'm not.
23       MR. McENTIRE:  Objection.  Form,
24  leading.
25       Q.  (Mr. Asafi continuing)  Okay.  Prior to
                                             95
            NORMAN E. MARK - COURT REPORTER SERVICE
     300 NP AVENUE - SUITE 201, FARGO, ND 58107 (701) 235-7571
```

```
 1       A.  As I'm told.
 2       Q.  Okay.  That part you don't remember.
 3  Would you know -- do you know if there were a number
 4  of people that were coming -- oh, you don't even
 5  remember that.
 6       A.  I remember hearing my husband's name
 7  being called.
 8       Q.  Okay.  By who?
 9       A.  I don't know.  I couldn't even begin to
10  guess.
11       Q.  Okay.
12       A.  I didn't know where I was, so...
13       Q.  I understand.  And during the rescue
14  and recovery people, - again, you might not remember
15  this or you might - they might have been coming in
16  there moving things around.  Would you agree?
17       MR. McENTIRE:  Objection.  Form,
18  leading.
19       A.  I would agree that they would have had
20  to find us if we were under a house.
21       Q.  (Mr. Asafi continuing)  Okay.  And in
22  all of that crisis mode people were moving things
23  around.  You would agree?
24       A.  Yes.
25       MR. McENTIRE:  Objection.  Form,
                                             94
            NORMAN E. MARK - COURT REPORTER SERVICE
     300 NP AVENUE - SUITE 201, FARGO, ND 58107 (701) 235-7571
```

```
 1  this incident did you do anything to maybe move
 2  anything around with regard to the furnace?  Did you
 3  move anything with regard to the furnace?
 4       A.  Not to my knowledge.  I wouldn't have
 5  touched it.  I don't touch air conditioners either.
 6       Q.  Okay.  Stove as well?  Did you do any
 7  moving around of the stove?
 8       A.  No.
 9       Q.  Okay.  Water heater, did you tamper
10  with that?
11       A.  No.
12       Q.  Okay.  Did you tamper with any of the
13  propane tanks out in the field?
14       A.  I don't know where they -- oh, no,
15  I do know where they are, but, no, I didn't until
16  after the accident.  Sorry.
17       Q.  Did you do anything as far as turn on
18  anything that might have ignited anything in the
19  house?  Did you do anything wrong?
20       MR. McENTIRE:  Objection.  Form,
21  leading.
22       A.  Not to my knowledge.  I wouldn't even
23  know where to begin in that scenario.
24       Q.  (Mr. Asafi continuing)  Okay.  You had
25  mentioned earlier that there was a smoke detector
                                             96
            NORMAN E. MARK - COURT REPORTER SERVICE
     300 NP AVENUE - SUITE 201, FARGO, ND 58107 (701) 235-7571
```

1 that was shared by two units?
2    A.   I don't think it was a detector.
3 I think it was like a big bell alarm --
4    Q.   Okay.
5    A.   -- in between the garages out front.
6    Q.   Okay.
7    A.   I just remember a loud ringing.
8    Q.   Right.  In the garage you shared with
9 the Hardins.  Is that correct?
10    A.   They had their side and we had ours
11 with a wall in between.
12    Q.   Okay.  The wall -- okay.  The wall
13 connects the two garages.
14    A.   Yes.
15    Q.   Okay.  But you don't know what that
16 bell was for.
17    A.   The only time I ever heard it go off
18 was when the red truck was there.
19    Q.   The red truck?
20    A.   The people who were working in the
21 attic.
22         MR. ASAFI:  Okay.  Thank you for your
23 time, Ms. Westby.  I'm going to pass the witness.
24         THE WITNESS:  Thank you.
25
                                                    97

1         EXAMINATION
2 BY MR. McENTIRE:
3    Q.   I'm going to have maybe five or ten
4 more minutes of questions and then we're going to be
5 finished, okay?
6    A.   Okay.
7    Q.   Did you graduate from high school?
8    A.   Yes.
9    Q.   Did you do any education after high
10 school?
11    A.   Yes.
12    Q.   Okay.  Did you finish college?
13    A.   No.
14    Q.   What did you study in college?
15    A.   Basics.  Psychology, philosophy.
16    Q.   Where was that?
17    A.   Cerro Coso Community College.  And
18 physically at the college and online while I resided
19 in Tennessee.
20    Q.   Okay.  How old were you when you
21 married Jacqueline's biological father?
22    A.   Twenty.
23    Q.   Twenty years old?  Okay.  How long had
24 you been married to him before you divorced?
25    A.   I want to say two -- I'm trying to
                                                    98

1 think of how old my daughter was.  That's...
2    Q.   Your daughter would be 20 now.
3    A.   Do the math.  I want to say maybe two
4 to three years at the most.
5    Q.   Do you know where your former husband's
6 living today?
7    A.   I believe San Diego, California.
8    Q.   Is he under any type of a restraining
9 order?
10    A.   Our divorce decree dictates that he
11 stay away from me.
12    Q.   Was there some type of an issue there
13 that required that restraining order?
14    A.   Yes.
15    Q.   Was there some type of threats or
16 physical abuse?
17    A.   Yes, in a sense.
18    Q.   What do you mean by in a sense?
19    A.   More mental than physical.
20         MR. PAULOS:  Yeah, again, I'm going to
21 just object to the line of questioning in general.
22 It's really not liability related, which is what the
23 deposition is designed to address, as well as it
24 doesn't seem to be rebutting anything that
25 Mr. Asafi --
                                                    99

1         MR. McENTIRE:  This is -- in the state
2 of Texas we don't have to rebut.
3         MR. PAULOS:  It still --
4         MR. McENTIRE:  It's a wide open depo.
5 I understand.
6    Q.   (Mr. McEntire continuing)  Did the
7 Hardins smoke?
8    A.   I don't recall ever seeing them smoke.
9    Q.   Your husband smoked.
10    A.   Yes.
11    Q.   Did the Hardins ever complain about
12 your cigarette smoking?
13    A.   Not to my knowledge.
14    Q.   Ricky Valenzuela -- that was the
15 name of the -- the last name of your good friend Mary
16 Beth, right?
17    A.   Mary Ann.
18    Q.   Mary Ann.  Valenzuela?  Does that ring
19 a bell now?
20    A.   It sounds familiar.
21    Q.   How often was your son, Talon, at Ricky
22 Valenzuela's home?
23    A.   The only way I can answer that is to
24 say if they weren't down there they were up at our
25 house.
                                                    100

```
 1      Q.  Okay.
 2      A.  Unless it was vacation time and none of
 3  us were there.
 4      Q.  Okay.  Have you ever been diagnosed
 5  with amnesia in connection with this incident?
 6      A.  Not to my knowledge.
 7          MR. McENTIRE:  That's a legitimate
 8  question.
 9          MR. PAULOS:  I'm going to object to it.
10          MR. McENTIRE:  Yeah.
11      Q.  (Mr. McEntire continuing)  So has
12  anybody -- has any doctor told you why or explained
13  to you why you can't have any memory of any of the
14  details of the date of the incident?
15          MR. PAULOS:  Object.
16      A.  Yes.
17      Q.  (Mr. McEntire continuing)  And what is
18  your understanding?
19      A.  The trauma, that I could possibly be
20  blocking it.
21      Q.  Okay.  So really when Mr. Asafi's
22  asking you these questions about what people could
23  have done after -- after the incident, you're simply
24  guessing as to what may have happened because you
25  have no memory of anything anyway.
                                              101
```

```
 1          MR. PAULOS:  Object to form.
 2          MR. ASAFI:  Objection.  Form.
 3      A.  Just of hearing the yelling of my
 4  husband's name.
 5      Q.  (Mr. McEntire continuing)  And other
 6  than that, you have no recollection of anybody else
 7  doing anything or present at your house.
 8      A.  Being in the ambulance for a couple
 9  seconds.  That's it.
10      Q.  Being in the ambulance for a couple
11  seconds and hearing someone call your husband's name.
12  That's it.
13      A.  Yes.
14      Q.  And you have no memory at all about
15  hearing any explosion or fire or anything like that.
16      A.  No.
17      Q.  Okay.  And you don't know where you
18  were physically found in the aftermath of the
19  incident, do you?
20      A.  No.
21      Q.  We mentioned -- I mentioned Caroline
22  Parker, and that name -- I was looking at your face.
23  That name didn't seem to register in your eyes.
24      A.  Not to begin with, no.
25      Q.  How about -- do you remember her name
                                              102
```

```
 1  now?
 2      A.  Yes.
 3      Q.  Caroline?  Or Melody?
 4      A.  I think she was blonde.
 5      Q.  Okay.  How about Melody?
 6      A.  I thought it was Melanie.  Melanie
 7  sounds familiar.
 8      Q.  They're kind of at the main office
 9  there?
10      A.  Yes.
11      Q.  Did she ever tell you who she was
12  employed by?
13      A.  I never asked.  I assumed Lincoln.
14      Q.  Well, I'm not asking for assumptions
15  here.  That's the important part.  Did she ever tell
16  you who she was employed by?
17      A.  Not to my knowledge.
18      Q.  Okay.  Fair enough.
19      A.  I don't think it came up.
20      Q.  It didn't come up.  Do you remember the
21  name of the maintenance man?
22      A.  No.
23      Q.  Do you remember even what he looked
24  like?
25      A.  I think he was tall, heavyset, and
                                              103
```

```
 1  drove a green truck.
 2      Q.  Okay.  So in terms of who they got paid
 3  by or who actually employed them, that never really
 4  came up.
 5      A.  No.
 6          MR. McENTIRE:  Okay.  Reserve the rest
 7  of my questions.
 8          MR. ASAFI:  Passing back to me?
 9          MR. McENTIRE:  Uh-huh.
10          MR. ASAFI:  Just got one more thing.
11              EXAMINATION
12  BY MR. ASAFI:
13      Q.  You don't have any evidence that my
14  clients did anything wrong, the Hardins next door?
15      A.  No.
16          MR. McENTIRE:  Objection.  Leading.
17          MR. ASAFI:  Reserve our questions for
18  the time of trial.
19          MR. McENTIRE:  Me too.
20          THE WITNESS:  Thank you.
21          THE VIDEOGRAPHER:  This concludes the
22  deposition.  We are now going off the record.  The
23  time is 1:23 p.m.
24          (Whereupon, the deposition of CELESTE
25  WESTBY concluded at 1:23 p.m.)
                                              104
```

```
1   STATE OF NORTH DAKOTA          Greg Hardin
2   COUNTY OF CASS                 Lincoln Property Co.
3
4              CERTIFICATE OF DEPONENT
5        I hereby certify that I have read and
    examined the aforegoing transcript, and the same is a
6   true and correct record of the testimony given by me,
    with corrections, if any, as noted on the attached
7   sheet or sheets.
8        DATE:
9                CELESTE WESTBY - WITNESS
10             CERTIFICATE OF REPORTER
11       Be it known that I reported the deposition of
    CELESTE WESTBY on July 17, 2014, at Radisson Hotel,
12  201 Fifth Street North, Fargo, North Dakota;
         That I was then and there a Notary Public in and
13  for the County of Cass and State of North Dakota, and
    that by virtue thereof I was duly authorized to
14  administer an oath;
         That the witness before testifying was by me
15  first duly sworn to testify the whole truth and
    nothing but the truth relative to said cause;
16       That the testimony of said witness was recorded
    in Stenograph by myself and transcribed into
17  typewritten testimony given by the witness;
         That I am not related to any of the parties
18  thereto, nor interested in the outcome of this
    action;
19       That the said deposition, having been
    transcribed, was subsequently made available to said
20  deponent by me, Paula D. Weber, for purposes of
    reading and signing;
21       Witness my hand this 28th day of July, 2014.
22
23                            Paula D. Weber
                              Notary Public
24                            Cass County, North Dakota
25  My commission expires June 10, 2016.
                                           105
              NORMAN E. MARK - COURT REPORTER SERVICE
    300 NP AVENUE - SUITE 201, FARGO, ND 58107 (701) 235-7571
```